## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THERAPEUTICSMD, INC.

       Plaintiff,

   v.

MAYNE PHARMA LLC

       Defendant

C.A. No. 25- 00440-UNA

## COMPLAINT

Plaintiff TherapeuticsMD, Inc. ("TXMD" or "Plaintiff") in this action against Defendant,

Mayne Pharma LLC ("Mayne" or "Defendant") (collectively, "the Parties") alleges as follows:

## NATURE OF THE ACTION

1.    TXMD brings this action for breach of contract, breach of the implied covenant of

good faith and fair dealing, fraudulent inducement, and unjust enrichment related to Defendant's

actions in relation to the License Agreement and Transaction Agreement between the Parties.

## PARTIES

2.    TherapeuticsMD, Inc. is organized under the laws of Nevada and located at 951

Yamato Road, Suite 220, Boca Raton, Florida 33431.

3.    Defendant Mayne Pharma LLC is organized under the laws of Delaware with a

registered agent at 1209 Orange Street, Wilmington, Delaware 19801.  Mayne also maintains an

office at 3301 Benson Drive Suite 401, Raleigh NC 27609.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over the claims pursuant to 28 U.S.C. § 1332, as the

Parties are citizens of different states (Nevada and Delaware), and the matter in controversy

exceeds the sum or value of $75,000.

5.      This Court has jurisdiction over Defendant, because Defendant is organized under the laws of Delaware, has consented to the jurisdiction of this court in the relevant License Agreement and Transaction Agreement, has committed acts within and outside Delaware giving rise to this action, and has maintained minimum contacts with this forum such that the exercise of jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice.

6.      Venue is appropriate in this Court, pursuant to 28 U.S.C. § 1391(b).

## FACTS

7.      Plaintiff TherapeuticsMD is a royalty company. It licenses its highly differentiated women's health products in the United States and globally to its exclusive licensing partners.

8.      Prior to the end of 2022, TXMD manufactured, marketed, and distributed several women's health products, including Annovera®, Bijuva®, and Imvexxy®, as well as branded prescription pre-natal vitamins.  These products were sold by TXMD or its subsidiaries, and listed TXMD or subsidiaries as the manufacturer (the "TXMD Products").

9.      Defendant Mayne Pharma LLC manufactures, markets, and/or distributes several pharmaceutical products in the United States.

10.     On or about December 4, 2022, TXMD and Mayne entered into a Transaction Agreement (the "Transaction Agreement") and a License Agreement (the "License Agreement") by which Mayne would, pursuant to a license from TXMD, manufacture, market, and distribute the TXMD Products.  These agreements were scheduled to close on or prior to December 30, 2002.

11.     On or about December 30, 2022, the Parties amended the Transaction Agreement

("Amendment No. 1 to the Transaction Agreement") and the License Agreement ("Amendment No. 1 to the License Agreement").

12.     The License Agreement and Transaction Agreement are valid contracts between the Parties.

13.     Under the License Agreement, Mayne manufactures and sells Mayne-branded women's health products under pharmaceutical labels and product names licensed from TXMD (the "Mayne Licensed Products").

14.     Under the Transaction Agreement, as of the Closing Date, Mayne would purchase the ongoing TXMD commercial pharmaceutical operations primarily in the form of unsold TXMD Products in inventory awaiting sale and distribution, partially finished TXMD Products inventory, TXMD's receivables and several payables, and so forth, the value of which the Parties negotiated in good faith.  TXMD and Mayne agreed that the Net Working Capital acquired by Mayne would be trued-up after the close of the transaction as, among other things, the remaining TXMD inventory previously sold into the commercial channel was distributed, dispensed to patients, or returned.  After the Closing Date, TXMD did not produce any more TXMD Products or sell any further TXMD Products, and Mayne began selling Mayne Licensed Products into the marketplace.

15.     As is alleged herein, the disposition of the TXMD Products that were already sold and in the commercial channel as of the closing date ("TXMD Inventory") was represented prior to closing, based upon estimates from TXMD, in "Estimated Net Working Capital."

16.     The Parties agreed to true-up the Estimated Net Working Capital in three discrete events.  The first true-up event was to occur within 90 days after the closing for all Estimated Net Working Capital categories, except for rebates, distribution fees, and returns, which would

be trued up after one year for rebates and distribution fees, and two years for returns.  Upon finally truing-up the net working capital for the rebates, distribution fees, and returns, the Parties were to arrive at a Final Net Working Capital number to complete the transaction as described in the Transaction Agreement.

17.    Approximately 90-days after closing, Mayne provided its calculations of the "Closing Net Working Capital" for the first true-up.  The Parties settled the Closing Net Working Capital in December 2023.

18.    Mayne subsequently provided statements for the rebates and distribution fees on January 16, 2024, and for returns on February 3, 2025.

**Net Working Capital ("NWC")**

19.    At Closing, Mayne was obligated to pay TXMD "an amount equal to the Purchase Price plus the Estimated Net Working Capital."  (Exhibit A, § 5.1 (Transaction Agreement)).

20.    Under the Transaction Agreement, "'Net Working Capital' means the Current Assets and Current Liabilities adjusted as of immediately prior to the Closing in a manner consistent with the Net Working Capital Annex."  (Exhibit A, § 1.1).

21.    The Pre-Closing Statement and "Net Working Capital Annex," found as Annex 5.3(a) to the Transaction Agreement, is a balance sheet associated with the Current Assets and Current Liabilities transferred to Mayne at Closing.  As shown in the image below, the Net Working Capital Annex includes the following Current Assets:  Net Accounts Receivable; Finished Goods Inventory; WIP; Raw Materials – API; Prepaid contract manufacturing costs; Prepaid PDUFA Fee; and Prepaid Rebates and Coupons.  The Pre-Closing Statement associated with the Net Working Capital Annex also includes the following Current Liabilities: Accounts Payable; Allowance for Coupons; Allowance for Returns; Allowance for Payer Rebates;

Wholesale Distributor Fees; and Accrued Contract Manufacturing Vendor.

*Current Assets:*
Net Accounts Receivable
Finished Goods Inventory
WIP
Raw Materials - API
Prepaid contract manufacturing costs
Prepaid PDUFA Fee
Prepaid Rebates and Coupons
**Total**

*Current Liabilities:*
Accounts Payable
Allowance for Coupons
Allowance for Returns
Allowance for Payer Rebates
Wholesale Distributor Fees
Accrued Contract Manufacturing Vendor
**Total**

**Total Net Working Capital**

22.     Section 5.3 of the Transaction Agreement describes the true-up process of the

"Closing Net Working Capital":

> Within ninety (90) Calendar Days after the Closing Date, Purchaser shall deliver to TXMD a statement setting forth Purchaser's calculation of the Net Working Capital as of the Closing (the "**Closing Net Working Capital**"), prepared consistent with the Net Working Capital Annex and delivered with reasonable supporting detail (the "**Closing Statement**"). Following delivery to TXMD of the Closing Statement and until the Closing Statement is finalized in accordance with this Section 5.3, TXMD shall be permitted, solely for purposes of this Section 5.3 and subject to Section 9.6, to review relevant books and records (including accountant work papers) and access to accountants and employees of TXMD to the extent necessary to complete TXMD's review of the Closing Statement, and the Purchaser shall cooperate with TXMD and its representatives in connection with their review of the Closing Statement, which information shall be deemed confidential information of Purchaser for purposes hereof. The Closing Statement, and the Closing Net Working Capital set forth therein, shall become final and binding on the parties on the date that is thirty (30) Calendar Days following Purchaser's delivery thereof to TXMD, unless TXMD delivers written notice of its disagreement specifying in reasonable detail each disputed

item or amount and the basis for its disagreement therewith (a "**Notice of Disagreement**") to Purchaser on or prior to such date.

(Exhibit A, § 5.3(b)).

23.    Section 5.3 also describes a process by which disputes over the Closing Net Working Capital would be resolved.  (Exhibit A, §§ 5.3(c)-(g)).

**Final Net Working Capital and True-Ups to NWC**

24.    Most Net Working Capital line items were to be trued-up in the first true-up event.  Section 5.3(h) of Amendment No. 1 to the Transaction Agreement identified three Net Working Capital line items to be resolved in the two years following Closing, with the resolution of these line items to result in the "Final Net Working Capital":

> For a period of two years following the Closing Date in the case of Allowance for Returns and one year following the Closing date in the case of Wholesale Distributor Fees and Payer Rebates, Purchaser shall continue to provide updated Closing Statements solely with respect to calculation of the Closing Net Working Capital conduct solely **with respect to the matters included in the items entitled Allowance for Returns, Allowance for Wholesale Distributor Fees and Payer Rebates, in each case, comparing actual invoices against accruals on a quarterly basis** (using Purchaser's fiscal quarters). The amounts set forth in the updated Closing Statements for such fiscal quarter shall become final and binding on the parties on the date that is thirty (30) Calendar Days following Purchaser's delivery thereof to TXMD, unless TXMD delivers written Notice of Disagreement to Purchaser on or prior to such date. The matter may be referred by either party to the Firm in same manner as clause (c) above. In the event that the Firm determines that amounts are due and payable to Purchaser, the amount, plus interest from the date of the Notice of Disagreement with interest calculated at the Interest Rate, shall be applied against the applicable accrual (e.g., Allowance for Returns, on the one hand, and Allowance for Wholesale Distributor Fees and Payer Rebates, on the other), provided, however, that if and when the applicable accrual has been depleted, TXMD shall pay the amount in excess and Purchaser shall be entitled to set off such amount, plus costs or attorneys' fees and other costs of collection pursuant to Section 12.8(a). In the event that the Firm determines that amounts are due and payable to TXMD (i) prior to two years following the Closing Date in the case of Allowance for Returns and one year following the Closing date in the case of Wholesale Distributor Fees and Payer Rebates, such amount in favor of TXMD shall be applied to the

applicable accrual in favor of TXMD and rolled to subsequent periods and (ii) from and after two years following the Closing Date in the case of Allowance for Returns and one year following the Closing date in the case of Wholesale Distributor Fees and Payer Rebates, if such aggregate amount of returns, rebates or distributor fees, as applicable (after taking into account all prior applications to the applicable accruals or allowances), results in the total of such returns, rebates or distributor fees as being less than the applicable allowance or accrual, Purchaser shall pay to TXMD such amount due plus interest from the date of the Notice of Disagreement with interest calculated at the Interest Rate, plus costs or attorneys' fees and other costs of collection. At the end of the two year period following the Closing Date in the case of Allowance for Returns and one year following the Closing Date in the case of Wholesale Distributor Fees and Payer Rebates, if the undisputed aggregate amount of returns, rebates or distributor fees, as applicable (after taking into account all prior applications to the applicable accruals or allowances), results in the total of such returns, rebates or distributor fees as being (x) less than the applicable allowance or accrual, Purchaser shall pay to TXMD such amount due or (y) more than the applicable allowance or accrual, TXMD shall pay to Purchaser such amount due. The term "**Final Net Working Capital**" as used in this Agreement means the Closing Net Working Capital as finally determined pursuant to this Section 5.3, as adjusted pursuant to this Section 5.3(h).

(Exhibit B, § 5.3(h) (emphasis added) (Amendment No. 1 to the Transaction Agreement)).

Therefore, "[f]or a period of . . . one year following the Closing date in the case of Wholesale Distributor Fees and Payer Rebates, [Mayne] shall continue to provide updated Closing Statements solely with respect to calculation of the Closing Net Working Capital . . . , in each case, comparing actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)." (*Id.*)  In the case of Allowance for Returns, Mayne was required to provide updated Closing Statements on a quarterly basis "[f]or a period of two years following the Closing Date[.]" (*Id.*)

*Current Liabilities:*
Accounts Payable
Allowance for Coupons
Allowance for Returns
Allowance for Payer Rebates
Wholesale Distributor Fees
Accrued Contract Manufacturing Vendor
Total

These line items are shown in the above image from the Pre-Closing Statement of the Transaction Agreement.

**<u>Wholesale Distributor Fees</u>**

25.    In the pharmaceutical industry, wholesale distributors purchase pharmaceuticals from manufacturers and charge a wholesale distribution fee.  These fees are incurred by manufacturers when the product is purchased from the manufacturer by the distributors.

26.    As of the Closing Date, TXMD Inventory existed in the commercial supply chain (or commercial channel) in the form of TXMD Products sold to distributors by TXMD prior to the close of the transaction with Mayne, but for which the distribution fees had not yet been paid or invoiced.  As part of the Net Working Capital, Mayne accepted this liability, and TXMD contributed an allowance to pay for the wholesaler distribution fees for the TXMD Products that TXMD sold prior to the transaction closing that Mayne would use to satisfy the distribution fee liability.  Under the Transaction Agreement, Mayne was to provide quarterly statements to TXMD comparing the allowance to the actual amounts paid as part of the true-up process.

27.    Since Mayne would have to pay these Wholesale Distributor Fees, the Wholesale Distributor Fees line item in the Pre-Closing Statement is treated as a liability against the assets transferred to Mayne as of the Closing Date.

**Allowance for Payer Rebates**

28.     The Allowance for Payer Rebates line item in the Pre-Closing Statement was an estimate of anticipated TXMD rebates to payers upon the sale of TXMD Products based on rebate contracts that were negotiated and in-place prior to the closing.

29.     Since Mayne would have to pay the Payer Rebate, the Allowance for Payer Rebates line item in the Pre-Closing Statement is treated as a liability against the assets transferred to Mayne as of the Closing Date.

30.     TXMD estimated the rebate "allowance" based upon its experience selling the TXMD Products for several years.  Importantly, rebates are only paid on pharmaceutical products that are ultimately dispensed to a patient; if a product is returned to the manufacturer, it is not subject to a rebate.  TXMD calculated the estimated rebates after it accounted for a returns factor based on its prior experience selling the TXMD Products.

31.     The Net Working Capital Allowance for Payer Rebates consisted of two subcategories.  First, TXMD estimated an amount of the Payer Rebate Allowance for TXMD Products that had been dispensed to patients prior to the transaction close, but which had not yet been invoiced by the payers.  Second, TXMD estimated an amount of the Payer Rebate Allowance for TXMD Inventory that was in the commercial channel, but which had not yet been dispensed to patients.  TXMD and Mayne would use estimates of the TXMD Inventory in the commercial channel as of the closing date to calculate the rebates owed based on the actual invoices received and paid by Mayne.  At the settlement for the first Net Working Capital true-up, Mayne required TXMD to increase the Allowance for Payer Rebates by approximately $2 million.

**Allowance for Returns**

32.    The Allowance for Returns line item in the Pre-Closing Statement was an estimate of anticipated returns of TXMD Products based upon several factors, including expiration of the pharmaceutical product and oversupply of inventory beyond an acceptable number of days of inventory.

33.    Since Mayne would have to process and pay for returns of TXMD Products sold by TXMD, the Allowance for Returns line item in the Pre-Closing Statement is treated as a liability against the assets transferred to Mayne as of the Closing Date.

34.    In negotiations between the Parties regarding the amount of TXMD Inventory that was in the channel at the close of the transaction, both Mayne and TXMD used an estimate of 5% of the TXMD Inventory would be returned, which was based upon pharmaceutical-industry best practices and TXMD's experience selling the same products in question.

**Mayne Begins Over-Selling and the Subsequent Return of TXMD Products**

35.    Beginning at the start of 2023, Mayne began selling Mayne Licensed Products in the marketplace.

36.    On information and belief, over the course of 2023 (and possibly in 2024 or 2025) Mayne sold more Mayne Licensed Products than was justified by market demand and the inventory already in the channel that could meet the market demand, including the TXMD Inventory in the channel.

37.    As a result of Mayne's over-selling market demand, the older, and sooner to expire TXMD Inventory was preferentially returned at a volume that significantly exceeded TXMD's estimates or returns volume estimates provided by Mayne as late as May of 2024.

38.    Mayne also failed to provide quarterly Closing Statements to TXMD

documenting the volume of returns of TXMD Inventory and comparing it to the Allowance for Returns in prior estimates.

39.     Mayne did not apprise TXMD as to the impact of Mayne's over-selling market demand until August 2024, when Mayne demanded that TXMD pay an additional amount for returned TXMD Inventory.  In February 2025, Mayne provided its Net Working Capital statement for returns that further increased its demand for the Allowance for Returns by approximately $1.5 million.

40.     These alleged returns of TXMD Inventory exceed the around 5% expected by TXMD and appear to constitute all or substantially all of TXMD's Inventory in the commercial supply chain as of the Closing Date.

41.     The data Mayne has shared with TXMD indicates a volume of returns that exceeds the TXMD Inventory estimated to be in the commercial channel at the Closing Date.  A majority of the returned TXMD Inventory was returned in 2023.

42.     Meanwhile, as part of settling the Closing Net Working Capital during 2023, Mayne represented to TXMD that TXMD Inventory was selling through the commercial channel and that both the Allowance for Coupons and Allowance for Rebates line items should be revised upward to reflect higher-than-expected coupon use and higher-than-expected rebates in the marketplace.  The increased returns of TXMD Inventory does not comport with increased payer rebates, because returned products cannot – at the same time – be subject to rebates and coupons.

**Mayne Initiates the Second True-Up for Rebates and Wholesale Distribution Fees**

43.     On January 16, 2024, Mayne sent TXMD the Closing Statement for Allowance for Rebates and Wholesale Distribution Fees.  This "Closing Statement" was a raw spreadsheet

with no summary information in the format of the Pre-Closing Statement.  The spreadsheet provided information for transactions that occurred after the Closing Date.  It did not follow the process agreed upon in the Transaction Agreement for the true-up of Rebates and Wholesaler Distribution Fees.  In this spreadsheet, Mayne claimed that TXMD owed it an additional amount over the Net Working Capital Allowances for Rebates and Wholesaler Distribution Fees.

44.     The January 16, 2024 "Closing Statement" was the first such document that Mayne sent TXMD related to post-Closing Date transactions related to rebates or distribution fees, except that Mayne had demanded an increase in the rebates allowance as part of the December 2023 settlement of the Closing Net Working Capital.  No quarterly statements had been sent prior to January 16, 2024.

**Mayne Initiates the Third True-Up for Returns**

45.     On February 3, 2025, Mayne sent TXMD its "Closing Statement" for Allowance for Returns.  In this spreadsheet, Mayne claims that TXMD owes it an additional amount for returned TXMD Inventory.

46.     The claimed returns of TXMD Inventory appear to exceed the volume of TXMD Inventory in the supply chain as of the Closing Date.

**COUNT I: BREACH OF CONTRACT
(TRANSACTION AGREEMENT, § 5.3(h))**

47.     Plaintiff repeats and realleges the previous allegations set forth above with the same force and effect as if set forth fully herein.

48.     The Transaction Agreement, executed on or about December 4, 2022, is a valid contract between the Parties.

49.     The Transaction Agreement closed on or about December 30, 2022.

50.     Section 5.3(h) of the Transaction Agreement required Mayne to "[f]or a period of

12

two years following the Closing Date in the case of Allowance for Returns and one year following the Closing Date in the case of Wholesale Distributor Fees and Payer Rebates, Purchaser shall continue to provide updated Closing Statements solely with respect to calculation of the Closing Net Working Capital[.]"  (Exhibit B, § 5.3(h)).  These required quarterly reports were to provide information "with respect to the matters included in the items entitled Allowance for Returns, Allowance for Wholesale Distributor Fees and Payer Rebates, in each case, comparing actual invoices against accruals on a quarterly basis[.]"  (*Id.*)

51.    Mayne provided TXMD with a single purported Closing Statement for Payer Rebates and Allowance for Wholesale Distributor Fees on January 16, 2024.

52.    Mayne provided TXMD with a single purported Closing Statement for Allowance for Returns on February 3, 2025.

53.    Mayne breached § 5.3(h) of the Transaction Agreement by failing to provide quarterly Closing Statements of Payer Rebates and Allowance for Wholesale Distributor Fees, in the format required, comparing actual invoices against accruals in the year following the Closing Date.

54.    Mayne breached § 5.3(h) of the Transaction Agreement by failing to provide quarterly Closing Statements of Allowance for Returns, in the format required, comparing actual invoices against accruals in the two years following the Closing Date.

55.    Because Mayne did not provide these quarterly reports, TXMD was forced to rely on incomplete information when settling the Closing Net Working Capital in December 2023 for the first true-up event, which caused settlement of funds in favor of Mayne and to the detriment of TXMD.  Additionally, absent detailed quarterly information on returns, TXMD has accepted reductions or offsets to its quarterly license fees paid by Mayne based upon higher levels of

returned products.

56.     Also, because Mayne did not provide these quarterly reports, TXMD was unable to identify, to prevent, or to mitigate any harms associated with the implementation of the Transaction Agreement or the Licensing Agreement.  For example, TXMD was unable to identify returns disallowed by TXMD's return policies or by agreement and to prevent future acceptance of such returns by Mayne.

57.     These breaches of § 5.3(h) of the Transaction Agreement caused harm to TXMD in an amount to be determined at trial.

**COUNT II: BREACH OF CONTRACT**
**(NDC LABELER CODE)**

58.     Plaintiff repeats and realleges the previous allegations set forth above with the same force and effect as if set forth fully herein.

59.     In facilitating the Transaction Agreement, the Parties agreed, in writing, that TXMD would transfer TXMD's NDC Labeler Code to Mayne as of the Closing Date.  The Labeler Code is the first portion of the National Drug Code ("NDC") the United States Food and Drug Administration assigns to individual pharmaceutical products.  TXMD's NDC Labeler Code was 50261.

60.     This agreement constituted a valid contract between the Parties.

61.     On or about December 30, 2022, TXMD transferred its NDC Labeler Code (50261) to Mayne.

62.     On or about January 27, 2023, and unbeknownst to TXMD and without TXMD's consent, Mayne transferred the NDC Labeler Code (50261) back to TXMD, eventually forcing TXMD to incur more than $100,000 in costs associated with the reporting responsibilities of the NDC holder related to government contracts.

63.    Mayne breached the contract concerning the NDC Labeler Code by transferring it back to TXMD when the parties had already agreed to the transfer during the closing period.

64.    TXMD suffered damages in an amount to be determined at trial.

## COUNT III: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

65.    Plaintiff repeats and realleges the previous allegations set forth above with the same force and effect as if set forth fully herein.

66.    To the best of TXMD's knowledge, Mayne oversold marketplace demand by selling Mayne Licensed Products into the commercial supply chain in volumes in excess of the prescribing demand for these products.

67.    Because sellers of pharmaceutical products keep limited inventories in stock and generally return the stock that is first to expire when supplies exceed needed inventory levels, Mayne's oversupply of Mayne Licensed Products led to premature returns of unexpired TXMD Inventory in the supply chain.

68.    To the best of TXMD's knowledge, Mayne's actions caused TXMD to experience returns of all, or nearly all, of the unexpired TXMD Inventory in the commercial channel as of the Closing Date.

69.    Mayne's actions prevented TXMD from receiving the "fruits of the bargain" associated with the Transaction Agreement, because Mayne claims that TXMD must now pay for returned products well beyond the expected (and historical) returns levels.  TXMD also does not receive the fruits of the bargain, because it incurred costs for the Allowance for Wholesale Distributor Fees for the returned TXMD Inventory.  Furthermore, TXMD has paid, and Mayne continues to ask TXMD to pay, respectively, for an Allowance for Coupons and Allowance for Rebates associated with these very returned products as if they had been dispensed to patients.

Additionally, TXMD has accepted reductions or offsets to its quarterly license fees paid by Mayne based upon these higher levels of returned products.

70.     Mayne's actions frustrated the overarching purpose of part of the Transaction Agreement, which was to effect a transfer of existing, in-channel TXMD Inventory, allow it to process through the commercial channel with the reasonable rate of returns, and then to reconcile and true-up the coupons, rebates, and wholesale distributor fees for products that TXMD had already sold.  This is why the Transaction Agreement included in the Net Working Capital the Allowance for Coupons, Allowance for Rebates, and Wholesale Distributor Fees line items.

71.     The Parties anticipated some level of returns, but not at a volume that appears to be all or substantially all of the TXMD Inventory in the commercial channel as of the close of the transaction.  Therefore, based upon the structure of the Transaction Agreement, the parties would have proscribed Mayne's sales activities that oversold the demand, had they thought to negotiate the Transaction Agreement with the understanding that the TXMD Inventory would be replaced by Mayne Inventory.

72.     For at least these reasons, Mayne's actions as described herein constitute a breach of the implied covenant of good faith and fair dealing associated with the Transaction Agreement.

73.     As a result of this breach, TXMD has been harmed in an amount to be determined at trial.

## COUNT IV: FRAUDULENT INDUCEMENT

74.     Plaintiff repeats and realleges the previous allegations set forth above with the same force and effect as if set forth fully herein.

75.     On March 26, 2023, Mayne provided TXMD with its Closing Statement, including its calculation of Closing Net Working Capital as of the Closing Date.

76.    On May 26, 2023, TXMD sent Mayne a Notice of Disagreement.

77.    On or about December 15, 2023, the Parties settled their disputes with respect to the final calculation of Closing Net Working Capital.

78.    This settlement is documented in a written agreement, dated December 15, 2023.

79.    The settlement is a valid contract.

80.    As part of the settlement of Closing Net Working Capital, TXMD paid Mayne $5,500,000.

81.    During discussions relating to settling the Closing Net Working Capital, Mayne represented to TXMD that the Allowance for Coupons and Allowance for Payer Rebates line items were going to be higher than either Party expected.  That is, Mayne represented to TXMD that TXMD Inventory was selling through the supply chain and that both Coupons and Payer Rebates were being used at a higher rate than expected by the Parties.

82.    These statements were false. Mayne was overselling Mayne Licensed Products into the supply chain and at same time was accepting abnormally high return volumes of TXMD Inventory in the supply chain.

83.    Mayne knew or should have known these representations to be false due to Mayne accepting the abnormally large volume of returns of TXMD Inventory in 2023, while knowing that rebates and coupons are not paid on inventory that is returned.

84.    Mayne's representations of higher-than-expected rebates gave TXMD the impression that TXMD Inventory was moving through the channel as anticipated and was not being returned outside of expected levels.  The absence of quarterly statements documenting these returns meant that TXMD had no information that would contradict Mayne's representations about coupons and rebates.

85.    TXMD relied on Mayne's representations about TXMD Inventory selling and agreed to settle the Closing Net Working Capital, including accepting more than $1.3 million in Allowances for Coupons and paying Mayne an additional $2 million to increase the Allowance for Payer Rebates.

86.    Had TXMD known that Mayne had oversold the TXMD Inventory and was accepting the return of all, or nearly all, of the TXMD Inventory in the supply chain as of the Closing Date, it would not have agreed to settle the Closing Net Working Capital on the terms it did, including paying money to Mayne as part of the settlement.

87.    Therefore, Mayne fraudulently induced TXMD to settle the Closing Net Working Capital in December 2023.

88.    As a result, TXMD suffered harm, including damages for monies paid to Mayne as part of the December 2023 settlement, in an amount to be determined at trial.

## COUNT V: UNJUST ENRICHMENT

89.    Plaintiff repeats and realleges the previous allegations set forth above with the same force and effect as if set forth fully herein.

90.    To the extent the court determines that Mayne has not breached any term of the Transaction Agreement, or the implied covenant of good faith and fair dealing as applied to the Transaction Agreement, TXMD alleges the following in the alternative.

91.    As alleged above, Mayne oversold the TXMD Inventory in the commercial channel with Mayne Licensed Products, which caused the return of TXMD Inventory.  Mayne has claimed TXMD is obligated to pay the full retail value of the product, for which TXMD paid Wholesale Distributor Fees and paid Mayne an allowance for Wholesaler Distribution Fees that had not yet been invoiced as of the close of the transaction for the returned TXMD Inventory.

92.    At the same time, Mayne sold Mayne Licensed Products to the marketplace and

booked sales of those products to the exclusion of TXMD Inventory already in the supply chain.

93.    Moreover, Mayne has been paid, and subsequently claimed, allowances for coupons and rebates associated with TXMD Inventory, even though those products were returned, and no coupon or rebate could have been redeemed on the returned TXMD Inventory.

94.    By overselling the TXMD Inventory with Mayne Licensed Products as described above, Mayne has been enriched.

95.    As a result of Mayne's actions, TXMD has been impoverished, including monies paid to Mayne to settle net working capital claims, and other net working capital claims for rebates, coupons, and wholesale distributor fees on returned TXMD Inventory that Mayne never allowed to move through the commercial channel.

96.    Mayne's enrichment is directly related to TXMD's impoverishment.

97.    There is an absence of justification for Mayne's actions.

98.    There is no adequate remedy at law.

99.    TXMD has suffered harm in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter full and final judgment in its favor and against Defendant:

A.       Declaring that Defendant's failure to provide updated Closing Statements, on a quarterly basis, with respect to calculation of Closing Net Working Capital conduct solely with respect to the matters included in the items entitled Allowance for Returns, Allowance for Wholesale Distributor Fees and Payer Rebates constitutes a breach of Section 5.3(h) of the Transaction Agreement;

B.       Declaring that Defendant's return of the NDC Labeler code constitutes breach of contract;

C.       Declaring that Defendant's sales activities, which caused an over-supply of Mayne Licensed Products and led to greater than expected returns of unexpired TXMD Inventory, constitutes a breach of the implied covenant of good faith and fair dealing associated with the Transaction Agreement and License Agreement.

D.       Declaring that Defendant fraudulently induced Plaintiff to settle the Closing Net Working Capital of the Transaction Agreement, including paying Defendant money for Rebates and Coupons for TXMD Inventory that had been returned and was not dispensed to patients;

E.       Declaring that Defendant unjustly enriched itself at the expense of Plaintiff by overselling demand for Mayne Licensed Products and forcing greater than expected returns of TXMD Inventory;

F.       Ordering Defendant to account to Plaintiff for all gains, profits and advantages derived from its wrongful acts;

G.      Awarding Plaintiff money damages for all of Defendant's profits arising from Defendant's unlawful conduct, including payment of license fees and return of net working capital allowances for rebates, coupons, and distribution fees;

H.      Awarding Plaintiff money damages for any injury sustained by Plaintiff as a result of Defendant's unlawful conduct;

I.      Awarding Plaintiff's reasonable attorney fees;

J.      Awarding Plaintiff the costs of this action; and

K.      Granting Plaintiff such other and further relief as the Court deems just, equitable and proper.

Date: April 8, 2025

**SMITH KATZENSTEIN & JENKINS LLP**

*/s/ Daniel A. Taylor*
Julie M. O'Dell (No. 6191)
Daniel A. Taylor (No. 6934)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
jmo@skjlaw.com
dat@skjlaw.com

*Attorneys for Plaintiff TherapeuticsMD, Inc.*