IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THERAPEUTICSMD, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:25-cv-00440-RGA |
| | ) | |
| MAYNE PHARMA LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**OPENING BRIEF IN SUPPORT OF DEFENDANT MAYNE PHARMA LLC'S
MOTION TO COMPEL SUBMISSION OF DISPUTED MATTERS TO BDO, OR
ALTERNATIVELY, TO COMPEL ARBITRATION AND STAY PROCEEDINGS
<u>PENDING A FINAL DETERMINATION</u>**

OF COUNSEL:

**ARNOLD & PORTER KAYE
SCHOLER LLP**
Aaron F. Miner (*pro hac vice* forthcoming)
Matthew F. Medina (*pro hac vice*
forthcoming)
250 West 55th Street
New York, NY 10019
Phone: 212.836.8000
Fax: 212.836.8689
aaron.miner@arnoldporter.com
matthew.medina@arnoldporter.com

May 30, 2025

**MORRIS, NICHOLS, ARSHT &
TUNNELL LLP**
S. Mark Hurd (Bar No. #3297)
Elise K. Wolpert (#6343)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Phone: (302) 658-9200
shurd@morrisnichols.com
ewolpert@morrisnichols.com

*Counsel for Defendant
Mayne Pharma LLC*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .......................................................................................................................1

NATURE AND STAGE OF THE PROCEEDINGS ...................................................................2

SUMMARY OF ARGUMENT ...................................................................................................2

STATEMENT OF FACTS ...........................................................................................................3

ARGUMENT ..............................................................................................................................6

      I.     LEGAL STANDARD...................................................................................6

      II.    THE COURT SHOULD COMPEL SUBMISSION OF DISPUTED
           MATTERS IN COUNTS I, III, IV, AND V TO BDO FOR AN
           EXPERT DETERMINATION .....................................................................7

      III.   ALTERNATIVELY, THIS COURT SHOULD COMPEL TXMD
           TO ARBITRATE THE PARTIES' DISPUTES BEFORE BDO............................9

      IV.   THIS COURT SHOULD STAY THE PROCEEDINGS PENDING
           THE FINAL DETERMINATION.......................................................................14

CONCLUSION............................................................................................................................17

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Advantage Sales & Mktg. v. USG Cos.*,
    2016 WL 2588163 (D. Del. May 4, 2016)...............................................................11

*Agiliance v. Resolver SOAR*,
    2019 WL 343668 (Del. Ch. Jan. 25, 2019)...............................................................11

*ArchKey Intermediate Holdings, Inc. v. Mona*,
    302 A.3d 975 (Del. Ch. 2023)..........................................................................7, 8, 14

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011)...............................................................................................7

*Coleman v. Sys. One Holdings, LLC*,
    117 F.4th 97 (3d Cir. 2024)...................................................................................17

*Commonwealth Ins. Co. v. Underwriters, Inc.*,
    846 F.2d 196 (3d Cir. 1988)..................................................................................15

*Dietz v. Bouldin.*,
    579 U.S. 40 (2016).................................................................................................15

*Doehler North America, Inc. v. Davis*,
    2022 WL 2785969 (July 15, 2022).................................................................15, 16

*In re FBI Wind Down, Inc.*,
    252 F. Supp. 3d 405 (D. Del. 2017).........................................................................11

*FeraDyne Outdoors, LLC v. Reaser*,
    C.A. 2023 WL 9094423 (Del. Super. Dec. 20, 2023)...................................7, 8, 14

*First Liberty Inv. Grp. v. Nicholsberg*,
    145 F.3d 647 (3d Cir. 1998)..........................................................................7, 10, 15

*Guidotti v. Legal Helpers Debt Resolution, LLC.*,
    716 F.3d 764 (3d Cir. 2013)......................................................................................3, 10

*HBMA Holdings, LLC v. LSF9 Stardust Holdings LLC*,
    2017 WL 6209594 (Del. Ch. Dec. 8, 2017)................................................................12

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    586 U.S. 63 (2019)...................................................................................................11

*Honeywell Intern. Inc. v. Audiovox Commun. Corp.*,
    2005 WL 2465898 (D. Del. May 18, 2005)................................................................16

*Husqvarna AB v. The Toro Company*,
    2016 WL 5213904 ((D. Del. Sept. 20, 2016)..........................................................16

*Luxottica Grp., S.p.A. v. Bausch & Lomb Inc.*,
    160 F. Supp. 2d 552 (S.D.N.Y. 2001)......................................................................6

*Mehiel v. Solo Cup*,
    2007 WL 901637 (Del. Super. Mar. 26, 2007).......................................................11

*Omni Tech Corp. v. MPC Sols. Sales*,
    LLC, 432 F.3d 797 (7th Cir. 2005)...........................................................................6

*Pixis Drones, LLC v. Lumenier LLC*,
    2023 WL 6660991 (D. Del. Oct. 12, 2023) .............................................................15

*Pragmatus Telecom, LLC v. Advance Store Co., Inc.*,
    No. 12-088-RGA, 2012 WL 2803695 (D. Del. July 10, 2012) ...............................17

*RedBird Cap. Partners Platform LP v. Concorde Parent, LP*,
    2024 WL 3220350 (Del. Ch. June 28, 2024).................................................. *passim*

*Sapp v. Indus. Action Servs., LLC*,
    75 F.4th 205 (3d Cir. 2023) .........................................................................9, 10, 11

*TMIP Participants LLC v. DSW Grp. Holdings LLC*,
    2016 WL 490257 (Del. Ch. Feb. 4, 2016)..............................................................10

*Tyler v. Diamond State Port Corp.*,
    816 F. App'x 729 (3d Cir. 2020) .............................................................................15

*U.S. for Use and Benefit of Ralph G. Degli Obizzi & Sons, Inc. v. Dobco, Inc.*,
    2024 WL 2208947 (D. Del. May 15, 2024)............................................................15

**Statutes**

9 U.S.C.
    § 2.............................................................................................................................7
    § 3........................................................................................................................7, 17
    § 4.............................................................................................................................7

<u>INTRODUCTION</u>

This case almost entirely concerns a post-transaction true-up arising out of a Transaction Agreement between Defendant Mayne Pharma LLC ("Mayne") and Plaintiff TherapeuticsMD, Inc. ("TXMD"), pursuant to which the parties agreed, if the parties could not resolve their dispute, the dispute would be submitted to BDO USA, LLP's National Dispute Advisory Service Practice ("BDO"). Plaintiff's efforts to short-circuit the contractual dispute resolution process should be rejected. This Court should compel submission of the disputed matters to BDO or, alternatively, compel arbitration and stay this litigation pending a final determination.

In December 2022, Mayne and TXMD entered into a transaction whereby Mayne received a license from TXMD to manufacture, market, and distribute certain TXMD women's health products ("TXMD Products"). As part of the transaction, Mayne purchased TXMD's existing inventory of its products ("TXMD Inventory").

Mayne paid TXMD a purchase price in addition to Estimated Net Working Capital. The Net Working Capital was "estimated" because, among other things, the ultimate disposition of the TXMD Inventory would affect the calculation of Net Working Capital. The parties anticipated that Net Working Capital would be trued-up over the next two years as the TXMD Inventory was distributed, dispensed to patients, or returned. For example, the disposition of the TXMD Inventory would affect wholesale distribution fees, payer rebates, and returns, all of which would cause a decline in Net Working Capital.

The Transaction Agreement contained a dispute resolution provision relating to Net Working Capital. If the parties are unable to resolve a dispute, Section 5.3(c) provides:

> [Mayne] and TXMD *shall* submit such dispute to BDO USA, LLP's National Dispute Advisory Service Practice . . . for resolution of all matters which remain in dispute which were included in the Notice of Disagreement, and the Firm shall make a final determination of the Closing Net Working Capital in accordance with the terms of this Agreement . . . .

Ex. A, § 5.3(c) (emphasis added).

## NATURE AND STAGE OF THE PROCEEDINGS

TXMD filed a complaint in this Court on April 8, 2025 on claims related to this true-up process, as well as one tag-along claim relating to the transfer of the National Drug Code labeler ("NDC Code"). The Complaint asserts five causes of action: two claims of breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, and unjust enrichment. All of these claims, except for Count II relating to the NDC Code, are subject to the dispute resolution clause in Section 5.3.

Mayne now moves to compel TXMD to comply with the dispute resolution process provided for in the parties' Transaction Agreement for all counts except for Count II. In the alternative, Mayne moves to compel arbitration of disputed issues. Mayne has also simultaneously moved to dismiss each count in the Complaint for failure to state a claim in its Motion to Dismiss filed contemporaneously herewith.

## SUMMARY OF ARGUMENT

1) In signing the Transaction Agreement, the parties expressly agreed to submission of disputed matters to BDO for a final binding determination.

2) If the Court concludes the Transaction Agreement does not require an expert determination, it should compel arbitration of the parties' disputes before BDO.

3) Four of Plaintiff's five claims fall within the plain scope of § 5.3 and thus are subject to expert determination or arbitration because they (1) are the subject of Notice of Disagreement correspondence and (2) relate to the provision of Closing Statements and/or the disputed constituent components of Closing Net Working Capital (i.e., allowances for coupons, rebates, and wholesale distributor fees).

4) This Court should stay the proceedings before this Court pending the final determination.

<u>STATEMENT OF FACTS</u>

Mayne is a specialty pharmaceutical company focused on commercializing novel and generic pharmaceuticals. TXMD is a "royalty company" that licenses women's health products. Compl.¶ 7. In December 2022, the parties executed the Transaction Agreement and License Agreement. *Id.* ¶ 10; **Ex. A** ("Transaction Agreement"). Through the parties' agreement, Mayne would receive a license from TXMD to manufacture, market, and distribute the TXMD Products. *Id.* ¶ 10. In addition to acquiring a license to sell Mayne-branded TXMD Products, Mayne would also purchase the ongoing TXMD commercial pharmaceutical operations. *Id.* ¶ 14. These were mainly in the form of unsold TXMD Products in inventory awaiting sale and distribution; partially finished TXMD Products inventory; and other items. *Id.* ¶ 14. The transaction was scheduled to close on or prior to December 30, 2022 (the "Closing"). *Id.* ¶ 10. Subsequently, the Transaction Agreement and the License Agreement were amended. *Id.* ¶ 11; **Ex. B** ("Amendment No. 1"); **Ex. C** ("Amendment No. 2").[1] Although the Complaint references the License Agreement, each of TXMD's claims relate to the Transaction Agreement.

At Closing, Mayne was obligated to pay TXMD "an amount equal to the Purchase Price plus the Estimated Net Working Capital." Compl. ¶ 19; Ex. A, § 5.1. TXMD and Mayne agreed that the Net Working Capital acquired by Mayne would be trued-up after the close of the transaction because, among other things, the remaining TXMD Inventory previously sold into the commercial channel was distributed, dispensed to patients, or returned. Compl. ¶ 14. In particular,

---

[1] The Court can take judicial notice of the Transaction Agreement and its Amendments because Plaintiff relied upon these documents in its Complaint (and attached them as exhibits). *See Guidotti v. Legal Helpers Debt Resolution, LLC.*, 716 F.3d 764, 776 (3d Cir. 2013) ("[W]hen it is apparent, based on the face of a complaint, *and the documents relied upon in the complaint*, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard") (internal quotation marks and citation omitted) (emphasis added).

the parties agreed to resolve three components of Net Working Capital to calculate a "Final Net Working Capital" in the two years following Closing: wholesale distributor fees, payer rebates, and returns. *Id.* ¶ 24; Ex. A, § 5.3(h). All three were treated as liabilities against the assets transferred to Mayne and would be paid by TXMD post-Closing.

The parties would true-up Estimated Net Working Capital to arrive at Final Net Working Capital in three stages: (1) within 90 days after the closing for all Estimated Net Working Capital categories except for rebates, distribution fees, and returns, to arrive at a "Closing Net Working Capital"; (2) within one year after the Closing for rebates and wholesale distributor fees; and (3) within two years for returns. *Id.* ¶ 16. To facilitate the resolution of Final Net Working Capital, Mayne had the option of providing updated Closing Statements that calculated Closing Net Working Capital for allowance for returns, wholesale distributor fees, and payer rebates, which would contain comparisons against accruals as calculated quarterly. Ex. A, § 5.3(h) ("Purchaser may continue to provide updated Closing Statements solely with respect to calculation of the Closing Net Working Capital conduct solely with respect to the matters included in the items entitled Allowance for Returns, Allowance for Wholesale Distributor Fees and Payer Rebates, in each case, comparing actual invoices against accruals on a quarterly basis."). TXMD agrees that Mayne provided statements for the rebates and distribution fees on January 16, 2024, and for returns on February 3, 2025. Compl. ¶ 18.

The parties negotiated for and agreed to a process for dispute resolution if disputes arose regarding Closing and Final Net Working Capital. Specifically, Mayne was required to provide a calculation of Closing Net Working Capital within 90 days of the Closing Date. Ex. A, § 5.3(b). If TXMD delivered a written notice of its disagreement with Mayne's calculation of Closing Net Working Capital ("Notice of Disagreement"), the parties would seek to resolve areas of

disagreement in good faith and in writing. *Id.* §§ 5.3(b)-(c). If no resolution was reached by the end of 30 days following delivery of the Notice of Disagreement, the Transaction Agreement required that the parties "shall submit such dispute" to BDO "for resolution of all matters which remain in dispute which were included in the Notice of Disagreement." *Id.* § 5.3(c). BDO would then "make a final determination of the Closing Net Working Capital in accordance with the terms" of the Transaction Agreement. *Id.* A similar process existed for referral to BDO in the event of disagreements over the calculation of Final Net Working Capital. *Id.* § 5.3(h).

Disputes about the calculation of Net Working Capital began immediately. In December 2023, TXMD and Mayne entered into a settlement for the Closing Net Working Capital ("December 2023 Settlement Agreement"). Compl. ¶ 17. As part of the settlement, TXMD and Mayne agreed that TXMD would pay Mayne $5,500,000. *Id.* ¶ 80; **Ex. D** (December 2023 Settlement Agreement). The parties also entered into mutual releases arising out of the "Applicable Sections," which were defined as Sections 5.3(a) through (g), which described, among other things, Closing Net Working Capital. Ex. D at 1.

Despite the December 2023 Settlement and dispute resolution clause, TXMD has now brought suit on a series of claims relating to the Closing and Final Net Working Capital. Among other things, TXMD alleges that sometime in 2023, upon "information and belief," Mayne began overselling Mayne Licensed Products beyond prescribing market demand. Compl. ¶ 36. TXMD claims that as a result, the older, and sooner-to-expire TXMD Inventory was preferentially returned at a volume that significantly exceeded expectations. *Id.* ¶ 37. As a result, these larger-than-expected returns generated changes to the constituent components of Net Working Capital, namely allowances for rebates, coupons and wholesale distributor fees. *Id.* ¶ 39. TXMD further alleges that Mayne misrepresented a higher amount for the Allowance for Coupons and Allowance for

Payer Rebates during the December 2023 negotiations with respect to the Closing Net Working Capital. *Id.* ¶ 81. Finally, TXMD also claims that Mayne did not send Closing Statements for Allowance for Rebates and Wholesale Distribution Fees and Closing Statement for Allowance of Returns every quarter, which meant that "TXMD was forced to rely on incomplete information when settling the Closing Net Working Capital in December 2023." *Id.* ¶¶ 51-56.

Four of Plaintiff's five claims relate directly to the calculation of Closing Net Working Capital and therefore fall squarely into § 5.3(c)'s dispute resolution provision. TXMD should not be allowed to end-run around the parties' bargained-for agreement. This Court should compel TXMD to engage in the agreed-upon dispute resolution process.

In the alternative, should the Court find that the Transaction Agreement does not require an expert determination, it should compel arbitration. Mayne also requests that, prior to any final determination, the Court stay this action.

<u>ARGUMENT</u>

I.    <u>LEGAL STANDARD</u>

Courts have the authority to enforce parties' contractual agreements to submit disputes for an expert determination. *See, e.g.*, *Omni Tech Corp. v. MPC Sols. Sales*, LLC, 432 F.3d 797, 801 (7th Cir. 2005) ("the case is remanded with instructions to stay the litigation while the independent accountant resolves the dispute about net working capital at closing."); *Luxottica Grp., S.p.A. v. Bausch & Lomb Inc.*, 160 F. Supp. 2d 552, 556 (S.D.N.Y. 2001) ("Luxottica's motion to compel B & L to submit the disputes embodied in the objections to an independent accountant for determination pursuant to section 2.5(c) of the Agreement is granted"); *RedBird Cap. Partners Platform LP v. Concorde Parent, LP*, 2024 WL 3220350 (Del. Ch. June 28, 2024) ("I find that the parties have agreed to first submit this budget dispute to the Independent Consultant process as mandated by Section 2.12(c) before the parties can seek resolution before this Court of any legal

claims that may arise."); *ArchKey Intermediate Holdings, Inc. v. Mona*, 302 A.3d 975, 997-1006 (Del. Ch. 2023) ("Before this action can proceed, the parties must present their disputes to the Independent Accountant. This case is stayed pending the Independent Accountant's determinations."); *FeraDyne Outdoors, LLC v. Reaser*, C.A. 2023 WL 9094423, *7 (Del. Sup. Dec. 20, 2023) ("As a matter of judicial efficiency and economy, the entirety of this action is STAYED pending resolution of the working capital dispute by the Accounting Firm").

The legal principles regarding the enforcement of arbitration agreements strongly favor giving full force and effect to those agreements.   Under the FAA, contractual arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects a "liberal federal policy favoring arbitration," and courts must "enforce [arbitration agreements] according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted). A party to a written arbitration agreement may petition the court "for an order directing that such arbitration proceed in the manner provided for in such agreement," 9 U.S.C. § 4, and the court "shall . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement," 9 U.S.C. § 3. Given the strong federal policy favoring arbitration, courts resolve doubts about the scope of an arbitration agreement in favor of arbitration. *First Liberty Inv. Grp. v. Nicholsberg*, 145 F.3d 647, 653 (3d Cir. 1998) ("[A]ny doubts concerning the scope of arbitrable issues must be resolved in favor of arbitration.") (citations omitted).

## II.   THE COURT SHOULD COMPEL SUBMISSION OF DISPUTED MATTERS IN COUNTS I, III, IV, AND V TO BDO FOR AN EXPERT DETERMINATION

The Transaction Agreement contemplates that the parties' disputes would be submitted to BDO for an expert determination.  In *RedBird Cap. Partners Platform LP*,  the Court of Chancery

considered a purchase agreement providing for a post-acquisition adjustment of the purchase price if the acquired company's projected capital expenses increased above a certain threshold. 2024 WL 3220350 at *2. The purchase agreement provided that "in the event that the parties could not reach a consensus on the change in [those] projections," the parties would undergo an "alternative dispute resolution procedure whereby the parties would submit unresolved disputes 'to an independent construction consulting firm' (the 'Independent Expert') for 'arbitration, acting as an expert and not an arbitrator.'" *Id.* (brackets omitted). Although the court did not find that the "Independent Expert" was an arbitrator, the court nonetheless required that the disputed issues "must first be submitted to the Independent Consultant before any remaining legal claims arising therefrom are brought in this Court." *Id.* at *5. *See also ArchKey Intermediate Holdings, Inc.*, 302 A.3d at 997-1006 (compelling submission of post-closing true-up disputes for determination by accountant); *FeraDyne Outdoors, LLC*, 2023 WL 9094423, at *7 ("Interpreted according to its plain meaning, APA § 1.7(d) properly commits the parties' dispute about the working capital figure to binding resolution by the Accounting Firm. . . . The working capital adjustment issue must first be resolved by the Accounting Firm before this Court can adjudicate the merits of the claims in the complaint.").

The Transaction Agreement requires determination by BDO of "any differences" as to the Closing Statement and Closing Net Working Capital as set forth in a Notice of Disagreement and related correspondence. Ex. A, § 5.3(c). The Transaction Agreement similarly requires determination by BDO of any differences as to the Final Net Working Capital as set forth in the respective Notice of Disagreement and related correspondence. *Id.* § 5.3(h). Count I asserts a breach of contract claim premised on Mayne's alleged failure to provide quarterly reports and updated Closing Statements in accordance with § 5.3(h), resulting in "settlement of funds in favor

of Mayne" "when settling the Closing Net Working Capital." Compl. ¶¶ 50, 55. Count III asserts a breach of the implied covenant of good faith and fair dealing claim based upon Mayne "overselling" Licensed Products, which generated increased Returns and Allowances for Wholesale Distributor Fees, Coupons, and Rebates, thereby affecting either Closing Net Working Capital and/or Final Net Working Capital. Compl. ¶ 69. Count IV asserts a claim for fraudulent inducement based upon TXMD's allegation that Mayne's representations relating to the rate of returns and the impact on Allowances for Coupons and Rebates, thereby affecting Closing Net Working Capital. Compl. ¶¶ 77, 81. Count V asserts a claim for unjust enrichment based upon the allegation that Mayne's sales of Licensed Products "replaced" in-channel TXMD Inventory, generating improper disbursements of Allowances for Wholesale Distributor Fees, Coupons, and Rebates, thereby affecting either Closing Net Working Capital and/or Final Net Working Capital. Compl. ¶¶ 91-95. Each of these claims (1) are the subject of Notice of Disagreement correspondence and (2) relate to the provision of Closing Statements and/or the disputed constituent components of Closing Net Working Capital (i.e., coupons, rebates, and wholesale distributor fees), they fall within the plain scope of the Transaction Agreement's dispute resolution provision in § 5.3.

### III.   ALTERNATIVELY, THIS COURT SHOULD COMPEL TXMD TO ARBITRATE THE PARTIES' DISPUTES BEFORE BDO

The line between an agreement to an expert determination and an agreement to arbitrate is not precise. *See generally Sapp v. Indus. Action Servs., LLC*, 75 F.4th 205 (3d Cir. 2023). The decision in *Sapp* held the parties' agreement reflected an agreement for an expert determination, and not an agreement to arbitrate, but this case differs from the facts in *Sapp* in several crucial ways. In reaching its decision, the Third Circuit articulated four factors to determine whether a dispute resolution clause provides for an expert determination or an arbitration: the scope of

authority granted to the accounting firm; the amount of time provided for the accounting firm to make its decision; whether the provision provides or refers to procedural rules that would govern the determination made by the accounting firm; and whether the dispute resolution process governs all disputes stemming from the contract or instead also permits mediation and/or litigation. *Id.*

The Third Circuit's holding in *Sapp* is distinguishable from the present case in at least three respects. *First*, the scope of authority granted to the accounting firm in Sapp was significantly narrower than the scope of authority granted to BDO in the Transaction Agreement. Specifically, the contractual language in *Sapp* limited the accounting firm's authority to deciding discrete, specific "accounting-related factual matters." *Sapp*, 75 F.4th at 213 ("[C]hallenges are limited to whether the Statement was prepared in accord with generally accepted accounting principles, whether the parties had reasonable access to all working papers, and/or whether there were mathematical errors."). Here, by contrast, the Transaction Agreement confers a significantly broader scope of authority, permitting BDO to finally determine "all matters which remain in dispute which were included in the Notice of Disagreement." Ex. A, § 5.3(b).

*Second*, the nature of the decision is fundamentally different: *Sapp* emphasized the reliance on the technical expertise of the accounting firm, while the Transaction Agreement calls for BDO to make a determination of what is properly included within Closing Net Working Capital based "on written materials submitted by Purchaser and TXMD (*i.e.*, not on independent review) and on the definitions included herein and the provisions of this Agreement." Ex. A, § 5.3(c). This is a final and binding *legal* determination based upon application of the terms of the Transaction Agreement, not a second look at compliance with GAAP, access to working papers, or mathematical errors as was the case in *Sapp*. *See TMIP Participants LLC v. DSW Grp. Holdings*

*LLC*, 2016 WL 490257, at \*12 (Del. Ch. Feb. 4, 2016) (explaining that even arbitrators "without legal training" can decide legal issues if the parties contracted for such a resolution).

*Third*, the nature of the selected neutral is different. The Transaction Agreement does not select an "independent accounting firm" as in *Sapp*. To the contrary, the parties bargained for and specifically selected BDO's Litigation & Disputes Services arm (i.e., the National Dispute Advisory Service Practice).

Accordingly, the Transaction Agreement's dispute resolution mechanism should alternatively be deemed as providing for "arbitration" of disputes regarding Closing Net Working Capital and Final Net Working Capital, consistent with established case law. *See, e.g., In re FBI Wind Down, Inc.*, 252 F. Supp. 3d 405, 414 (D. Del. 2017) (treating a contract clause regarding disputes over post-closing adjustments as an arbitration clause); *Advantage Sales & Mktg. v. USG Cos.*, 2016 WL 2588163, at \*2 (D. Del. May 4, 2016); *Agiliance v. Resolver SOAR*, 2019 WL 343668, \*4 (Del. Ch. Jan. 25, 2019) (ordering arbitration by "nationally-recognized accounting firm"); *Mehiel v. Solo Cup*, 2007 WL 901637, \*2–3 (Del. Super. Mar. 26, 2007) (requiring arbitration by a "neutral auditor").

A federal court considering a motion to compel arbitration must also determine the substantive arbitrability of the claims at issue—that is, whether they fall within the scope of the valid arbitration agreement. *See Young*, 119 F.4th at 321. Through "clear and unmistakable" evidence in the arbitration agreement, parties may elect for the arbitrator to determine substantive arbitrability, instead of the court. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) (citation omitted). If so, "a court possesses no power to decide the arbitrability issue." *Id.* at 68. However, if a court is left to determine substantive arbitrability, it first "determine[s] whether the arbitration clause is broad or narrow in scope" and then applies that scope to "the

asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration." *HBMA Holdings, LLC v. LSF9 Stardust Holdings LLC*, 2017 WL 6209594, at *4 (Del. Ch. Dec. 8, 2017) (quoting *Parfi Hldgs. AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155 (Del. 2002)) (quotation marks omitted). If the clause is broad, the court will "defer to arbitration on any issues that touch on contract rights or contract performance." *Id.* A narrow arbitration clause leads the court to consider if the cause of action being pursued "directly relates to the right in the contract." *Id.*

Here, the Transaction Agreement's arbitration clause is broad. Indeed, the scope of arbitration clause is coextensive with "any differences" as to the Closing Statement and Closing Net Working Capital as set forth in Notice of Disagreement and related correspondence. Ex. A, § 5.3(b) ("The Closing Statement, and the Closing Net Working Capital set forth therein, shall become final and binding on the parties . . . unless TXMD delivers written notice of its disagreement specifying in reasonable detail each disputed item or amount and the basis for its disagreement therewith (a "**Notice of Disagreement**") to Purchaser on or prior to such date."); § 5.3(c) ("following delivery of a Notice of Disagreement, Purchaser and TXMD shall seek to resolve in good faith and in writing any differences which they may have with respect to the matters specified in the Notice of Disagreement. . . . [I]f no resolution has been reached, Purchaser and TXMD shall submit such dispute to BDO USA, LLP's National Dispute Advisory Service Practice").

The Transaction Agreement similarly requires determination by BDO of any differences as to the Final Net Working Capital as set forth in the respective Notice of Disagreement and related correspondence. *Id.* § 5.3(h). In December 2022, TXMD and Mayne amended § 5.3(h) to reflect the process for providing updated Closing Statements with respect to calculation of the

Closing Net Working Capital based on Allowance for Returns, Wholesale Distributor Fees, and Payer Rebates. Ex. B. In doing so, the parties adopted the same process as in the original Transaction Agreement, establishing that updates to the Closing Net Working Capital under 5.3(h) "shall become final and binding on the parties on the date that is thirty (30) Calendar Days following Purchaser's delivery thereof to TXMD, unless TXMD delivers written Notice of Disagreement to Purchaser on or prior to such date. The matter may be referred by either party to the Firm in same manner as clause [5.3](c) above." Ex. B.

Accordingly, based on the express terms of the Transaction Agreement, if a dispute relates to the Closing Statements, Closing Net Working Capital, or Allowance for Returns, Wholesale Distributor Fees, and Payer Rebates, the claim is subject to mandatory, binding arbitration. Count I, which asserts a breach of contract claim premised on Mayne's alleged failure to provide quarterly reports and updated Closing Statements in accordance with § 5.3(h), resulting in "settlement of funds in favor of Mayne" "when settling the Closing Net Working Capital." Compl. ¶¶ 50, 55. Count III asserts a breach of the implied covenant of good faith and fair dealing claim based upon Mayne "overselling" Licensed Products, which generated increased Returns and Allowances for Wholesale Distributor Fees, Coupons, and Rebates, thereby affecting either Closing Net Working Capital and/or Final Net Working Capital. Compl. ¶ 69. Count IV asserts a claim for fraudulent inducement based upon TXMD's allegation that Mayne's representations relating to the rate of returns and the impact on Allowances for Coupons and Rebates, thereby affecting Closing Net Working Capital. Compl. ¶¶ 77, 81. Finally, Count V asserts a claim for unjust enrichment based upon the allegation that Mayne's sales of Licensed Products "replaced" in-channel TXMD Inventory, generating improper disbursements of Allowances for Wholesale Distributor Fees, Coupons, and Rebates, thereby affecting either Closing Net Working Capital and/or Final Net

Working Capital. Compl. ¶¶ 91-95. These claims (1) are the subject of Notice of Disagreement correspondence and (2) relate to the provision of Closing Statements and/or the disputed constituent components of Closing Net Working Capital (*i.e.*, coupons, rebates, and wholesale distributor fees), and therefore fall within the plain scope of the Transaction Agreement's arbitration provision.

IV.    THIS COURT SHOULD STAY THE PROCEEDINGS PENDING THE FINAL DETERMINATION

If this Court compels submission of the disputed matters to BDO for an expert determination, this Court should use its inherent authority to stay this case pending that firm's final determination. Issuance of a discretionary stay based upon this Court's inherent authority to control its own docket would be in accord with the many Delaware cases staying litigation pending an expert determination by an accounting firm. *See RedBird Cap. Partners Platform LP v. Concorde Parent, LP*, 2024 WL 3220350 (Del. Ch. June 28, 2024) ("Once the Independent Consultant process mandated by Section 2.12 has concluded, the parties may return to this Court to resolve any legal issues then extant, if any."); *ArchKey Intermediate Holdings, Inc. v. Mona*, 302 A.3d 975, 997-1006 (Del. Ch. 2023) ("Before this action can proceed, the parties must present their disputes to the Independent Accountant. This case is stayed pending the Independent Accountant's determinations. After the Independent Accountant has made its determinations, the parties may return to this court to address any remaining issues. Further litigation in this court will take into account the Independent Accountant's determinations."); *FeraDyne Outdoors, LLC v. Reaser*, 2023 WL 9094423, *7 (Del. Sup. Dec. 20, 2023) ("The working capital adjustment issue must first be resolved by the Accounting Firm before this Court can adjudicate the merits of the claims in the complaint. Accordingly, this action is stayed pending the Accounting Firm's determination. After the Accounting Firm has resolved the working capital dispute, the parties can

- 14 -

return to this Court to address any issues that remain, at which time the Court will take into consideration the Accounting Firm's determination.").

"[A] district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Dietz v. Bouldin.*, 579 U.S. 40, 45 (2016) (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 630 (1962)). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket." *Commonwealth Ins. Co. v. Underwriters, Inc.*, 846 F.2d 196, 199 (3d Cir. 1988) (citation omitted); *see also Doehler North America, Inc. v. Davis*, 2022 WL 2785969, at *3 (July 15, 2022) (Andrews, J.). "When determining whether to grant or deny a motion to stay, a district court must exercise judgment by 'weigh[ing] competing interests and maintain[ing] an even balance.'" *Tyler v. Diamond State Port Corp.*, 816 F. App'x 729, 731 (3d Cir. 2020) (quoting *Landis v. North American Co.*, 299 U.S. 248, 255 (1936)). In exercising this discretion, courts evaluate three factors: "(1) whether a stay will unduly prejudice or present a clear tactical disadvantage to the non-moving party, i.e., the balance of harms; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether a stay will promote judicial economy, e.g., how close to trial has the litigation advanced." *Pixis Drones, LLC v. Lumenier LLC*, 2023 WL 6660991, at *3 (D. Del. Oct. 12, 2023); *see also U.S. for Use and Benefit of Ralph G. Degli Obizzi & Sons, Inc. v. Dobco, Inc.*, 2024 WL 2208947, at *1 (D. Del. May 15, 2024) (discussing factors). Here, each factor weighs decidedly in favor of the requested stay.

*First*, TXMD will face no undue prejudice or clear tactical disadvantage by complying with the contractual provisions for which it bargained for and to which it expressly agreed. To the extent TXMD attempts to conjure up any prejudice or disadvantage, it is self-inflicted: it was TXMD that

necessitated the requested stay by prematurely running to federal court to assert unripe claims that depend upon BDO's final determination. Importantly, the requested stay will in effect be quite short, and thus any claim of undue prejudice or clear tactical disadvantage by TXMD would be hollow. The parties contractually obligated themselves to request that BDO "deliver to the parties its resolution in writing not more than forty five (45) Calendar Days after its engagement)." Ex. A, § 5.3(c). Thus, they will be equally subject to the same effects on the litigation timeline. *See Husqvarna AB v. The Toro Company*, 2016 WL 5213904, at *1 (D. Del. Sept. 20, 2016) (supporting a stay when the parties were "disadvantaged to an equal degree in the market place and in terms of their legal dispute"). Nor is there a risk of competing timelines related to other lawsuits. *See Doehler*, 2022 WL 2785969, at *3 (finding that this consideration weighed against a stay).

*Second*, a short stay pending BDO's final determination will streamline the claims and defenses in this case. *See Honeywell Intern. Inc. v. Audiovox Commun. Corp.*, 2005 WL 2465898, at *4 (D. Del. May 18, 2005) (noting with approval that stay was likely to simplify the issues and trial in a complex patent infringement matter). As explained *supra*, the core allegations animating TXMD's claims in Counts I, III, IV, and V focus on the provision of Closing Statements and/or the disputed constituent components of Closing Net Working Capital (*i.e.*, allowances for coupons, rebates, and wholesale distributor fees). These claims falls squarely within the plain language of the arbitration, or expert determination, provision set forth in Section 5.3. For example, if the BDO determines that Mayne's alleged failure to provide quarterly reports and updated Closing Statements did not violate § 5.3(h), then Count I would be effectively barred.

*Third*, a short stay pending BDO's final determination would promote judicial economy. Like in *RedBird*, each set of claims "would necessarily require a presentation by each side to

- 16 -

explain whether" Mayne properly calculated Net Working Capital, and therefore "would involve the application of the very expertise that the [Transaction] Agreement sought to employ via [BDO], but in a costly legal proceeding." Defendant has sought to raise this issue with the court promptly to avoid the duplicative briefing and adjudication of threshold issues that BDO must first make. At the outset of the case—with no discovery having been exchanged and no trial date set—the judicial economy factor weighs heavily in favor of granting the requested stay. *See, e.g.*, *Pragmatus Telecom, LLC v. Advance Store Co., Inc.*, No. 12-088-RGA, 2012 WL 2803695 (D. Del. July 10, 2012) (supporting a stay when proceedings were in their "infancy" and "[n]o discovery of significance ha[d] occurred").

If this Court alternatively concludes that § 5.3 constitutes an arbitration provision, § 3 of the FAA requires a stay of this case pending arbitration. 9 U.S.C. § 3; *Coleman v. Sys. One Holdings, LLC*, 117 F.4th 97, 102 (3d Cir. 2024) (the "mandatory stay pending arbitration under Section 3 of the FAA" applies to a "party [that has] committed itself to arbitrate one or more issues in suit").

<u>CONCLUSION</u>

For these reasons, Defendant respectfully moves to compel submission of disputed matters to BDO, or alternatively, to compel arbitration of Counts I, III, IV, and V, and stay proceedings pending a final determination.

MORRIS, NICHOLS, ARSHT
& TUNNELL LLP

*/s/ S. Mark Hurd*
OF COUNSEL:

**ARNOLD & PORTER KAYE
SCHOLER LLP**
Aaron F. Miner (*pro hac vice* forthcoming)
Matthew F. Medina (*pro hac vice*
forthcoming)
250 West 55th Street
New York, NY 10019
Phone: 212.836.8000
aaron.miner@arnoldporter.com
matthew.medina@arnoldporter.com

May 30, 2025

S. Mark Hurd (#3297)
Elise K. Wolpert (#6343)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Phone: (302) 658-9200
shurd@morrisnichols.com
ewolpert@morrisnichols.com

*Counsel for Defendant
Mayne Pharma LLC*