## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THERAPEUTICSMD, INC.<br><br>Plaintiff,<br><br>v.<br><br>MAYNE PHARMA LLC<br><br>Defendant | C.A. No. 25-440-RGA |

### FIRST AMENDED COMPLAINT

Plaintiff TherapeuticsMD, Inc. ("TXMD" or "Plaintiff") in this action against Defendant, Mayne Pharma LLC ("Mayne" or "Defendant") (collectively, "the Parties") alleges as follows:

### NATURE OF THE ACTION

1.     TXMD brings this action for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, and unjust enrichment related to Defendant's actions in relation to the License Agreement and Transaction Agreement between the Parties.

### PARTIES

2.     TherapeuticsMD, Inc. is organized under the laws of Nevada and located at 951 Yamato Road, Suite 220, Boca Raton, Florida 33431.

3.     Defendant Mayne Pharma LLC is organized under the laws of Delaware with a registered agent at 1209 Orange Street, Wilmington, Delaware 19801.  Mayne also maintains an office at 3301 Benson Drive Suite 401, Raleigh NC 27609.

### JURISDICTION AND VENUE

4.     This Court has jurisdiction over the claims pursuant to 28 U.S.C. § 1332, as the Parties are citizens of different states (Nevada and Delaware), and the matter in controversy

exceeds the sum or value of $75,000.

5.      This Court has jurisdiction over Defendant, because Defendant is organized under the laws of Delaware, has consented to the jurisdiction of this court in the relevant License Agreement and Transaction Agreement, has committed acts within and outside Delaware giving rise to this action, and has maintained minimum contacts with this forum such that the exercise of jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice.

6.      Venue is appropriate in this Court, pursuant to 28 U.S.C. § 1391(b).

## FACTS

7.      Plaintiff TherapeuticsMD is a royalty company. It licenses its highly differentiated women's health products in the United States and globally to its exclusive licensing partners.

8.      Prior to the end of 2022, TXMD manufactured, marketed, and distributed several women's health products, including Annovera®, Bijuva®, and Imvexxy®, as well as branded prescription pre-natal vitamins.  These products were sold by TXMD or its subsidiaries, and listed TXMD or subsidiaries as the manufacturer (the "TXMD Products").

9.      Defendant Mayne Pharma LLC manufactures, markets, and/or distributes several pharmaceutical products in the United States.

10.     On or about December 4, 2022, TXMD and Mayne entered into a Transaction Agreement (the "Transaction Agreement") and a License Agreement (the "License Agreement") by which Mayne would, pursuant to a license from TXMD, manufacture, market, and distribute the TXMD Products.  These agreements were scheduled to close on or prior to December 30, 2002.

11.     On or about December 30, 2022, the Parties amended the Transaction Agreement

("Amendment No. 1 to the Transaction Agreement") and the License Agreement ("Amendment No. 1 to the License Agreement").

12.　　The License Agreement and Transaction Agreement are valid contracts between the Parties.

13.　　Under the License Agreement, Mayne manufactures and sells Mayne-branded women's health products under pharmaceutical labels and product names licensed from TXMD (the "Mayne Licensed Products").

14.　　Under the Transaction Agreement, as of the Closing Date, Mayne would purchase the ongoing TXMD commercial pharmaceutical operations primarily in the form of unsold TXMD Products in inventory awaiting sale and distribution, partially finished TXMD Products inventory, TXMD's receivables and several payables, and so forth, the value of which the Parties negotiated in good faith. TXMD and Mayne agreed that the Net Working Capital acquired by Mayne would be trued-up after the close of the transaction as, among other things, the remaining TXMD inventory previously sold into the commercial channel was distributed, dispensed to patients, or returned. After the Closing Date, TXMD did not produce any more TXMD Products or sell any further TXMD Products, and Mayne began selling Mayne Licensed Products into the marketplace.

15.　　As is alleged herein, the disposition of the TXMD Products that were already sold and in the commercial channel as of the closing date ("TXMD Inventory") was represented prior to closing, based upon estimates from TXMD, in "Estimated Net Working Capital."

16.　　The Parties agreed to true-up the Estimated Net Working Capital in three discrete events. The first true-up event was to occur within 90 days after the closing for all Estimated Net Working Capital categories, except for rebates, distribution fees, and returns, which would

Case 1:25-cv-00440-RGA    Document 16    Filed 06/20/25    Page 4 of 28 PageID #: 316

be trued up after one year for rebates and distribution fees, and two years for returns.  Upon

finally truing-up the net working capital for the rebates, distribution fees, and returns, the Parties

were to arrive at a Final Net Working Capital number to complete the transaction as described in

the Transaction Agreement.

17.     Approximately 90-days after closing, Mayne provided its calculations of the

"Closing Net Working Capital" for the first true-up.  The Parties settled the Closing Net Working

Capital in December 2023.

18.     Mayne subsequently provided statements for the rebates and distribution fees on

January 16, 2024, and for returns on February 3, 2025.

**Net Working Capital ("NWC")**

19.     At Closing, Mayne was obligated to pay TXMD "an amount equal to the Purchase

Price plus the Estimated Net Working Capital."  (Exhibit A, § 5.1 (Transaction Agreement)).

20.     Under the Transaction Agreement, "'Net Working Capital' means the Current

Assets and Current Liabilities adjusted as of immediately prior to the Closing in a manner

consistent with the Net Working Capital Annex."  (Exhibit A, § 1.1).

21.     The Pre-Closing Statement and "Net Working Capital Annex," found as Annex

5.3(a) to the Transaction Agreement, is a balance sheet associated with the Current Assets and

Current Liabilities transferred to Mayne at Closing.  As shown in the image below, the Net

Working Capital Annex includes the following Current Assets:  Net Accounts Receivable;

Finished Goods Inventory; WIP; Raw Materials – API; Prepaid contract manufacturing costs;

Prepaid PDUFA Fee; and Prepaid Rebates and Coupons.  The Pre-Closing Statement associated

with the Net Working Capital Annex also includes the following Current Liabilities: Accounts

Payable; Allowance for Coupons; Allowance for Returns; Allowance for Payer Rebates;

Wholesale Distributor Fees; and Accrued Contract Manufacturing Vendor.

*Current Assets:*
Net Accounts Receivable
Finished Goods Inventory
WIP
Raw Materials - API
Prepaid contract manufacturing costs
Prepaid PDUFA Fee
Prepaid Rebates and Coupons

**Total**

*Current Liabilities:*
Accounts Payable
Allowance for Coupons
Allowance for Returns
Allowance for Payer Rebates
Wholesale Distributor Fees
Accrued Contract Manufacturing Vendor

**Total**

**Total Net Working Capital**

22.    Section 5.3 of the Transaction Agreement describes the true-up process of the

"Closing Net Working Capital":

> Within ninety (90) Calendar Days after the Closing Date, Purchaser shall
> deliver to TXMD a statement setting forth Purchaser's calculation of the
> Net Working Capital as of the Closing (the "**Closing Net Working
> Capital**"), prepared consistent with the Net Working Capital Annex and
> delivered with reasonable supporting detail (the "**Closing Statement**").
> Following delivery to TXMD of the Closing Statement and until the
> Closing Statement is finalized in accordance with this Section 5.3,
> TXMD shall be permitted, solely for purposes of this Section 5.3 and
> subject to Section 9.6, to review relevant books and records (including
> accountant work papers) and access to accountants and employees of
> TXMD to the extent necessary to complete TXMD's review of the
> Closing Statement, and the Purchaser shall cooperate with TXMD and its
> representatives in connection with their review of the Closing Statement,
> which information shall be deemed confidential information of Purchaser
> for purposes hereof. The Closing Statement, and the Closing Net
> Working Capital set forth therein, shall become final and binding on the
> parties on the date that is thirty (30) Calendar Days following
> Purchaser's delivery thereof to TXMD, unless TXMD delivers written
> notice of its disagreement specifying in reasonable detail each disputed

item or amount and the basis for its disagreement therewith (a "**Notice of Disagreement**") to Purchaser on or prior to such date.

(Exhibit A, § 5.3(b)).

23.    Section 5.3 also describes a process by which disputes over the Closing Net Working Capital would be resolved.  (Exhibit A, §§ 5.3(c)-(g)).

**Final Net Working Capital and True-Ups to NWC**

24.    Most Net Working Capital line items were to be trued-up in the first true-up event.  Section 5.3(h) of Amendment No. 1 to the Transaction Agreement identified three Net Working Capital line items to be resolved in the two years following Closing, with the resolution of these line items to result in the "Final Net Working Capital":

> For a period of two years following the Closing Date in the case of Allowance for Returns and one year following the Closing date in the case of Wholesale Distributor Fees and Payer Rebates, Purchaser shall continue to provide updated Closing Statements solely with respect to calculation of the Closing Net Working Capital conduct solely **with respect to the matters included in the items entitled Allowance for Returns, Allowance for Wholesale Distributor Fees and Payer Rebates, in each case, comparing actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)**. The amounts set forth in the updated Closing Statements for such fiscal quarter shall become final and binding on the parties on the date that is thirty (30) Calendar Days following Purchaser's delivery thereof to TXMD, unless TXMD delivers written Notice of Disagreement to Purchaser on or prior to such date. The matter may be referred by either party to the Firm in same manner as clause (c) above. In the event that the Firm determines that amounts are due and payable to Purchaser, the amount, plus interest from the date of the Notice of Disagreement with interest calculated at the Interest Rate, shall be applied against the applicable accrual (e.g., Allowance for Returns, on the one hand, and Allowance for Wholesale Distributor Fees and Payer Rebates, on the other), provided, however, that if and when the applicable accrual has been depleted, TXMD shall pay the amount in excess and Purchaser shall be entitled to set off such amount, plus costs or attorneys' fees and other costs of collection pursuant to Section 12.8(a). In the event that the Firm determines that amounts are due and payable to TXMD (i) prior to two years following the Closing Date in the case of Allowance for Returns and one year following the Closing date in the case of Wholesale Distributor Fees and Payer Rebates, such amount in favor of TXMD shall be applied to the

applicable accrual in favor of TXMD and rolled to subsequent periods and (ii) from and after two years following the Closing Date in the case of Allowance for Returns and one year following the Closing date in the case of Wholesale Distributor Fees and Payer Rebates, if such aggregate amount of returns, rebates or distributor fees, as applicable (after taking into account all prior applications to the applicable accruals or allowances), results in the total of such returns, rebates or distributor fees as being less than the applicable allowance or accrual, Purchaser shall pay to TXMD such amount due plus interest from the date of the Notice of Disagreement with interest calculated at the Interest Rate, plus costs or attorneys' fees and other costs of collection. At the end of the two year period following the Closing Date in the case of Allowance for Returns and one year following the Closing Date in the case of Wholesale Distributor Fees and Payer Rebates, if the undisputed aggregate amount of returns, rebates or distributor fees, as applicable (after taking into account all prior applications to the applicable accruals or allowances), results in the total of such returns, rebates or distributor fees as being (x) less than the applicable allowance or accrual, Purchaser shall pay to TXMD such amount due or (y) more than the applicable allowance or accrual, TXMD shall pay to Purchaser such amount due. The term "**Final Net Working Capital**" as used in this Agreement means the Closing Net Working Capital as finally determined pursuant to this Section 5.3, as adjusted pursuant to this Section 5.3(h).

(Exhibit B, § 5.3(h) (emphasis added) (Amendment No. 1 to the Transaction Agreement)).

Therefore, "[f]or a period of . . . one year following the Closing date in the case of Wholesale Distributor Fees and Payer Rebates, [Mayne] shall continue to provide updated Closing Statements solely with respect to calculation of the Closing Net Working Capital . . . , in each case, comparing actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)." (*Id.*)  In the case of Allowance for Returns, Mayne was required to provide updated Closing Statements on a quarterly basis "[f]or a period of two years following the Closing

Date[.]"  (*Id.*)

```
Current Liabilities:
Accounts Payable
Allowance for Coupons
Allowance for Returns
Allowance for Payer Rebates
Wholesale Distributor Fees
Accrued Contract Manufacturing Vendor
Total
```

These line items are shown in the above image from the Pre-Closing Statement of the

Transaction Agreement.

25.    The "updated Closing Statements" were required to be submitted quarterly and

the information contained therein was to be summarized "on a quarterly basis," comparing the

actual invoices against the accruals against each line item. (*Id.*)  The Transaction Agreement

anticipated resolving any disputes as to the quarterly "updated Closing Statements by providing

for resolution of disputes over the Closing Statement as to each fiscal quarter.  (Exhibit B,

§ 5.3(h) ("The amounts set forth in the updated Closing Statements for such fiscal quarter shall

become final and binding on the parties on the date that is thirty (30) Calendar Days following

Purchaser's delivery thereof to TXMD, unless TXMD delivers written Notice of Disagreement

to Purchaser on or prior to such date.")).

**<u>Wholesale Distributor Fees</u>**

26.    In the pharmaceutical industry, wholesale distributors purchase pharmaceuticals

from manufacturers and charge a wholesale distribution fee.  These fees are incurred by

manufacturers when the product is purchased from the manufacturer by the distributors.

27.    As of the Closing Date, TXMD Inventory existed in the commercial supply chain

(or commercial channel) in the form of TXMD Products sold to distributors by TXMD prior to

the close of the transaction with Mayne, but for which the distribution fees had not yet been paid

or invoiced. As part of the Net Working Capital, Mayne accepted this liability, and TXMD contributed an allowance to pay for the wholesaler distribution fees for the TXMD Products that TXMD sold prior to the transaction closing that Mayne would use to satisfy the distribution fee liability. Under the Transaction Agreement, Mayne was to provide quarterly statements to TXMD comparing the allowance to the actual amounts paid as part of the true-up process.

28.     Since Mayne would have to pay these Wholesale Distributor Fees, the Wholesale Distributor Fees line item in the Pre-Closing Statement is treated as a liability against the assets transferred to Mayne as of the Closing Date.

29.     When TXMD and Mayne settled the first true-up to the Closing Net Working capital in December 2023, the Wholesale Distributor Fees line item was $3,739,336 and was "subject to adjustment pursuant to section 5.3(h)."

**Allowance for Payer Rebates**

30.     The Allowance for Payer Rebates line item in the Pre-Closing Statement was an estimate of anticipated TXMD rebates to payers upon the sale of TXMD Products based on rebate contracts that were negotiated and in-place prior to the closing.

31.     Since Mayne would have to pay the Payer Rebate, the Allowance for Payer Rebates line item in the Pre-Closing Statement is treated as a liability against the assets transferred to Mayne as of the Closing Date.

32.     TXMD estimated the rebate "allowance" based upon its experience selling the TXMD Products for several years. Importantly, rebates are only paid on pharmaceutical products that are ultimately dispensed to a patient; if a product is returned to the manufacturer, it is not subject to a rebate. TXMD calculated the estimated rebates after it accounted for a returns factor based on its prior experience selling the TXMD Products.

33.     The Net Working Capital Allowance for Payer Rebates consisted of two subcategories.  First, TXMD estimated an amount of the Allowance for Payer Rebates attributable to TXMD Products that had been dispensed to patients prior to the transaction close, but which had not yet been invoiced by the payers.  Second, TXMD estimated an amount of the Allowance for Payer Rebates attributable to TXMD Inventory that was in the commercial channel, but which had not yet been dispensed to patients.  TXMD and Mayne would use estimates of the TXMD Inventory in the commercial channel as of the closing date to calculate the rebates owed based on the actual invoices received and paid by Mayne.

34.     When TXMD and Mayne settled the first true-up to the Closing Net Working capital in December 2023, Mayne represented to TXMD that both pre- and post-transaction rebates were higher than expected and asked TXMD to increase the Allowance for Payer Rebates by approximately $2 million.  After that settlement, the Allowance for Payer Rebates line item was $17,843,969 and was "subject to adjustment pursuant to section 5.3(h)."

**Allowance for Returns**

35.     The Allowance for Returns line item in the Pre-Closing Statement was an estimate of anticipated returns of TXMD Products based upon several factors, including expiration of the pharmaceutical product and oversupply of inventory.

36.     Since Mayne would have to process and pay for returns of TXMD Products sold by TXMD, the Allowance for Returns line item in the Pre-Closing Statement is treated as a liability against the assets transferred to Mayne as of the Closing Date.

37.     In negotiations between the Parties regarding the amount of TXMD Inventory that was in the channel at the close of the transaction, both Mayne and TXMD used an estimate of 5% of the TXMD Inventory would be returned, which was based upon pharmaceutical-industry

best practices and TXMD's experience selling the same products in question.

38.    When TXMD and Mayne settled the first true-up to the Closing Net Working

capital in December 2023, the Allowance for Returns line item was $3,941,021 and was "subject

to adjustment pursuant to section 5.3(h)."

**Mayne Begins Over-Selling and the Subsequent Return of TXMD Products**

39.    Beginning at the start of 2023, Mayne began selling Mayne Licensed Products in

the marketplace.

40.    In § 7.12 "Inventory" of the Transaction Agreement, TXMD made the

representation and warranty that "[t]he TXMD Group maintains no more than 45 days of

Inventory at its distributors for any Product.  All Inventory consists of a quality that is usable and

salable in the ordinary course of business consistent in all material respects with past practice."

(Exhibit A, § 7.12).

41.    Mayne has since estimated that, as of January 1, 2023, the TXMD Inventory was

valued at approximately $18,346,381.

42.    On information and belief, over the course of 2023 (and possibly in 2024 or 2025)

Mayne sold more Mayne Licensed Products than was justified by market demand and the

inventory already in the channel that could meet the market demand, including the TXMD

Inventory in the channel.

43.    As a result of Mayne's over-selling market demand, the older, and sooner-to-

expire TXMD Inventory was preferentially returned at a volume that significantly exceeded

TXMD's estimates or returns volume estimates provided by Mayne as late as May of 2024.

44.    Mayne also failed to provide quarterly "updated Closing Statements" to TXMD

"comparing actual invoices against accruals on a quarterly basis," documenting the volume of

returns of TXMD Inventory and comparing it to the Allowance for Returns in prior estimates.

45.     Mayne did not apprise TXMD as to the impact of Mayne's over-selling market demand until August 2024, when Mayne demanded that TXMD pay an additional amount for returned TXMD Inventory.  In February 2025, Mayne provided its Net Working Capital "Closing Statement" for returns that further increased its demand for the Allowance for Returns by approximately $16.9 million.

46.     These alleged returns of TXMD Inventory exceed the around 5% expected by TXMD and appear to constitute all or substantially all of TXMD's Inventory in the commercial supply chain as of the Closing Date.

47.     The data Mayne has shared with TXMD indicates a volume of returns of TXMD Inventory that exceeds the inventory estimated to be in the commercial channel at the Closing Date.  A majority of the returned TXMD Inventory was returned in 2023.

48.     Meanwhile, as part of settling the Closing Net Working Capital during 2023, Mayne represented to TXMD that TXMD Inventory was selling through the commercial channel and that both the Allowance for Coupons and Allowance for Rebates line items should be revised upward to reflect higher-than-expected coupon use and higher-than-expected rebates in the marketplace.  The increased returns of TXMD Inventory does not comport with increased payer rebates, because returned products cannot – at the same time – be subject to rebates and coupons.

**Mayne Initiates the Second True-Up for Rebates and Wholesale Distribution Fees**

49.     On January 16, 2024, Mayne sent TXMD the Closing Statement for Allowance for Rebates and Wholesale Distribution Fees.  This "Closing Statement" was a raw spreadsheet with no summary information in the format of the Pre-Closing Statement.  The spreadsheet

provided information for transactions that occurred after the Closing Date.  It did not follow the process agreed upon in the Transaction Agreement for the true-up of Rebates and Wholesaler Distribution Fees.  In this spreadsheet, Mayne claimed that TXMD owed it an additional amount over the Net Working Capital Allowances for Rebates and Wholesaler Distribution Fees.

50.    The January 16, 2024 "Closing Statement" was the first such document that Mayne sent TXMD related to post-Closing Date transactions related to rebates or distribution fees, except that Mayne had demanded an increase in the rebates allowance as part of the December 2023 settlement of the Closing Net Working Capital.  No quarterly "updated Closing Statements" "comparing actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)" had been sent prior to January 16, 2024.

**Mayne Initiates the Third True-Up for Returns**

51.    On February 3, 2025, Mayne sent TXMD its "Closing Statement" for Allowance for Returns.  This document is a spreadsheet.  In this spreadsheet, Mayne claims that TXMD owes it an additional amount for returned TXMD Inventory.  This additional amount was **more than five times the amount** discussed in the first true-up to the Closing Net Working capital in December 2023, when the Allowance for Returns line item was $3,941,021, which is an amount that TXMD owed Mayne as of the Closing Date, and was "subject to adjustment pursuant to section 5.3(h)."  In the February 3, 2025 "Closing Statement," Mayne asserted that the total processed and unprocessed returns had ballooned from $3,941,021 to $20,841,862 and that – as a result – TXMD should pay Mayne an additional $16,900,841.

52.    The total dollar value of Mayne's claimed returns of TXMD Inventory in the February 3, 2025 "Closing Statement" – $20,841,862 –appears to exceed Mayne's own January 2024 estimates of TXMD Inventory in the supply chain as of the Closing Date, which Mayne

had valued at approximately $18,346,381.

**COUNT I: BREACH OF CONTRACT**
**(TRANSACTION AGREEMENT, § 5.3(h))**

53.    Plaintiff repeats and realleges the previous allegations set forth above with the same force and effect as if set forth fully herein.

54.    The Transaction Agreement, executed on or about December 4, 2022, is a valid contract between the Parties.

55.    The Transaction Agreement closed on or about December 30, 2022.

56.    Section 5.3(h) of the Transaction Agreement required Mayne to "[f]or a period of two years following the Closing Date in the case of Allowance for Returns and one year following the Closing Date in the case of Wholesale Distributor Fees and Payer Rebates, Purchaser shall continue to provide updated Closing Statements solely with respect to calculation of the Closing Net Working Capital[.]"  (Exhibit B, § 5.3(h)).  These required quarterly reports were to provide information "with respect to the matters included in the items entitled Allowance for Returns, Allowance for Wholesale Distributor Fees and Payer Rebates, in each case, comparing actual invoices against accruals on a quarterly basis[.]"  (*Id.*).

57.    Mayne provided TXMD with a single purported Closing Statement for Payer Rebates and Allowance for Wholesale Distributor Fees on January 16, 2024.  This document is a spreadsheet.  The spreadsheet does not "compar[e] actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)" (*id.*) such as in the format specified in Annex 5.3(a) "Net Working Capital."

58.    Mayne provided TXMD with a single purported Closing Statement for Allowance for Returns on February 3, 2025.  This document is a spreadsheet.  The spreadsheet does not "compar[e] actual invoices against accruals on a quarterly basis (using Purchaser's fiscal

14

quarters)" (*id.*) such as in the format specified in Annex 5.3(a) "Net Working Capital."

59.     Mayne breached § 5.3(h) of the Transaction Agreement by failing to provide quarterly "updated Closing Statements" of Payer Rebates and Allowance for Wholesale Distributor Fees, in the format required, "in each case, comparing actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)" in the year following the Closing Date.

60.     Mayne breached § 5.3(h) of the Transaction Agreement by failing to provide quarterly "updated Closing Statements" of Allowance for Returns, in the format required, "in each case, comparing actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)" in the two years following the Closing Date.

61.     Because Mayne did not provide these quarterly "updated Closing Statements" in the format required, "in each case, comparing actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)," TXMD was forced to rely on incomplete information when settling the Closing Net Working Capital in December 2023 for the first true-up event, which caused settlement of funds in favor of Mayne and to the detriment of TXMD. Additionally, absent detailed quarterly information on returns, TXMD has accepted reductions or offsets to its quarterly license fees paid by Mayne based upon higher levels of returned products.

62.     Also, because Mayne did not provide these quarterly "updated Closing Statements" in the format required, "in each case, comparing actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)," TXMD was unable to identify, to prevent, or to mitigate any harms associated with the implementation of the Transaction Agreement or the Licensing Agreement.  For example, the data shared by Mayne indicates that Mayne accepted returns that had been previously rejected or were disallowed by TXMD for a number of reasons.

Absent "updated Closing Statements," TXMD did not know that Mayne was accepting these returns and was unable to mitigate any damages, such as by taking action to stop the flow of returns from distributors or by preventing Mayne from accepting such returns in the future.

63.    For example, when TXMD and Mayne settled the first true-up to the Closing Net Working capital in December 2023, the Allowance for Returns line item was $3,941,021 and was "subject to adjustment pursuant to section 5.3(h)."  When Mayne presented an updated Closing statement reflecting the Allowance for Returns in February 2025, the Allowance for Returns line item presented by Mayne had grown by $11,237,299 in returns processed by Mayne and $9,604,562 in unprocessed claims.  The processed returns included many that were either disallowed, disputed, or had been previously rejected by TXMD.  Had Mayne reported these returns to TXMD at any point, TXMD would have been on notice that Mayne was processing returns that potentially needed to be disallowed or disputed, and/or were previously-rejected and could have taken steps to avoid continued harm in the form of returns for which Mayne now demands compensation.

64.    Therefore, Mayne's breaches of § 5.3(h) of the Transaction Agreement caused harm to TXMD in an amount to be determined at trial.

## COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

65.    Plaintiff repeats and realleges the previous allegations set forth above with the same force and effect as if set forth fully herein.

66.    To the extent the Court determines that Mayne has not breached any term of the Transaction Agreement, TXMD alleges the following in the alternative.

67.    To the best of TXMD's knowledge, Mayne oversold marketplace demand by selling Mayne Licensed Products into the commercial supply chain in volumes in excess of the

demand for these products.

68.     Because sellers of pharmaceutical products keep limited inventories in stock and generally return the stock that is first to expire when supplies exceed needed inventory levels, Mayne's oversupply of Mayne Licensed Products led to premature returns of TXMD Inventory in the supply chain preferentially over Mayne's newer inventory and the aging of TXMD Inventory in the supply chain such that TXMD Inventory was returned.

69.     To the best of TXMD's knowledge, Mayne's actions in overselling demand caused returns of all, or nearly all, of the TXMD Inventory in the commercial channel as of the Closing Date.

70.     To the best of TXMD's knowledge, Mayne has also accepted returns of TXMD Inventory that TXMD had previously rejected, disputed, or that were disallowed.

71.     Also, to the best of TXMD's knowledge, Mayne has begun rejecting unprocessed returns and telling distributors to collect from directly TXMD.  As a result, distributors have been contacting TXMD for payment associated with these returns.

72.     Mayne's actions overselling demand, accepting previously-rejected returns, accepting disallowed returns, and/or rejecting returns and sending distributors to collect from TXMD have prevented TXMD from receiving the "fruits of the bargain" associated with the Transaction Agreement, because Mayne claims that TXMD must now pay for returned products well beyond the expected (and historical) returns levels.  TXMD also does not receive the fruits of the bargain, because it incurred costs for the Allowance for Wholesale Distributor Fees for the returned TXMD Inventory.  Furthermore, TXMD has paid, and Mayne continues to ask TXMD to pay, respectively, for an Allowance for Coupons and Allowance for Rebates associated with these very returned products as if they had been dispensed to patients.  Additionally, TXMD has

accepted reductions or offsets to its quarterly license fees paid by Mayne based upon these higher levels of returned products. Also, TXMD now faces direct costs associated with the returns not processed by Mayne and sent back to TXMD for collection.

73.   Mayne's actions frustrated the overarching purpose of part of the Transaction Agreement, which was to effect a transfer of existing, in-channel TXMD Inventory, allow it to process through the commercial channel with the reasonable rate of returns, and then to reconcile and true-up the coupons, rebates, and wholesale distributor fees for products that TXMD had already sold. This is why the Transaction Agreement included in the Net Working Capital the Allowance for Coupons, Allowance for Rebates, and Wholesale Distributor Fees line items.

74.   The Parties anticipated some level of returns and negotiated an expected value of the returned goods as part of the net working capital, but not at a volume that appears to be all or substantially all of the TXMD Inventory in the commercial channel as of the close of the transaction and far exceeds the negotiated value. Therefore, based upon the structure of the Transaction Agreement, the Parties would have proscribed Mayne's sales activities that oversold demand in the marketplace, had they thought to negotiate the Transaction Agreement with the understanding that the TXMD Inventory would be replaced by Mayne Inventory. The Parties would have also proscribed Mayne's acceptance of returns previously rejected by TXMD, disallowed under TXMD policy, or disallowed for other reasons, had they thought to negotiate the Transaction Agreement with the understanding that rejected or disallowed returns should not be accepted. Moreover, the Parties would have also proscribed Mayne's refusal to process returns or to send distributors to TXMD for collection some two years after the Closing Date and after Mayne had sent its February 3, 2025, "Closing Statement" for Allowance for Returns.

75.   For at least these reasons, Mayne's actions as described herein constitute a breach

of the implied covenant of good faith and fair dealing associated with the Transaction

Agreement.

76.     As a result of this breach, TXMD has been harmed in an amount to be determined

at trial.

<h3 style="text-align:center"><u>COUNT III: BREACH OF CONTRACT<br>(NDC LABELER CODE)</u></h3>

77.     Plaintiff repeats and realleges the previous allegations set forth above with the

same force and effect as if set forth fully herein.

78.     In December 2022, individuals at TXMD and Mayne met and communicated on a

regular basis about the details of facilitating the Transaction Agreement as of the Closing Date.

These details included various regulatory and related tasks associated with, among other things,

the transfer of TXMD's Product New Drug Applications and Product Investigational New Drug

Applications to Mayne.

79.     Another regulatory task associated with closing the Transaction Agreement was

the transfer of TXMD's NDC Labeler Code to Mayne.  The Labeler Code is the first portion of

the National Drug Code ("NDC") the United States Food and Drug Administration assigns to

individual pharmaceutical products.  TXMD's NDC Labeler Code was 50261.

80.     During the aforementioned discussions, the Parties agreed that TXMD would

transfer TXMD's NDC Labeler Code to Mayne as of the Closing Date.

81.     This agreement constituted a valid contract between the Parties.

82.     In December 2022, to facilitate the transfer of the NDC Labeler Code, Mayne

provided TXMD with information necessary to transfer the NDC Labeler Code with the Food

and Drug Administration.

83.     On or about December 30, 2022, having received the necessary information from

Mayne, TXMD transferred its NDC Labeler Code (50261) to Mayne.

84.    On or about January 3, 2023, unbeknownst to TXMD and without TXMD's

consent, Mayne transferred the NDC Labeler Code (50261) back to TXMD.

85.    As a result of this transfer back of the NDC Labeler Code after the Closing Date,

TXMD incurred significant costs that were associated with the post-Closing Date reporting

responsibilities of the NDC holder related to government contracts.

86.    Mayne breached the contract concerning the NDC Labeler Code by transferring it

back to TXMD when the Parties had already agreed that TXMD would transfer the NDC Labeler

Code on or about the Closing Date.

87.    As a result of Mayne's breach, TXMD suffered damages in an amount to be

determined at trial.

## COUNT IV: BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING
## (NDC LABELER CODE)

88.    Plaintiff repeats and realleges the previous allegations set forth above with the

same force and effect as if set forth fully herein.

89.    To the extent the Court determines that Mayne has not breached any term of any

contract between the Parties, TXMD alleges the following in the alternative.

90.    In the Transaction Agreement, the Parties agreed to transfer a number of assets

from TXMD to Mayne.

91.    As part of the Transaction Agreement, individuals from Mayne and TXMD met in

December 2022 to prepare the details of the transaction.

92.    One such detail of the transaction was the transfer of the NDC Labeler Code from

TXMD to Mayne.

93.    The Parties expected that, after the Closing Date, which was at the end of

December 2022, TXMD would transfer all the necessary assets and information to Mayne, including the NDC number, that would allow Mayne to commercialize the licensed pharmaceutical products under the agreed framework.

94.    The Parties expected that, after the Closing Date, which was at the end of December 2022, Mayne would assume TXMD's products, covered by various FDA regulatory approvals and that Mayne would assume the ongoing benefits of these products including revenues as well as the ongoing responsibilities associated with these products, including regulatory filings and other expenses.

95.    In December 2022, to facilitate the transfer of the NDC Labeler Code, Mayne provided TXMD with information necessary to transfer the NDC Labeler Code with the Food and Drug Administration.

96.    On or about December 30, 2022, having received the necessary information from Mayne, TXMD transferred its NDC Labeler Code (50261) to Mayne.

97.    On or about January 3, 2023, unbeknownst to TXMD and without TXMD's consent, Mayne transferred the NDC Labeler Code (50261) back to TXMD.

98.    As a result of this transfer back of the NDC Labeler Code after the Closing Date, TXMD incurred significant costs in early 2023 that were associated with the reporting responsibilities of the NDC holder related to government contracts.  This was at a time when TXMD had already transferred the relevant INDs and NDAs associated with the Mayne Licensed Products and was – with regards to the FDA – was no longer selling these products.

99.    Had the Parties sought to negotiate the transfer of the NDC Labeler Code explicitly in the Transaction Agreement, they would have proscribed Mayne from transferring the code back to TXMD in January 2023, *after the Closing Date*, and they also would have

proscribed TXMD from having to pay for the cost to collect and assemble the relevant information from Mayne, prepare the documentation on Mayne's behalf, and make the required regulatory filings also on Mayne's behalf.

100.    As a result of these actions by Mayne, TXMD did not receive the fruits of the bargain and instead suffered damages associated with the increased cost of the regulatory filings in 2023, *after the Closing Date*, that Mayne should have handled and paid for.

101.    As a result of Mayne's breach, TXMD has suffered damages in an amount to be determined at trial.

## COUNT V: FRAUDULENT INDUCEMENT

102.    Plaintiff repeats and realleges the previous allegations set forth above with the same force and effect as if set forth fully herein.

103.    On March 26, 2023, Mayne provided TXMD with its Closing Statement, including its calculation of Closing Net Working Capital as of the Closing Date.

104.    On May 26, 2023, TXMD sent Mayne a Notice of Disagreement.

105.    On or about December 15, 2023, the Parties settled their disputes with respect to the final calculation of Closing Net Working Capital.

106.    This settlement is documented in a written agreement, dated December 15, 2023.

107.    The settlement is a valid contract.

108.    As part of the settlement of Closing Net Working Capital, TXMD paid Mayne $5,500,000.

109.    During discussions relating to settling the Closing Net Working Capital, Mayne represented to TXMD that the Allowance for Coupons and Allowance for Payer Rebates line items through 2023 had already been and, in 2024, were expected to be higher than either Party expected.  That is, Mayne represented to TXMD that throughout 2023 both Coupons and Payer

22

Rebates were being used at a higher rate than expected by the Parties, indicating that TXMD Inventory was selling through the supply chain as anticipated under Transaction Agreement.

110.    These statements were false, at least because, throughout 2023, Mayne had oversold and was continuing to oversell Mayne Licensed Products into the supply chain and at same time, through 2023, had accepted and was continuing to accept abnormally high return volumes of TXMD Inventory in the supply chain.

111.    Mayne knew or should have known these representations to be false, because Mayne had accepted abnormally large volume of returns of TXMD Inventory in 2023, while knowing that rebates and coupons cannot be paid on inventory that is returned.

112.    Mayne's representations that rebates had been submitted throughout 2023 at higher-than-expected rates gave TXMD the impression that TXMD Inventory was moving through the channel as anticipated and was not being returned outside of expected levels. Because Mayne had not submitted "updated Closing Statements" in the format required, "in each case, comparing actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)," documenting these returns at the time, TXMD did not have any other information that would contradict Mayne's representations about coupons and rebates.

113.    Therefore, TXMD relied on Mayne's representations about the rate at which TXMD Inventory had sold in 2023 and was continuing to sell at the end of 2023 and into 2024, and as a result of Mayne's representations about current sales, TXMD agreed to settle the Closing Net Working Capital, including accepting more than $1.3 million in Allowances for Coupons and paying Mayne an additional $2 million to increase the Allowance for Payer Rebates.

114.    Had TXMD known, in December 2023, that Mayne had oversold market demand

23

and was, throughout 2023, accepting the return of all, or nearly all, of the TXMD Inventory in the supply chain as of the Closing Date, it would not have agreed, in December 2023, to settle the Closing Net Working Capital on the terms it did, including paying money to Mayne as part of the settlement.

115.   Therefore, Mayne fraudulently induced TXMD to settle the Closing Net Working Capital in December 2023.

116.   As a result, TXMD suffered harm, including damages for monies paid to Mayne as part of the December 2023 settlement, in an amount to be determined at trial.

## COUNT VI: UNJUST ENRICHMENT

117.   Plaintiff repeats and realleges the previous allegations of paragraphs 1–52, 67–73, 93–98, and 103–114 set forth above with the same force and effect as if set forth fully herein.

118.   To the extent the Court determines that Mayne has not breached any term of the Transaction Agreement, any other contract between the Parties, or the implied covenant of good faith and fair dealing as applied to the Transaction Agreement, TXMD alleges the following in the alternative.

119.   As alleged above, Mayne oversold demand for the TXMD Inventory and Mayne Licensed Products in the commercial channel, which led to premature returns of TXMD Inventory in the supply chain preferentially over Mayne's newer inventory and the aging of TXMD Inventory in the supply chain such that TXMD Inventory was returned.  Mayne has claimed TXMD is obligated to pay the full value of the returned TXMD Inventory, for which TXMD paid Wholesale Distributor Fees and has already paid Mayne an allowance for Wholesaler Distribution Fees that had not yet been invoiced as of the close of the transaction for the returned TXMD Inventory.

120.   At the same time, Mayne sold Mayne Licensed Products to the marketplace and

booked sales of those products to the exclusion of TXMD Inventory already in the supply chain.

121.    Moreover, Mayne has been paid, and subsequently claimed, allowances for coupons and rebates associated with TXMD Inventory, even though those products were returned, and no coupon or rebate could have been redeemed on the returned TXMD Inventory.

122.    By overselling the TXMD Inventory with Mayne Licensed Products as described above, Mayne has been enriched.

123.    As a result of Mayne's actions, TXMD has been impoverished, including monies paid to Mayne to settle net working capital claims, and other net working capital claims for rebates, coupons, and wholesale distributor fees on returned TXMD Inventory that Mayne never allowed to move through the commercial channel.

124.    Mayne's enrichment is directly related to TXMD's impoverishment.

125.    There is an absence of justification for Mayne's actions.

126.    There is no adequate remedy at law.

127.    TXMD has suffered harm in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter full and final judgment in its favor and against Defendant:

A.      Declaring that Defendant's failure to provide updated Closing Statements, on a quarterly basis, with respect to calculation of Closing Net Working Capital conduct solely with respect to the matters included in the items entitled Allowance for Returns, Allowance for Wholesale Distributor Fees and Payer Rebates constitutes a breach of Section 5.3(h) of the Transaction Agreement;

B.      Declaring that Defendant's return of the NDC Labeler code constitutes breach of contract;

C.      Declaring the Defendant's return of the NDC Labeler code constitutes breach of the implied covenant of good faith and fair dealing;

D.      Declaring that Defendant's sales activities, which caused an over-supply of Mayne Licensed Products and led to greater than expected returns of TXMD Inventory, constitutes a breach of the implied covenant of good faith and fair dealing associated with the Transaction Agreement and License Agreement.

E.      Declaring that Defendant's acceptance of returns previously rejected by TXMD and/or disallowed by TXMD, which caused greater than expected returns of TXMD Inventory, constitutes a breach of the implied covenant of good faith and fair dealing associated with the Transaction Agreement and License Agreement.

F.      Declaring that Defendant's rejecting unprocessed returns and directing distributors to collect from TXMD constitutes a breach of the implied covenant of good faith and fair dealing associated with the Transaction Agreement and License Agreement.

G.      Declaring that Defendant fraudulently induced Plaintiff, in December 2023, to settle the Closing Net Working Capital of the Transaction Agreement, including paying Defendant money for Rebates and Coupons for TXMD Inventory that had been returned and was not dispensed to patients;

H.      Declaring that Defendant unjustly enriched itself at the expense of Plaintiff by overselling demand for Mayne Licensed Products and forcing greater than expected returns of TXMD Inventory;

I.      Ordering Defendant to account to Plaintiff for all gains, profits and advantages derived from its wrongful acts;

J.      Awarding Plaintiff money damages for all of Defendant's profits arising from Defendant's unlawful conduct, including payment of license fees and return of net working capital allowances for rebates, coupons, and distribution fees;

K.      Awarding Plaintiff money damages for any injury sustained by Plaintiff as a result of Defendant's unlawful conduct;

L.      Awarding Plaintiff's reasonable attorney fees;

M.      Awarding Plaintiff the costs of this action; and

N.      Granting Plaintiff such other and further relief as the Court deems just, equitable and proper.

Date: June 20, 2025

**SMITH KATZENSTEIN & JENKINS LLP**

*/s/ Daniel A. Taylor*
Julie M. O'Dell (No. 6191)
Daniel A. Taylor (No. 6934)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
jmo@skjlaw.com
dat@skjlaw.com

*Attorneys for Plaintiff TherapeuticsMD, Inc.*