**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THERAPEUTICSMD, INC. <br><br>          Plaintiff, <br><br>      v. <br><br> MAYNE PHARMA LLC <br><br>         Defendant | C.A. No. 25-440-RGA |

**PLAINTIFF THERAPEUTICSMD'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION TO COMPEL SUBMISSION OF DISPUTED MATTERS
FOR AN EXPERT DETERMINATION, OR ALTERNATIVELY TO COMPEL
ARBITRATION AND STAY PROCEEDINGS (D.I. 8)**

**SMITH KATZENSTEIN & JENKINS LLP**

Julie M. O'Dell (No. 6191)
Daniel A. Taylor (No. 6934)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
jmo@skjlaw.com
dat@skjlaw.com

*Attorneys for Plaintiff TherapeuticsMD, Inc*

Dated: June 27, 2025

## TABLE OF CONTENTS

TABLE OF CITATIONS ........................................................................................................ iii

I.      NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

II.     SUMMARY OF ARGUMENT ........................................................................................ 2

III.    STATEMENT OF FACTS .............................................................................................. 3

        A.      The Transaction Agreement ................................................................................ 3

IV.     ARGUMENT .................................................................................................................. 5

        A.      There Is No Arbitration Clause in the Transaction Agreement ............................ 6

                1.      Defendant's Arguments "In the Alternative" Fail ....................................... 9

        B.      An Expert Determination Is Not Appropriate ...................................................... 15

        C.      A Stay Is Not Warranted ................................................................................... 17

V.      CONCLUSION .............................................................................................................. 19

## TABLE OF CITATIONS

**Cases**

*ArchKey Intermediate Holdings Inc. v. Mona*,
  302 A.3d 975 (Del. Ch. 2023).............................................................. 8, 16, 17

*Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., AFL-CIO*,
  544 F.2d 1207 (3d Cir. 1976).............................................................. 17

*Elf Atochem N. Am., Inc. v. Jaffari*,
  727 A.2d 286 (Del. 1999) ................................................................... 6

*Enhanced Sec. Research, LLC v. Cisco Sys., Inc.*,
  2010 WL 2573925 (D. Del. June 25, 2010)........................................ 18

*FeraDyne Outdoors, LLC v. Reaser*,
  2023 WL 9094423 (Del. Super. Ct. Dec. 20, 2023) ........................... 17

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995) ........................................................................... 7

*HBMA Holdings, LLC v. LSF9 Stardust Holdings LLC*,
  2017 WL 6209594 (Del. Ch. Dec. 8, 2017) ....................................... 12

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  586 U.S. 63 (2019).............................................................................. 11

*In re Viking Pump, Inc.*,
  148 A.3d 633 (Del. 2016) ................................................................... 7

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
  560 F.3d 156 (3d Cir. 2009)................................................................ 7, 11

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936)............................................................................ 17

*Pragmatus Telecom, LLC v. Advanced Store Co., Inc.*,
  2012 WL 2803695 (D. Del. July 10, 2012) ........................................ 18

*RedBird Capital Partners Platform LP v. Concorde Parent, LP*,
  2024 WL 3220350 (Del. Ch. June 28, 2024)...................................... 16

*Sapp v. Indus. Action Servs., LLC*,
  75 F.4th 205 (3d Cir. 2023) ............................................................... 9, 10

## I.    <u>NATURE AND STAGE OF THE PROCEEDINGS</u>

Plaintiff TherapeuticsMD, Inc. ("Plaintiff" or "TXMD") filed a Complaint in this action on April 8, 2025 (D.I. 1) and served Defendant Mayne Pharma, LLC ("Defendant" or "Mayne") on April 10, 2025 (D.I. 5). Shortly before the answer was due, the parties stipulated to grant Defendant an additional 29 days to respond (D.I. 6), which the Court ordered on May 1, 2025.

On May 30, 2025, Defendant filed a Complaint against Plaintiff alleging breach of the same contract as alleged in this action. (D.I. 1, Ex. A; D.I. 9, Ex. A; *see generally* C.A. No. 25-670-RGA, D.I. 1 and Ex. A) That same day, Mayne filed a Motion to Compel Submission of Disputed Matters for an Expert Determination, or Alternatively to Compel Arbitration and Stay Proceedings (the "Motion to Compel"). (D.I. 8) The motion and accompanying brief lack the required certification for nondispositive motions required under Local Rule 7.1.1.[1] (*Id.*; D.I. 9) Mayne does not seek to stay the duplicative litigation. (D.I. 8; D.I. 9) Mayne also filed a motion to dismiss for failure to state a claim. (D.I. 10) The Parties have stipulated (D.I. 15), and the Court has ordered an extension of time until June 27, 2025, for Plaintiff to respond to the pending motions, (*see* June 17, 2025, Order). On June 20, 2025, pursuant to Federal Rule of Civil Procedure 14(a)(1)(B), Plaintiff filed a First Amended Complaint ("FAC"). (D.I. 16) Plaintiff opposes the Motion to Compel.

---

[1] Defendant makes two contradictory arguments. First, Defendant contends that the Transaction Agreement ("TA") **does not contain an arbitration clause** and requests that the Court compel an expert determination. (D.I. 9 at 7–9) Second, Defendant avers "alternatively" that the TA **has a valid arbitration clause** that the Court should enforce. (*Id.* at 9–14) The latter argument is essentially a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), which would not require a meet and confer under the Local Rules.

## II.    **SUMMARY OF ARGUMENT**

1.      Section 5.3(c) is not an arbitration clause. It outlines two specific approaches to resolving disputes over the dollar values in the Closing Net Working Capital line items. First, the Parties may "resolve [the dispute] in writing[.]" (D.I. 16, Ex. A at § 5.3(c)) Second, the parties may engage a third-party accounting firm to determine what the disputed value is. (*Id.*) Both of these options can be "final and binding on the parties" depending on which writing is finalized first. (*Id.* at § 5.3(e)) Third, the parties may litigate "[a]ny claim or dispute arising out of or relating to" the Transaction Agreement. (*Id.* at § 13.10) The language relating to the third-party determination is neither mandatory nor exclusive and is not an agreement to arbitrate. The Court has subject matter jurisdiction, and the relevant claims should not be dismissed.

2.      Compelling an expert determination will not assist the Court in resolving the disputes raised in the FAC for the simple reason that Section 5.3(c) prohibits the use of any findings of the expert as evidence in this litigation. (*Id.* at § 5.3(c) (emphasis added) ("Any determinations by the Firm, and any work or analyses performed by the Firm in connection with its resolution of any dispute under this Section 5.3(c) **shall not be admissible in evidence in any suit, action or other proceeding between the partie**s[.]")) The expert also cannot perform an "independent review." Whatever the expert finds or concludes will be unavailable as evidence in this litigation.

3.      Should the Court determine to compel the expert determination, it should not stay this litigation. A stay would prejudice TXMD. Mayne has filed other motions in this case and has initiated its own separate lawsuit arising out of the same transaction or occurrence discussed in the FAC. Mayne does not request to stay that litigation – it only seeks to use a potential stay to its advantage while raising its counterclaims to this litigation in a separate lawsuit.

III.    **STATEMENT OF FACTS**

In December 2022, the Parties entered into transaction and license agreements transferring several pharmaceutical product lines from TXMD to Mayne. As part of this transaction, Mayne paid TXMD $140 million plus an amount based upon the valuation of the ongoing operations that were transferred. Given the complexities of distributing these products, the final value of the line items to the "Closing Net Working Capital" was to be determined in a series of true ups over a 2-year period following the closing date. The FAC alleges that as part of settling the initial true up in December 2023, and based upon Mayne's representations at the time, TXMD paid Mayne approximately $5.5 million. (D.I. 16 at ¶ 108) In a subsequent updated closing statement in January 2024, Mayne demanded additional money. (*Id.* at ¶ 49) And in February 2025, Mayne asserted that the total processed and unprocessed returns had ballooned from $3.9 million to $20.8 million and that – as a result – TXMD should pay Mayne an additional $16.9 million. (*Id.* at ¶ 51) This volume of returns appears to exceed Mayne's own January 2024 estimates of TXMD Inventory in the supply chain as of the closing date, which Mayne had valued at approximately $18.3 million and is greatly in excess of the 5% returns rate estimated and negotiated by the Parties as part of the working capital. (*Id.* at ¶ 52) At present, there remain three Closing Net Working Capital line items for the Parties to resolve: Allowance for Returns, Allowance for Payer Rebates, and Wholesale Distributor Fees. (*Id.* at ¶¶ 24–38) Specific facts associated with the FAC are discussed in the Argument section, as necessary.

A.    **The Transaction Agreement**

The Transaction Agreement ("TA") includes at least three possible routes for dispute resolution. First, the parties may litigate "[a]ny claim or dispute arising out of or relating to" the Transaction Agreement. (D.I. 16, Ex. A at § 13.10) Second, the Parties may resolve a dispute related to line items in the Closing Net Working Capital "in writing." (*Id.* at § 5.3(c)) Third, the

3

parties may engage an expert for a determination of what the disputed Closing Net Working Capital line-item values are. (*Id.*) Both of the second and third options can be "final and binding on the parties" depending on which writing is finalized first. (*Id.* at § 5.3(e))

Section 5.3(c) establishes a process by which the Parties can disagree as to specific terms of the Closing Net Working Capital. The TA states:

> (c) During the thirty (30) Calendar Days following delivery of a Notice of Disagreement, Purchaser and TXMD shall seek to resolve in good faith and in writing any differences which they may have with respect to the matters specified in the Notice of Disagreement. At the end of such thirty (30) Calendar Day period, if no resolution has been reached, Purchaser and TXMD shall submit such dispute to BDO USA, LLP's National Dispute Advisory Service Practice (the "**Firm**"); provided that, any representatives of the Firm associated in any way with resolving any such dispute shall not have previously provided services to the Purchaser or TXMD, for resolution of all matters which remain in dispute which were included in the Notice of Disagreement, and the Firm shall make a final determination of the Closing Net Working Capital in accordance with the terms of this Agreement (with it being understood that the parties will request that the Firm deliver to the parties its resolution in writing not more than forty five (45) Calendar Days after its engagement). The Firm shall make its determination only with respect to the matters still in dispute and, with respect to each such matter, its determination shall be within the range of the dispute between Purchaser and TXMD. The Firm's determination shall be based solely on written materials submitted by Purchaser and TXMD (*i.e.*, not on independent review) and on the definitions included herein and the provisions of this Agreement. Any determinations by the Firm, and any work or analyses performed by the Firm in connection with its resolution of any dispute under this <u>Section 5.3(c)</u> shall not be admissible in evidence in any suit, action or other proceeding between the parties, other than to the extent necessary to enforce payment obligations under this <u>Section 5.3</u>.

(D.I. 16, Ex. A at § 5.3(c) (emphasis in original)) Should the Parties be unable to resolve any disputes related to the Closing Net Working Capital line items, this clause identifies an accounting

firm, "BDO USA,"[2] as the "Firm" and a process for resolving such disputes. (*Id.*) The clause does not use the word "arbitration" or refer to the Firm as an "arbitrator," nor does it specify any rules by which such a proceeding would happen. (*Id.*) Moreover, the Firm's authority only arises when the parties engage it, and its determination is only final and binding on the parties if the matters in dispute are resolved in writing by the Firm prior to any written settlement of the Parties. (*Id.* at § 5.3(e))

The scope of the Firm's investigation is limited – it simply receives "written materials submitted by [Mayne] and TXMD," does not conduct any "independent review," and instead selects a number "within the range of the dispute between Purchaser and TXMD." (*Id.*) There is no evidentiary hearing, no argument, and no written opinion. The final determinations of the Closing Net Working Capital line items result in an obligation for one party to pay the other. (*Id.* at § 5.3(d)-(g))

Should the Parties choose to engage the Firm, "[a]ny determinations by the Firm, and any work or analyses performed by the Firm in connection with its resolution of any dispute under this Section 5.3(c) **shall not be admissible in evidence in any suit, action or other proceeding between the parties**, other than to the extent necessary to enforce payment obligations under this Section 5.3." (*Id.* at § ¶ 5.3(c) (emphasis added))

IV.    **ARGUMENT**

This dispute is about breach of the covenant of good faith and fair dealing. The FAC alleges other causes of action, but the facts central to the breach of the covenant claim are relevant to the dispute resolution issue that Defendant raises in this Motion to Compel. The data that feeds into

---

[2] BDO USA is disqualified from performing this service, as it now performs accounting work for Mayne.

the Closing Net Working Capital calculations does not account for – and has no way to account for – the underlying breach of the covenant by Defendant's oversupply of products in the marketplace. This oversupply caused the premature return of TXMD inventory. This is reflected in a single line item, the "Allowance for Returns," which is a number that has fully been within Defendant's control. That number has grown from $3.9 million to $20.8 million, and now Defendant demands $16.9 million to cover the alleged shortfall, even though the returns far exceed industry averages or even the total value of TXMD's inventory in the supply chain when the deal closed. Plaintiff filed this lawsuit to resolve this conflict, because at every turn, Defendant has asked TXMD to pay more money and to do so based upon conflicting and incomplete information. The solution, according to Defendant, is to take these questions to the accounting Firm, which will review written submissions and make an unappealable determination with a potentially eight figure price tag. For the reasons discussed, the TA does not mandate such an outcome. It does not contain a valid mandatory agreement to arbitrate. To the extent that the TA includes an expert determination, the Court should not compel such a determination. An expert determination will not address the merits of the claims of the FAC, nor will the Firm's findings be inadmissible in this proceeding. A stay pending an expert determination is not warranted, either.

### A. There Is No Arbitration Clause in the Transaction Agreement

Defendant cannot soft-pedal its arbitration argument in the alternative. A fundamental question of Court's jurisdiction is whether the TA contains a valid, mandatory arbitration agreement. Delaware courts lack subject matter jurisdiction to resolve disputes that litigants have contractually agreed to arbitrate. *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 287 (Del. 1999). For this reason, Plaintiff addresses arbitration first. Section 5.3(c) of the TA is not an arbitration clause, and the relevant case law does not command dismissal of the claims in the FAC.

"[B]efore compelling arbitration pursuant to the Federal Arbitration Act, a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (citations omitted). "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Here, Delaware law applies. (D.I. 16, Ex. A at § 13.10) Delaware courts "interpreting a contract 'will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions.'" *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

Considering the four corners of the TA, there are at least three routes for dispute resolution. The parties may litigate "[a]ny claim or dispute arising out of or relating to" the Transaction Agreement. (D.I. 16, Ex. A at § 13.10) Should there be specific disputes about line items in the Closing Net Working Capital, the Parties may resolve those disputes "in writing." (*Id.* at § 5.3(c)) Alternatively, the parties may engage an expert for a determination of what the disputed Closing Net Working Capital line-item values are. (*Id.*) Both of the Closing Net Working Capital options can be "final and binding on the parties" depending on which writing is finalized first. (*Id.* at § 5.3(e))

An arbitration generally has the following characteristics: (1) an individual or panel of legal professionals; (2) a sponsoring organization; (3) established procedural rules; (4) an arbitrator ruling on procedure; (5) parties represented by counsel; (6) an arbitrator taking evidence and hearing testimony; (7) the arbitrator issues an award; (8) immunity from suit; (9) the arbitrator's

decision is subject to appeal; and (10) federal or state laws govern the proceeding. *ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975, 989-90 (Del. Ch. 2023).

Under these factors, the referral to the Firm (which is one of three dispute resolution processes) is clearly not an arbitration. Of the ten factors identified in *ArchKey*, only two – the issuance of an award and representation by counsel[3] – are shared with arbitration. Otherwise, the Firm process shares no other factors with arbitration. Section 5.3(c) identifies the Firm as resolving disputes related to the Closing Net Working Capital. (*Id.* at § 5.3(c)) It is neither an individual nor a panel of legal professionals. At no point is the Firm identified as an "arbitrator" or is the process referred to as an "arbitration." (*Id.*) There is no sponsoring organization, and traditional arbitration rules, such as those of the AAA, do not apply. (*Id.*) The clause does not state that it applies to "any and all disputes." (*Id.*) There is no individual taking evidence and hearing testimony, and only written submissions are allowed. (*Id.*) The Firm does not have immunity from suit. There is no appeal of the Firm's "determination." And no federal or state laws govern the proceedings.

Additionally, the scope of the Firm's review is limited – it is not to conduct an "independent review" and is to instead make a determination related to the Closing Net Working Capital "based solely on written materials submitted by [Mayne] and TXMD" and to determine a dollar amount "within the range of the dispute between [Mayne] and TXMD." (*Id.*) This is to happen within 45 days of engagement. (*Id.*)

Moreover, the Firm's work product is not a final judgment or opinion that can be used elsewhere. In fact, whatever work product the Firm produces, including "[a]ny determinations by the Firm, and any work or analyses performed by the Firm in connection with its resolution of any

---

[3] Although the TA does not specify this, the Parties have subsequently agreed to be represented by counsel but only if both sides are represented.

dispute under this Section 5.3(c) shall not be admissible in evidence in any suit, action or other proceeding between the parties[.]" (*Id.*)

Given the limited scope of the Firm's investigation, the limited applicability of the Firm's determinations in other courts, and in view of the fact that the Parties have the option to litigate disputes arising out of the TA in court, § 5.3(c) is not an agreement to arbitrate. *Sapp v. Indus. Action Servs., LLC*, 75 F.4th 205, 214 (3d Cir. 2023). Therefore, no valid agreement to arbitrate exists, and the relevant claims should not be dismissed.

### 1.    Defendant's Arguments "In the Alternative" Fail

After arguing that an expert determination is necessary and should be compelled, Defendant argues the exact opposite position "in the alternative" – that a valid agreement to arbitrate exists (D.I. 9 at 9–11) and that the language of the TA is "broad" which means that the Firm (and not the Court) must determine the substantive arbitrability of the claims (*id.* at 11-14).

### a.    There Is No Valid Agreement to Arbitrate.

As discussed above, § 5.3(c) of the TA is not a valid agreement to arbitrate. Defendant argues that an agreement to arbitrate exists, because in contrast to the Third Circuit's holding in *Sapp*, the agreement is not to an expert determination and must therefore be an agreement to arbitrate. (D.I. 9 at 9-11) In *Sapp*, the Third Circuit found that the agreement was for an expert determination, reasoning that the inability of the third party to make "final and binding rulings on issues of *law*" was determinative. *Sapp*, 75 F.4th at 214 (citing *Penton Bus. Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, 466 (Del. Ch. 2018)). Here, *Sapp* applies, because the TA does not grant the Firm the ability to decide any legal questions or to issue final and binding legal rulings.[4]

_____

[4] Even though Defendant argues that BDO can make "a final and binding *legal* determination" (D.I. 9 at 10 (emphasis in original)), this is an unsupported conclusory argument.

For example, "[a]ny determinations by the Firm, and any work or analyses performed by the Firm in connection with its resolution of any dispute under this <u>Section 5.3(c)</u> **shall not be admissible in evidence in any suit, action or other proceeding between the parties**[.]" (D.I. 16, Ex. A at § 5.3(c) (emphasis added)) In view of the statutory frameworks supporting arbitration, an arbitrator's binding legal ruling should have preclusive effect and be admissible in other proceedings. The inadmissibility of the Firm's determination in other proceedings strongly suggests that § 5.3(c) is not a valid agreement to arbitrate.

Moreover, under the factors identified in *Sapp*, the role ascribed to the Firm in § 5.3(c) is more likely that of an expert, not an arbitrator. These factors are: (1) the scope of the third-party's authority; (2) the time allocated for the third-party to resolve the matters referred; (3) the procedural rules; and (4) whether the agreement allows for other types of dispute resolution. *Sapp*, 75 F.4th at 213-14. First, the scope of the Firm's authority is the "final determination of the Closing Net Working Capital." (D.I. 16, Ex. A at § 5.3(c)) Defendant tries to inflate this into a potentially larger set of issues including "all matters which remain in dispute which were included in the Notice of Disagreement" (D.I. 9 at 10), but these matters do not address legal questions and are limited to disputes over the Closing Net Working Capital line items, and nothing more. (*See generally* D.I. 16, Ex. A at § 5.3); *see also Sapp*, 75 F.4th at 213 (noting that an agreement for expert determination extends to the resolution of specific issues). Second, in terms of time allocated, the Firm has 45 days from engagement to make its determination (*id.* at § 5.3(c)) – this short schedule is very much a sign that the Parties intended the Firm to be an expert and not an arbitrator that would take significantly longer to resolve broader, legal disputes. Defendant does not address this factor. (D.I. 9 at 10-11) Third, § 5.3(c) does not specify any procedural rules, such as those of the AAA (D.I. 16, Ex. A at § 5.3(c)), which suggests that the Firm is an expert and not

an arbitrator. Defendant also does not address this factor. (D.I. 9 at 10-11) Fourth, the TA allows disputes to be resolved in one of at least two ways that do not involve the Firm: (a) the parties may reach a written settlement (D.I. 16, Ex. A at § 5.3(e)) or (b) through litigation (*id.* at § 13.10 ("Any claim or dispute arising out of or relating to this Agreement shall be subject to the exclusive jurisdiction of the United States District Court for the District of Delaware[.]")) These other available options suggest that § 5.3(c) refers to an expert determination by the Firm and not arbitration. Defendant also does not address this factor. (D.I. 9 at 10-11) For at least these reasons, § 5.3(c) is not a valid agreement to arbitrate, and the Court need not address the question of substantive arbitrability.

### b.    The Court Should Not Defer Substantive Arbitrability

Defendant contends that scope of § 5.3(c) is "broad" and that the court is therefore powerless to determine the underlying substantive arbitrability of the disputes raised in the FAC. (*Id.* at 11-14 (citations omitted)) Should the Court determine that there is a valid agreement to arbitrate, the Court should decline to consider the question of substantive arbitrability for the reasons stated in Defendant's brief. (*Id.*) "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019). In its opening brief, Defendant avers that "the Transaction Agreement's arbitration clause is broad" (D.I. 9 at 12) and that "[i]f the clause is broad, the court will 'defer arbitration on any issues that tough on contract rights or contract performance.'" (*Id.* (citation omitted)) By Defendant's logic, the Court does not have the power to determine whether a "particular dispute falls within the scope of [an arbitration] agreement." *Kirleis*, 560 F.3d at 160.

Of course, for the reasons stated above, § 5.3(c) is not a valid agreement to arbitrate. It is also not "broad." Should the Parties have a specific dispute related to the Closing Net Working

Capital line items, they may settle the dispute themselves by written agreement that becomes "final and binding" on the Parties – they do not have to engage the Firm at all. (D.I. 16, Ex. A at § 5.3(c),(e)) Also, the Parties can litigate any and all disputes arising from or related to the TA. (*Id.* at § 13.10) Should the Parties engage the Firm, it cannot perform any independent investigation, and its determination must fall within the range specified by the Parties. (*Id.* at § 5.3(c)) For these reasons, should the Court consider substantive arbitrability, the relevant clause is narrow, and the Court can determine the question of whether claims are arbitrable. *See, e.g.*, *HBMA Holdings, LLC v. LSF9 Stardust Holdings LLC*, 2017 WL 6209594, at *5 (Del. Ch. Dec. 8, 2017) (finding a clause to be narrow).

### i.    The Disputes Raised Do Not Fall Within the Scope of the Purported "Arbitration Agreement"

To the extent that the Court finds a valid agreement to arbitrate and that it may determine whether a dispute falls within the scope of a purported "arbitration agreement," the claims of the FAC do not fall within the scope of such an agreement.

With respect to the individual counts of the FAC, Defendant makes the conclusory assertion that, by virtue of disputing aspects of Closing Statements, either as part of a cause of action or as part of damages, all the claims "fall within the plain scope of the [TA]'s arbitration provision." (D.I. 9 at 14) As discussed above, the TA allows the Parties to litigate their disputes in court, to settle their disputes in writing, or to present them to the Firm for a determination. And even if the parties present their disputes to the Firm for a determination, that does not prevent the Parties from settling their disputes in writing prior to the Firm issuing its final findings. Therefore, not all Closing Net Working Capital disputes fall within the scope of the alleged "arbitration provision."

At present, there remain three Closing Net Working Capital line items for the Parties to resolve: Allowance for Returns, Allowance for Payer Rebates, and Wholesale Distributor Fees. (*Id.* at ¶¶ 24–38) For a specific count to "fall within the scope" of the purported "arbitration provision" it would have to be resolved solely by the Firm making a final determination as to one of the three remaining line items.

At the heart of this litigation is the question of who should be responsible for returns caused by an over supply of inventory when the volume of returns is orders of magnitude larger than the negotiated Allowance for Returns that the Parties closed the transaction with. This is, in part, the result of the Defendant failing to provide information to TXMD (as required by the TA) as the Defendant was receiving the returns. This deprived TXMD of the opportunity to mitigate. These are legal, contractual issues that, while they touch on the ultimate settlement of Closing Net Working Capital line items such as Allowance for Returns, are not accounting claims at their core. In this context, the accounting Firm is neither able to, nor charged with resolving disputes such as these.

The FAC includes six causes of action. Below, Plaintiff addresses the core factual questions associated with the Firm's accounting "determination" and whether the Firm's potential resolution of the three remaining line items will resolve the disputes.

Count I alleges breach of § 5.3(h) of the TA based upon the format, frequency, and information associated with updated Closing Statements. (*Id.* at ¶¶ 53–64) As alleged, damages for this breach could involve a forensic accounting of Mayne's inventory, the returns processed, and the unprocessed returns: "The processed returns included many that were either disallowed, disputed, or had been previously rejected by TXMD." (*Id.* at ¶ 63) The Closing Net Working Capital statement only allows a single number "Allowance for Returns," and that is all that the

Firm is allowed to determine in resolving any disputes. (D.I. 16, Ex. A at § 5.3(c),(e),(h)) Therefore, the Firm cannot resolve the question of damages associated with the dispute alleged in Count I of the FAC. And even if the Firm were to perform an "independent review" (which it cannot), under the plain language of the TA, whatever the Firm finds is inadmissible in this litigation.

Count II alleges breach of the implied covenant of good faith and fair dealing based upon Mayne's oversupply of licensed products in the marketplace, its acceptance of the returns discussed with respect to Count I, and its rejection of returns and sending companies to TXMD for collection. (D.I. 16 at ¶¶ 65–76) As to market oversupply, there is no portion of the Closing Net Working Capital that relates to this question. Similarly, the "Allowance for Returns" line item is a single number that, as with Count I, fails to capture the detail associated with the dispute. Finally, the sending of companies to TXMD for collection is not a matter that is captured at all in the Closing Net Working Capital line items.

Counts III and IV allege breach of contract and the implied covenant of good faith and fair dealing associated with the NDC Labeler Code, a subject not discussed or included in the Closing Net Working Capital. (*Id.* at ¶¶ 77-101)

Count V alleges fraudulent inducement associated with the Parties' settlement of the Closing Net Working Capital in December 2023. (*Id.* at ¶¶ 102-116) This is memorialized in a written settlement of the parties as allowed by ¶ 5.3(e) of the TA. (*Id.* at ¶ 17) The FAC alleges that Mayne misrepresented facts at the time. These relate to interim reports and periodic reporting that Mayne never provided (as is the subject of Count I). A determination by the Firm of the Allowance for Returns and Allowance for Rebates line items might provide insight into the fraudulent inducement alleged, but the numbers determined would be final numbers, not interim

numbers as of December 15, 2023. Again, even if the Firm could determine such interim numbers, those findings would be inadmissible to resolve Count V.

Count VI alleges unjust enrichment associated with the facts discussed in the other counts. (*Id.* at ¶¶ 117-127) As with the other counts, the harms associated with this allegation could be further informed by a determination of the Allowance for Rebates, the Allowance for Returns, and the Allowance for Wholesale Distributor Fees, but knowing these numbers will not fully resolve the dispute. For example, the unjust enrichment claim requires identifying the degree to which Mayne oversupplied the market demand and determining which of TXMD's products were returned as a result of that oversupply. Neither of these numbers fall within the remaining line items. As with the other counts, were the Firm to make these determinations, it would not be able to present those findings to the Court so that the claim could be resolved in this litigation.

For the reasons discussed above, nothing in the TA suggests that the Firm, in determining the remaining three Closing Net Working Capital line items, would be able to resolve the disputes in Counts I-VI of the FAC. Therefore, these claims are not within the scope of the purported arbitration clause.

### B.     An Expert Determination Is Not Appropriate

An expert determination is not appropriate in this case. As with arbitration, Defendant argues that with respect to the individual counts of the FAC, Defendant makes the conclusory assertion that, by virtue of disputing aspects of Closing Statements, either as part of a cause of action or as part of damages, all the claims "fall within the plain scope of the [TA]'s dispute resolution provision." (D.I. 9 at 9) In support Defendant cites three cases, each of which is readily distinguishable from this case. For obvious reasons, the courts in these cited cases sought to use the output of the experts as part of their legal determinations. However, unlike these other situations, the TA does not allow a court to use the Firm's "determinations" in subsequent

proceedings. As argued above, with respect to arbitration, the alleged "dispute resolution provision" in § 5.3 of the TA, is not mandatory or exclusive, and the parties may alternatively settle their disputes in writing, or they may litigate those same disputes in court. If the parties rely on the Firm to make a determination, the final report is one of three Closing Net Working Capital line-item values. The Firm may not undertake an independent review, and any interim work or findings by the Firm is not admissible in any other litigation or proceeding. (D.I. 16, Ex. A at § 5.3)

Defendant contends that *RedBird Capital Partners Platform LP v. Concorde Parent, LP*, 2024 WL 3220350 (Del. Ch. June 28, 2024) supports a referral to an expert determination in this case. *RedBird* is distinguishable – the court denied a preliminary injunction to prevent the referral to an expert determination and reasoned in part that "the Independent Consultant is to review a large swath of materials, from books and records to the actual construction sites, to conduct its own **independent analysis** and reach a determination of how much the Company's budget increased during the specified time period, bracketed at a minimum by the Pre-Closing Statement and at a maximum by the Post-Closing Statement." *Id.* at *4 (emphasis added). In this case, the Firm is strictly forbidden to perform an "independent review" and cannot provide helpful information for the parties or the Court, and even if it did that information would not be admissible.

Similarly, in *ArchKey*, 302 A.3d at 975, the court treated an independent accountant as an expert, but retained the legal determinations for the court, noting that "the Independent Accountant is not empowered to decide whether there has been a breach of the implied covenant. That is an issue for the court to resolve, after the Independent Accountant has done its work, and with the benefit of the Independent Accountant's determinations." *Id.* at 1006. In stark contrast to *ArchKey*, Defendant contends that Plaintiff's implied covenant claim, including the legal determination as to breach (Count II of the FAC), is fully within the scope of an expert determination, and *not within*

*the realm of the Court.* (D.I. 9 at 9) And yet, even if this Court were to follow *ArchKey* and retain jurisdiction over the implied covenant claims in Count II, the Firm's determinations would be inadmissible in this case, and the Court could not use that determination to inform its opinion.

Finally, Defendant cites *FeraDyne Outdoors, LLC v. Reaser*, 2023 WL 9094423 (Del. Super. Ct. Dec. 20, 2023) as reaching the outcome Defendant avers should apply here. That case is sparse on details, and Defendant does not bother to explain what aspects of the asset purchase agreement in that matter are similar to the TA at issue in this matter. In view of the conclusory citation, Plaintiff declines to speculate.

A common theme in the case law is that courts will refer matters to experts when the experts produce materials that will assist the court in resolving the disputes before it. These cases are largely distinguishable from this case in that the TA prohibits the Firm from performing any "independent review" and makes the Firm's findings inadmissible in other proceedings. *Cf. ArchKey*, 302 A.3d at 990 ("Expert determinations generally operate like factual determinations and are unenforceable in their own right."). For these reasons, an expert determination is not appropriate.

## C.     A Stay Is Not Warranted

Should the Court order an expert determination, it should not stay proceedings in this matter. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). "How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Id.* at 254–55 (citations omitted). District courts have "broad power to stay proceedings." *Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., AFL-CIO*, 544 F.2d 1207, 1215 (3d Cir. 1976) (citing *Landis*, 299 U.S. at 254-55).

"Courts typically cite three factors that should guide the exercise of a court's discretion when deciding whether a stay is appropriate[.]" *Enhanced Sec. Research, LLC v. Cisco Sys., Inc.*, 2010 WL 2573925, at *3 (D. Del. June 25, 2010). These are (1) whether a stay will simplify the issues for trial, (2) whether discovery is complete and a trial date has been set, and (3) whether granting a stay would cause the non-movant to suffer undue prejudice from any delay or allow the movant to gain a clear tactical advantage. *Id.*

First, a stay pending an expert determination will not simplify issues for trial. As discussed in Section A.1.b.i, above, the Firm cannot produce anything that will be admissible at trial. At most, the Firm can determine three Net Working Capital line items that may inform some aspects of trial, but the Firm will not make any legal determinations and the rationales underlying its accounting calculations will be inadmissible. Defendant cites *Pragmatus Telecom, LLC v. Advanced Store Co., Inc.*, 2012 WL 2803695 (D. Del. July 10, 2012) for the proposition of staying a case in its infancy. In *Pragmatus*, the court stayed a later-filed case pending resolution of the first-filed declaratory judgment action. *Id*. This case is distinguishable, because this case is the first filed litigation, and Defendant has filed a subsequent case, C.A. No. 25-670. Defendant does not seek to stay the later case. Staying this case while allowing the later case to proceed would not simplify issues for trial.  This factor weighs against a stay.

Second, discovery is not complete, and no trial has been scheduled. This factor weighs in favor of a stay, with the exception of Defendant's later-filed matter alleging breach of the TA, which Defendant does not seek to stay.

Third, ordering an expert determination and staying this case would prejudice TXMD and would allow Defendant to gain a clear tactical advantage. Defendant avers that there is no harm to TXMD because any harm is "self-inflicted" as a result of TXMD filing this suit. (D.I. 9 at 15–16)

In fact, TXMD pursued one of the legal remedies available to it under the TA – that is filing a lawsuit in the District of Delaware raising "[a]ny claim or dispute arising out of or relating to this [Transaction] Agreement[.]" (D.I. 16, Ex. A at § ¶ 13.10) The FAC raises claims or disputes arising out of the TA. Defendant seeks to force TXMD into an opaque dispute resolution process that will hide the facts evidencing Defendant's acts from the Court's view. Also, in view of Defendant's competing, later-filed lawsuit, a stay of this case would further advantage Defendant. This factor weighs against a stay.

With two factors weighing against a stay and one favoring, a stay would not be appropriate at this time

## V.   CONCLUSION

For the reasons stated above, Defendant's motion(s) should be denied.

Dated: June 27, 2025

SMITH KATZENSTEIN & JENKINS LLP

*/s/ Daniel A. Taylor*
Julie M. O'Dell (No. 6191)
Daniel A. Taylor (No. 6934)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
jmo@skjlaw.com
dat@skjlaw.com

*Attorneys for Plaintiff TherapeuticsMD, Inc*