IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THERAPEUTICSMD, INC.,<br><br>        *Plaintiff*,<br><br>    v.<br><br>MAYNE PHARMA LLC,<br><br>        *Defendant*. | C.A. No. 1:25-cv-00440-RGA |

**REPLY BRIEF IN SUPPORT OF DEFENDANT MAYNE PHARMA LLC'S
MOTION TO COMPEL SUBMISSION OF DISPUTED MATTERS TO BDO, OR
ALTERNATIVELY, TO COMPEL ARBITRATION AND STAY PROCEEDINGS
<u>PENDING A FINAL DETERMINATION</u>**

OF COUNSEL:

**ARNOLD & PORTER KAYE
SCHOLER LLP**

Aaron F. Miner (admitted *pro hac vice*)
Matthew F. Medina (admitted *pro hac vice*)
250 West 55th Street
New York, NY 10019
Phone: 212.836.8000
Fax: 212.836.8689
aaron.miner@arnoldporter.com
matthew.medina@arnoldporter.com

July 21, 2025

**MORRIS, NICHOLS, ARSHT &
TUNNELL LLP**
S. Mark Hurd (Bar No. #3297)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Phone: (302) 658-9200
shurd@morrisnichols.com

*Counsel for Defendant Mayne Pharma LLC*

## **TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT ................................................................................................. 1

II. ARGUMENT ............................................................................................................................. 2

    A.   SUBMISSION OF DISPUTED MATTERS TO BDO IS MANDATORY, NOT OPTIONAL................................................................................................................. 2

    B.   WHETHER ARBITRATION OR AN EXPERT DETERMINATION, THE AGREEMENT MANDATES BINDING ADR CONDUCTED BY BDO ...................... 4

        1   Arbitration ............................................................................................................ 4

        2.   Expert Determination .......................................................................................... 7

    C.   THE REQUESTED STAY IS WARRANTED .............................................................. 10

III. CONCLUSION ........................................................................................................................ 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advantage Sales & Mktg. v. USG Cos.*,
  2016 WL 2588163 (D. Del. May 4, 2016) ............................................................. 4, 5

*Agiliance v. Resolver SOAR*,
  2019 WL 343668 (Del. Ch. Jan. 25, 2019) ............................................................. 4

*ArchKey Intermediate Holdings Inc. v. Mona*,
  302 A.3d 975 (Del. Ch. 2023) ............................................................................. 8, 9

*FeraDyne Outdoors, LLC v. Reaser*, No. N23C-03-173 SKR, 2023 WL 9094423
   (Del. Super. Ct. Dec. 20, 2023) ............................................................................ 9

*HBMA Holdings, LLC v. LSF9 Stardust Holdings LLC*,
  2017 WL 6209594 (Del. Ch. Dec. 8, 2017), *order clarified* (Del. Ch. 2018) .......... 6

*In re FBI Wind Down, Inc.*,
  252 F. Supp. 3d 405 (D. Del. 2017) ....................................................................... 4

*Mehiel v. Solo Cup*,
  2007 WL 901637 (Del. Super. Mar. 26, 2007) ....................................................... 4

*RedBird Capital Partners Platform LP v. Concorde Parent, LP*,
  2024 WL 3220350 (Del. Ch. June 28, 2024) ...................................................... 7, 8

*Sapp v. Indus. Action Servs., LLC*,
  75 F.4th 205 (3d Cir. 2023) .................................................................................... 5

I.  **PRELIMINARY STATEMENT**

In its Answering Brief (Dkt. No. 18), Plaintiff TherapeuticsMD, Inc. ("TXMD") reveals its true reason for refusing to comply with the contractually required dispute resolution process set forth in Section 5.3 of the Transaction Agreement (the "Agreement")—its fear that it will be subject to a final determination by BDO that it does not like. As TXMD puts it: "The solution, according to Defendant, is to take these questions to the accounting Firm, which will review written submissions and make an unappealable determination with a potentially eight figure price tag." AB at 6. Fear of BDO's final determination is not a valid reason for refusing to comply with a contractual obligation. TXMD cannot be permitted to short-circuit the contractual dispute resolution process it bargained for, agreed to, and initiated.

TXMD's Answering Brief[1] is an exercise in misdirection. *First*, TXMD replaces the contractual "shall" with its brief's "may" and advances a "choose-your-own-adventure" reading of the Agreement that does violence to the contractual text. TXMD contends that the Agreement provides for "at least three possible routes for dispute resolution." AB at 3-4. On the contrary, Section 5.3 creates a dispute resolution process that proceeds in mandatory, sequential steps.

*Second*, TXMD concedes that the Agreement requires an expert determination but claims that it is "inappropriate in this case" because the final written determination by BDO cannot be introduced into evidence at trial. That is a classic red herring—this Motion has nothing to do with evidentiary disputes. TXMD also overstates its argument: the Agreement expressly permits introduction of the final determination by BDO "to the extent necessary to enforce payment

---

[1] TXMD relies upon the allegations contained in its First Amended Complaint ("FAC") (Dkt. No. 16) to oppose Mayne's Motion, which is aimed at the originally filed Complaint (Dkt. No. 1). That is improper. The FAC contains additional and/or different allegations and Count IV asserts a brand-new tag-along claim for breach of the implied covenant of good faith and fair regarding the NDC Code transfer. However, each of Mayne's arguments in its opening brief apply equally to the FAC.

- 1 -

obligations under this Section 5.3." Ex. A, § 5.3(c). Regardless of whether the final determination can be introduced into evidence, TXMD agreed to, but has refused, binding ADR before BDO.

*Third*, TXMD's feigned cry of prejudice at the requested stay is hollow. TXMD contends that Mayne "only seeks to use a potential stay to its advantage while raising its counterclaims to this litigation in a separate lawsuit." AB at 2. As TXMD knows, the Mayne-filed-case has nothing to do with the purchase price adjustment claims at issue here but instead relates to TXMD's conduct and misrepresentations with respect to specific third parties. The only overlap between the cases is the parties, the jurisdiction, and the underlying contract. Mayne's claims arise under different sections of the Agreement, involve different dispute mechanisms, and involve different evidence, damages, and legal issues.

In myopically seizing on the differences between an expert determination and arbitration, TXMD overlooks the key point—it agreed to mandatory ADR before BDO but has refused to comply. This Court should enforce the plain language of the Agreement, compel arbitration or submission of the disputed matters to BDO, and stay this case pending BDO's final determination.

## II. ARGUMENT

### A. SUBMISSION OF DISPUTED MATTERS TO BDO IS MANDATORY, NOT OPTIONAL

TXMD argues that the Agreement "includes at least three possible routes for dispute resolution." AB at 3. Not so. The Agreement does not create three "routes" but rather sets forth a sequential dispute resolution process that proceeds in required steps. The contractual text is replete with mandatory, not permissive, terms.

Step 1. Mayne is required to provide a Closing Statement which becomes "final and binding" after 30 calendar days of its delivery to TXMD unless TXMD sends Mayne a Notice of Disagreement outlining in detail each disputed item or amount and the basis for its disagreement.

Ex. A, § 5.3(b) ("The Closing Statement, and the Closing Net Working Capital set forth therein, *shall* become final and binding on the parties on the date that is thirty (30) Calendar Days following Purchaser's delivery thereof to TXMD, unless TXMD delivers written notice of its disagreement specifying in reasonable detail each disputed item or amount and the basis for its disagreement therewith (a '**Notice of Disagreement**') to Purchaser on or prior to such date." (emphasis added)).

Step 2. Once the Notice of Disagreement is received by Mayne, the parties are required to attempt to resolve the disputed matters for 30 calendar days. Ex. A, § 5.3(c) ("During the thirty (30) Calendar Days following delivery of a Notice of Disagreement, Purchaser and TXMD *shall* seek to resolve in good faith and in writing any differences which they may have with respect to the matters specified in the Notice of Disagreement." (emphasis added)).

Step 3. If the parties are unable to resolve the dispute within 30 calendar days of delivery of the Notice of Disagreement, TXMD and Mayne are *required* to submit the dispute to BDO. Ex. A, § 5.3(c) ("At the end of such thirty (30) Calendar Day period, if no resolution has been reached, Purchaser and TXMD *shall* submit such dispute to BDO USA, LLP's National Dispute Advisory Service Practice (the '**Firm**')…for resolution of all matters which remain in dispute which were included in the Notice of Disagreement, and the Firm *shall* make a final determination of the Closing Net Working Capital in accordance with the terms of this Agreement…." (emphasis added)).[2]

TXMD repeatedly insists that a final determination by BDO is not mandatory because it contends, pointing to Section 5.3(e), that the parties "may settle the dispute themselves by written

---

[2] Amendment No. 1 imports the same process for disputes as to "updated Closing Statements" and the Allowance for Returns, Allowance for Wholesale Distributor Fees and Payer Rebates, line items which yield Final Net Working Capital. Ex. B, § 5.3(h) ("The term '**Final Net Working Capital**' as used in this Agreement means the Closing Net Working Capital as finally determined pursuant to this Section 5.3, as adjusted pursuant to this Section 5.3(h).").

- 3 -

agreement that becomes 'final and binding' on the Parties – they do not have to engage the Firm at all." AB at 12; *id*. at 2 ("Both of these options can be 'final and binding on the parties' depending on which writing is finalized first."). But Section 5.3(e) does not make submission of disputed matters to BDO optional. When read together with Section 5.3(c)[3], Section 5.3(e) merely provides that the parties can resolve some but not all issues in a final and binding written agreement while BDO is conducting its review but before it issues its final determination.

### B. WHETHER ARBITRATION OR AN EXPERT DETERMINATION, THE AGREEMENT MANDATES BINDING ADR CONDUCTED BY BDO

#### 1. Arbitration

Courts have repeatedly upheld arbitration clauses based upon similar contract provisions and circumstances. *See, e.g.*, *In re FBI Wind Down, Inc.*, 252 F. Supp. 3d 405, 414 (D. Del. 2017) (treating a contract clause regarding disputes over post-closing adjustments as an arbitration clause); *Advantage Sales & Mktg. v. USG Cos., Inc.*, 2016 WL 2588163, at *2 (D. Del. May 4, 2016) (compelling arbitration where asset purchase agreement stated that "if the Plaintiff and Defendants 'are unable to resolve any disagreement with respect to the calculation of Revenue for the Measurement Period,' then the disputed amounts 'will be referred to the Accounting Firm...for final determination.'"); *Agiliance, Inc. v. Resolver SOAR, LLC*, 2019 WL 343668, *4 (Del. Ch. Jan. 25, 2019) (ordering arbitration by "nationally-recognized accounting firm"); *Mehiel v. Solo Cup*, 2007 WL 901637, *2–3 (Del. Super. Mar. 26, 2007) (requiring arbitration by a "[n]eutral [a]uditor").

---

[3] Ex. A, § 5.3(c) ("The Firm shall make its determination only with respect to the matters still in dispute"); § 5.3(e) ("If a timely Notice of Disagreement is delivered by TXMD to Purchaser, then the Closing Statement, and the Closing Net Working Capital contained therein, shall become final and binding on the parties on the earlier of (i) the date Purchaser and TXMD resolve in writing any differences they have with respect to the matters specified in the Notice of Disagreement, and (ii) the date all matters in dispute are finally resolved in writing by the Firm.").

TXMD argues that no valid agreement to arbitrate exists "[g]iven the limited scope of the Firm's investigation, the limited applicability of the Firm's determinations in other courts, and in view of the fact that the Parties have the option to litigate disputes arising out of the TA in court, § 5.3(c)." AB at 9. The scope of authority granted to the accounting firm in *Sapp v. Industrial Action Services, LLC*, 75 F.4th 205, 213 (3d Cir. 2023), on which TXMD relies, was significantly narrower than the scope of authority granted to BDO in the Agreement here. Specifically, the contractual language in *Sapp* limited the accounting firm's authority "to whether the Statement was prepared in accord with generally accepted accounting principles, whether the parties had reasonable access to all working papers, and/or whether there were mathematical errors." *Sapp*, 75 F.4th at 213. Here, by contrast, the Agreement confers a significantly broader scope of authority, permitting BDO to finally determine "all matters which remain in dispute which were included in the Notice of Disagreement." Ex. A, § 5.3(c). Further, as explained *supra*, TXMD's argument that BDO's final determination cannot be admitted into evidence is a red herring. Finally, TXMD's argument that the "Governing Law and Jurisdiction" provision in Section 13.10, which requires suits to be filed in Delaware state or federal courts, somehow presents an alternative "route" for dispute resolution is simply wrong. That provision does not mention, much less excuse, compliance with Section 5.3. *See Advantage Sales & Mktg. LLC*, 2016 WL 2588163, at *2 (rejecting argument "that the parties' agreement to submit to the jurisdiction of the courts of Delaware to resolve disputes regarding the merger agreement trumps the arbitration clause. This argument contradicts the basic principle of contract interpretation that specific language controls over general language." (internal citations omitted)).

As for substantive arbitrability, TXMD contends that the arbitration clause is narrow because the parties can litigate disputes under the Agreement, BDO cannot perform its own

independent investigation, and BDO's determination must fall within the range specified by the parties. AB at 12. None of TXMD's three reasons are tied to the actual contractual language, setting the scope of which disputes are subject to arbitration. The Agreement's arbitration clause is broad because it is coextensive with "any differences" as to the Closing Statements and Net Working Capital as set forth in Notice of Disagreement and related correspondence. Ex. A, §§ 5.3(c), (e); *see also id.* §§ 5.3(h). The claims in the FAC, except the NDC Code transfer claims, fall within the scope of the arbitration agreement because they relate to Closing Statements and Net Working Capital adjustments and thus "touch on contract rights or contract performance." *HBMA Holdings, LLC v. LSF9 Stardust Holdings LLC*, 2017 WL 6209594, at *4 (Del. Ch. Dec. 8, 2017), *order clarified,* 2018 WL 784732 (Del. Ch. Feb. 7, 2018); *see also id.* ("If the court is evaluating a narrow arbitration clause, it will ask if the cause of action pursued in court directly relates to the right in the contract. If the arbitration clause is broad in scope, the court will defer to arbitration on any issues that touch on contract rights or contract performance.").

Even if the Court were to find the arbitration clause to be narrow (it is not), TXMD's claims would still fall within the scope of the arbitration clause. Just as the neutral accountant in *HBMA Holdings* had jurisdiction over the determination of Adjusted EBITDA, BDO has jurisdiction over the determination of Net Working Capital under Section 5.3, which necessarily encompasses disputes as to Closing Statements, Closing Net Working Capital, Final Net Working Capital, Allowance for Returns, and Allowance for Wholesale Distributor Fees and Payer Rebates. *Id.* at *5 ("Therefore, the Neutral Accountant has jurisdiction over the determination of Adjusted EBITDA. The substantive arbitrability analysis ends with this articulation of the Neutral Accountant's jurisdiction."). TXMD's arguments that the dispute is the "result of the Defendant

failing to provide information to TXMD (as required by the TA) as the Defendant was receiving the returns," AB at 13, bears on *procedural* arbitrability, not *substantive* arbitrability.

> "If the subject matter to be arbitrated is the calculation of an earn-out, or the amount of working capital, or the company's net worth at closing, ***all issues as to what financial or other information should be considered in performing the calculation are decided by the arbitrator***."…The Neutral Accountant may "rely on the terms of the underlying agreement, and the arbitrator's interpretation of the contract is likely to affect the scope of arbitration. Nonetheless, those decisions fall within the category of procedural arbitrability. They are not 'gateway' issues about whether the particular dispute should be arbitrated at all."

*HBMA Holdings, LLC*, 2017 WL 6209594, at *5 (emphasis added) (citations omitted).

    2.    Expert Determination[4]

TXMD concedes that the Agreement requires an expert determination but argues that compelled submission is "not appropriate in this case" because BDO's final binding determination is not admissible evidence. AB at 15-16. To the contrary, an expert determination is "appropriate" in this case because the Agreement requires it. As explained *supra*, TXMD's evidentiary argument is a red herring. Even if BDO's final determination cannot be introduced into evidence at trial, that does not mean that it is not binding and does not mean that it will not streamline the parties' disputes and thereby promote judicial economy.

TXMD seeks to distinguish *RedBird Capital Partners Platform LP v. Concorde Parent, LP,* 2024 WL 3220350 (Del. Ch. June 28, 2024) solely on the basis that the independent consultant in that case undertook its own independent review. AB at 16. This is a distinction without a

---

[4] TXMD summarily contends that "BDO USA is disqualified from performing this service, as it now performs accounting work for Mayne." AB at 5 n.2. That is not how it works: This is not a legal conflict of interest in which a conflict of one professional at BDO is imputed to all professionals at BDO, as in the case of a law firm. The dispute resolution provision does not require a final determination by any neutral accounting firm—it specifically names BDO, and states that if representatives at BDO have provided services to either TXMD or Mayne, then *other representatives* of BDO must adjudicate the dispute. Ex. A, § 5.3(c). The Agreement simply does not support TXMD's entity level conflict argument.

difference. In refusing to enjoin the independent consultant process until plaintiff's legal claims could be determined in court, the *RedBird* Court emphasized that it was constrained by the contractual language itself—not by any consideration of whether the expert determination would later be helpful to the court or admissible into evidence.

> This Court enforces parties' contractual agreements, even if a party has come to believe that it received a bad deal. The parties foresaw that they would dispute the purported increase in the Company's BBNB CapEx Budget, with each side advocating for a calculation that would result in their side receiving the escrowed funds. Accordingly, the parties agreed to an ADR process whereby the parties would enter into negotiation; where that failed, the Independent Consultant would independently calculate the increase in the Company's BBNB CapEx Budget after each side submitted to the Independent Consultant their respective calculations, within a range bounded by those calculations.

*RedBird Capital Partners Platform LP,* 2024 WL 3220350, at *5. TXMD may now "believe that it received a bad deal," *id*., because it faces "a potentially eight figure price tag," AB at 6, but that is no reason for its refusal to comply with its contractual obligation to participate in ADR.

In addressing *ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975 (Del. Ch. 2023), TXMD attempts to defeat a strawman. *See* AB at 16-17 ("Defendant contends that Plaintiff's implied covenant claim, including the legal determination as to breach (Count II of the FAC), is fully within the scope of an expert determination, and *not within the realm of the Court*."). Mayne makes no such contention. There can be factual accounting issues that must be decided by the accounting firm, and legal issues that must be decided by this Court. Both things can be true at the same time. But the Agreement includes no provision staying the dispute resolution process pending litigation, and there is no contractual basis for TXMD to initiate the Section 5.3 dispute resolution process through its Notices of Disagreement only to hit pause and prevent the ultimate resolution required by the Agreement (*i.e.*, a final determination by BDO). The ADR process is designed to promote judicial economy. If BDO can resolve matters that are binding on the parties, and that

narrows the issues to be litigated, that is beneficial for this Court and the parties. TXMD is seeking to force this Court to wade into complex accounting issues that the parties agreed to have BDO address. This Court should follow the *ArchKey* process of compelling submission of disputed matters to BDO and staying the case pending BDO's final determination. *ArchKey*, 302 A.3d at 1006 ("Before this action can proceed, the parties must present their disputes to the Independent Accountant. This case is stayed pending the Independent Accountant's determinations. After the Independent Accountant has made its determinations, the parties may return to this court to address any remaining issues.").

Finally, unable to distinguish *FeraDyne Outdoors, LLC v. Reaser*, 2023 WL 9094423 (Del. Super. Ct. Dec. 20, 2023), TXMD dismisses the case as "sparse on details." AB at 17. *FeraDyne* dealt with an asset purchase agreement to acquire hunting, fishing, and outdoor products and related intellectual property. The Court concluded that the ADR provision in the contract committed the parties' dispute "about the working capital figure to binding resolution by the Accounting Firm." *FeraDyne Outdoors, LLC*, 2023 WL 9094423 at *8. Faced with cross motions to dismiss, the Court cited *ArchKey* and held that "[a] central issue to the action, the dispute over the proper working capital figure, has yet to be determined by the Accounting Firm. The resolution of this dispute is likely to have significant consequences for the Court's determination of the issues raised in the motions to dismiss the counterclaims." *Id*. at *8. Accordingly, the Court stayed the entirety of the action pending an expert determination "as a matter of judicial efficiency and economy." *Id.*

Whether this Court construes the Agreement to call for arbitration or an expert determination by BDO, it is clear that the Agreement contains a binding ADR clause with which TXMD has stubbornly refused to comply. *See ArchKey Intermediate Holdings Inc.*, 302 A.3d at

989 ("The Purchaser claims that the [contract] calls for arbitration. [Seller] contends that the [contract] calls for expert determination. The parties have presented their arguments as if those were exclusive alternatives, but that is a false dichotomy. Both are forms of binding ADR. Parties can use the language of contract to create ADR mechanisms that fall along a spectrum." (footnote omitted)).

### C. THE REQUESTED STAY IS WARRANTED

TXMD's feigned cry of prejudice at the requested stay is hollow. TXMD contends that Mayne "seeks to use a potential stay to its advantage while raising its counterclaims to this litigation in a separate lawsuit." Opp. at 2. As is clear from the complaints, the Mayne-filed-case has nothing to do with the purchase price adjustment claims at issue in this case but instead relates to TXMD's conduct and misrepresentations with respect to specific third parties. The only overlap between the two cases are the parties, the jurisdiction, and the underlying contract. The two cases involve entirely different sections of the Agreement, assert different claims, allege different damages, are subject to different dispute mechanisms, and deal with different periods of time. There is no basis to deny the requested stay because of a later filed case with unrelated and totally separate claims, evidence, damages, and legal issues. A stay will further the interest of judicial economy, and TXMD's invocation of the Mayne-filed-case as a reason to deny the requested stay of the instant case is without merit.

### III. CONCLUSION

For these reasons, Defendant respectfully moves to compel submission of all disputed matters to BDO, or alternatively, to compel arbitration of Counts I, II, V, and VI of the FAC and stay proceedings pending a final determination.

|  |  |
|---|---|
| OF COUNSEL:<br><br>**ARNOLD & PORTER KAYE SCHOLER LLP**<br>Aaron F. Miner (admitted *pro hac vice*)<br>Matthew F. Medina (admitted *pro hac vice*)<br>250 West 55th Street<br>New York, NY 10019<br>Phone: 212.836.8000<br>aaron.miner@arnoldporter.com<br>matthew.medina@arnoldporter.com | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br><br>/s/ *S. Mark Hurd*<br>S. Mark Hurd (#3297)<br>1201 N. Market Street<br>P.O. Box 1347<br>Wilmington, DE 19899-1347<br>Phone: (302) 658-9200<br>shurd@morrisnichols.com<br><br>*Counsel for Defendant Mayne Pharma LLC* |

July 21, 2025

- 11 -