IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THERAPEUTICSMD, INC.,

               *Plaintiff*,

    v.

MAYNE PHARMA LLC,

               *Defendant*.

C.A. No. 1:25-cv-00440-RGA

**OPENING BRIEF IN SUPPORT OF DEFENDANT MAYNE PHARMA LLC'S
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT
<u>FOR FAILURE TO STATE A CLAIM</u>**

OF COUNSEL:

**ARNOLD & PORTER KAYE
SCHOLER LLP**
Aaron F. Miner (admitted *pro hac vice*)
Matthew F. Medina (admitted *pro hac vice*)
250 West 55th Street
New York, NY 10019
Phone: 212.836.8000
Fax: 212.836.8689
aaron.miner@arnoldporter.com
matthew.medina@arnoldporter.com

July 21, 2025

**MORRIS, NICHOLS, ARSHT &
TUNNELL LLP**
S. Mark Hurd (Bar No. #3297)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Phone: (302) 658-9200
shurd@morrisnichols.com

*Counsel for Defendant Mayne Pharma LLC*

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ........................................................................ 1

SUMMARY OF ARGUMENT ............................................................................................... 2

STATEMENT OF FACTS ...................................................................................................... 2

LEGAL STANDARD ............................................................................................................. 6

ARGUMENT ........................................................................................................................... 7

    I.    THE TRANSACTION AGREEMENT DOES NOT REQUIRE CLOSING
        STATEMENTS TO BE PROVIDED EVERY QUARTER IN THE FORMAT
        ALLEGED, NOR CAN TXMD ALLEGE CAUSAL DAMAGES ...................... 7

    II.    TXMD'S BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
        AND FAIR DEALING CLAIM FAILS BECAUSE TXMD DOES NOT
        PLEAD A SPECIFIC IMPLIED CONTRACTUAL OBLIGATION BUT
        INSTEAD ASKS THE COURT TO REWRITE THE TRANSACTION
        AGREEMENT ..................................................................................................... 11

    III.    TXMD'S BREACH OF CONTRACT CLAIM RELATING TO THE NDC
        CODE FAILS BECAUSE IT PLEADS NO CONTRACTUAL OBLIGATION
        THAT MAYNE REFRAIN FROM TRANSFERING THE CODE ................... 14

    IV.    TXMD'S BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
        AND FAIR DEALING CLAIM RELATING TO THE NDC CODE FAILS
        BECAUSE THERE ARE NO CONTRACTUAL GAPS OR
        UNANTICIPATED DEVELOPMENTS ............................................................ 16

    V.    TXMD'S FRAUDULENT INDUCEMENT CLAIM FAILS BECAUSE IT
        HAS NOT PLED WITH PARTICULARITY AN ACTIONABLE
        STATEMENT THAT WAS KNOWINGLY FALSE WHEN MADE ................ 17

    VI.    TXMD'S UNJUST ENRICHMENT CLAIM FAILS BECAUSE THE
        ALLEGED CONDUCT ARISES FROM A RELATIONSHIP
        COMPREHENSIVELY GOVERNED BY CONTRACT .................................. 19

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Capital Corp. v. GC—Sun Holdings, L.P.*,
    910 A.2d 1020 (Del. Ch. 2006)......................................................................................11, 16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................................6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................................6

*Buck v. Hampton Twp. Sch. Dist.*,
    452 F.3d 256 (3d Cir. 2006)........................................................................................3

*Cantor Fitzgerald, L.P. v. Cantor, et al.*,
    1998 WL 842316 (Del. Ch. Nov. 10, 1998) ...............................................11, 12, 13

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*,
    350 F. Supp. 2d 582 (D. Del. 2004)........................................................................10

*Chordia v. Lee*,
    2024 WL 49850 (Del. Ch. Jan. 4, 2024) (Cook, V.C.) ............................................17

*Dunlap v. State Farm Fire & Cas. Co.*,
    878 A.2d 434 (Del. 2005) ....................................................................................11, 12

*Flores v. Strauss Water Ltd.*,
    2016 WL 5243950 (Del. Ch. Sept. 22, 2016) ..........................................................17

*Garner v. Glob. Plasma Sols. Inc.*,
    590 F. Supp. 3d 738 (D. Del. 2022)........................................................................18

*Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*,
    2014 WL 6703980 (Del. Ch. Nov. 26, 2014) ..........................................................19

*Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*,
    2018 WL 6311829 (Del. Ch. Dec. 3, 2018)............................................................17

*Great Lakes Chem. Corp. v. Pharmacia Corp.*,
    788 A.2d 544 (Del. Ch. 2001)..................................................................................18

*iBio, Inc. v. Fraunhofer USA, Inc.*,
    2020 WL 5745541 (Del. Ch. Sep. 25, 2020) ..........................................................20

*Jeter v. Revolutionwear, Inc.*,
  2016 WL 3947951 (Del. Ch. July 19, 2016) ..................................................................17

*Johnson v. Gov't Emps. Ins. Co.*,
  2014 WL 2708300 (D. Del. June 16, 2014), *aff'd sub nom. Johnson v. GEICO
  Cas. Co.*, 672 F. App'x 150 (3d Cir. 2016) ......................................................................9

*Kuroda v. SPJS Holdings, L.L.C.*,
  971 A.2d 872 (Del. Ch. 2009) ........................................................................................20

*Liborio III, L.P. v. Artesian Water Co., Inc.*,
  306 A.3d 529 ..................................................................................................................18

*Lincoln Nat. Life Ins. Co. v. Snyder*,
  722 F. Supp. 2d 546 (D. Del. 2010) ..................................................................................3

*Lord v. Souder*,
  748 A.2d 393 (Del. 2000) ...............................................................................................18

*Lungu v. Antares Pharma Inc.*,
  2022 WL 212309 (3d Cir. Jan. 25, 2022) .........................................................................7

*Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*,
  261 A.3d 1199 (Del. 2021) ...............................................................................................9

*Mrs. Fields Brand, Inc. v. Interbake Foods LLC*,
  2017 WL 2729860 (Del. Ch. June 26, 2017) ..................................................................13

*Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*,
  112 A.3d 878 (Del. 2015) .........................................................................................11, 16

*Nemec v. Shrader*,
  991 A.2d 1120 (Del. 2010) ..............................................................................11, 13, 14

*Nutt v. A.C. & S., Inc.*,
  466 A.2d 18 (Del. Super. Ct. 1983), *aff'd sub nom. Mergenthaler v. Asbestos
  Corp. of Am.*, 480 A.2d 647 (Del. 1984) ........................................................................18

*Oxbow Carbon & Minerals Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*,
  202 A.3d 482 (Del. 2019) .........................................................................................11, 14

*Phunware, Inc. v. Excelmind Grp. Ltd.*,
  117 F. Supp. 3d 613 (D. Del. 2015) ..........................................................................7, 8, 9

*REI Holdings, LLC v. LienClear - 0001, LLC*,
  2019 WL 3546881 (D. Del. Aug. 5, 2019) .....................................................................20

*Reklam v. Bellator Sport Worldwide LLC*,
    2017 WL 5172397 (D. Del. Nov. 8, 2017) ...............................................................13

*Satellite Fin. Plan. Corp. v. First Nat. Bank of Wilmington*,
    633 F. Supp. 386 (D. Del. 1986) ............................................................................18

*Schock v. Nash*,
    732 A.2d 217 (Del. 1999) ......................................................................................19

*Scott v. Vantage Corp.*,
    2018 WL 5919743 (D. Del. Nov. 13, 2018) ..........................................................12

*Sheth v. Harland Fin. Sols., Inc.*,
    2014 WL 4783017 (Del. Super. Ct. Aug. 28, 2014) ..............................................13

*Tolliver v. Christina Sch. Dist.*,
    564 F. Supp. 2d 312 (D. Del. 2008) ......................................................................20

## **Other Authorities**

Fed. R. Civ. P. 9 ...........................................................................................................2, 18, 19

Fed. R. Civ. P. 12(b)(6) ..................................................................................................2, 6

## NATURE AND STAGE OF PROCEEDINGS

In December 2022, Defendant Mayne Pharma LLC ("Mayne") and Plaintiff TherapeuticsMD, Inc. ("TXMD") entered into a Transaction Agreement (the "Transaction Agreement") and License Agreement whereby Mayne received a license from TXMD to manufacture, market, and distribute certain TXMD women's health products ("TXMD Products"), and Mayne purchased TXMD's existing inventory of its products ("TXMD Inventory").

Mayne paid TXMD a purchase price in addition to Estimated Net Working Capital. The Net Working Capital was "estimated" because, among other things, the ultimate disposition of the TXMD Inventory would affect the calculation of Net Working Capital. The parties anticipated that Net Working Capital would be trued-up over the next two years as the TXMD Inventory was distributed, dispensed to patients, or returned. For example, the disposition of the TXMD Inventory would affect wholesale distribution fees, payer rebates, and returns, all of which would cause a decline in Net Working Capital.

On April 8, 2025, TXMD brought suit on claims related to this true-up process and an unrelated claim relating to the transfer of the National Drug Code ("NDC Code"). On May 30, 2025, Mayne simultaneously filed a motion to dismiss the complaint and a motion to compel submission of disputed matters to BDO, or, alternatively, to compel arbitration and stay proceedings pending a final determination. On June 20, 2025, while Mayne's two motions were pending, TXMD filed a First Amended Complaint ("FAC"). The FAC asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, and unjust enrichment. These claims have no basis in the parties' agreements and fail to satisfy

Delaware pleading standards. Mayne now moves to dismiss under Fed. R. Civ. P. 12(b)(6).[1]

## SUMMARY OF ARGUMENT

1.  TXMD's claim for breach of § 5.3(h) of the Transaction Agreement based on the formatting and frequency of Mayne's Closing Statements fails to allege both breach and causal damages.

2.  TXMD's claim for breach of the implied covenant of good faith and fair dealing fails because it does not allege a specific implied contractual obligation that is apparent from the text of the Transaction Agreement but instead asks this Court to rewrite the Transaction Agreement two and a half years after execution.

3.  TXMD's claim for breach of contract relating to the NDC Code transfer fails to allege a breach.

4.  TXMD's claim for the implied covenant of good faith and fair dealing relating to the NDC Code transfer fails because, as pled, there are no contractual gaps or unanticipated developments.

5.  TXMD's claim for fraudulent inducement fails to allege any actionable misrepresentation, much less an actionable misrepresentation with the particularity required by Fed. R. Civ. P. 9.

6.  TXMD's claim for unjust enrichment fails because it alleges conduct governed by a valid and enforceable contract.

## STATEMENT OF FACTS

Mayne is a specialty pharmaceutical company focused on commercializing branded and generic pharmaceuticals. TXMD is a "royalty company" that licenses women's health products. FAC ¶ 7. On or about December 4, 2022, the parties executed the Transaction Agreement and License Agreement. *Id.* ¶ 10; **Ex. A** (Transaction Agreement). Through the parties' agreements, Mayne received a license from TXMD to manufacture, market, and distribute the TXMD Products. *Id.* ¶ 10. In addition to acquiring a license to sell Mayne-branded TXMD Products, Mayne also purchased the ongoing TXMD commercial pharmaceutical operations. *Id.* ¶ 14. These were in the

---

[1]    In moving in the alternative to dismiss all Counts of the FAC, Mayne does not waive its right to arbitration or to compel determination of disputed matters by BDO but instead expressly reserves such rights.

form of unsold TXMD Products in inventory awaiting sale and distribution, partially finished TXMD Products inventory, and other items. *Id.* The Transaction Agreement closed on or about December 30, 2022 (the "Closing"). *Id.* ¶ 55. Subsequently, the Transaction Agreement was amended several times. *Id.* ¶ 11; **Ex. B** ("Amendment No. 1); **Ex. C** ("Amendment No. 2"); **Ex. D** ("Side Letter").[2] In particular, on or about March 15, 2023, the parties executed Amendment No. 2 and a Side Letter, in which the NDC Code was transferred to Mayne. Ex. C; Ex. D. Although the FAC references the License Agreement, Plaintiff's claims relate to the Transaction Agreement.

At Closing, Mayne was obligated to pay TXMD "an amount equal to the Purchase Price plus the Estimated Net Working Capital." FAC ¶ 19; *see* Ex. A, § 5.1. TXMD and Mayne agreed that the Net Working Capital acquired by Mayne would be trued-up after the close of the transaction because, among other things, the remaining TXMD Inventory previously sold into the commercial channel was distributed, dispensed to patients, or returned. FAC ¶ 14. In particular, the parties agreed to resolve three components of Net Working Capital to calculate a "Final Net Working Capital" in the two years following Closing: wholesale distributor fees, payer rebates, and returns. *Id.* ¶ 24; Ex. A, § 5.3(h). All three were treated as liabilities against the assets transferred to Mayne and would be paid by TXMD post-Closing:

- Wholesale Distributor Fees are fees paid by Mayne to wholesale distributors for TXMD Products sold to distributors before the Closing, but for which distribution fees had not yet been paid. FAC ¶¶ 26-28.

- Payer Rebates are rebates paid by Mayne to payers based on rebate contracts

---

[2]    The Court can take judicial notice of the Transaction Agreement and its Amendments. In evaluating a 12(b)(6) motion to dismiss, a court "may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (internal quotations and citation omitted); *Lincoln Nat. Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 560 (D. Del. 2010) ("[T]he court may properly consider the Amendment as part of the contract for purposes of the motion to dismiss . . . .").

negotiated and in place before the Closing. *Id.* ¶¶ 30-31.

- The Allowance for Returns consists of refunds and processing fees for returns of TXMD Products sold by TMXD before the Closing. *Id.* ¶¶ 35-36.

The parties would true-up Estimated Net Working Capital to arrive at Final Net Working Capital in three stages: (1) within 90 days after the closing for all Estimated Net Working Capital categories except for rebates, distribution fees, and returns, to arrive at a "Closing Net Working Capital"; (2) within one year after the Closing for rebates and wholesale distributor fees; and (3) within two years for returns. *Id.* ¶ 16. To facilitate the resolution of Final Net Working Capital, Mayne could provide updated Closing Statements that calculated Closing Net Working Capital for allowance for returns, wholesale distributor fees, and payer rebates, which would contain comparisons against accruals as calculated quarterly. Ex. B, § 2 ("Purchaser shall continue to provide updated Closing Statements solely with respect to calculation of the Closing Net Working Capital conduct solely with respect to the matters included in the items entitled Allowance for Returns, Allowance for Wholesale Distributor Fees and Payer Rebates, in each case, comparing actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)."). TXMD agrees that Mayne provided Closing Statements for the rebates and distribution fees on January 16, 2024, and for returns on February 3, 2025. FAC ¶ 18.

TXMD alleges that on January 3, 2023, Mayne transferred TXMD's NDC Code back to TXMD, in violation of an agreement that Mayne would possess the NDC Code as of the Closing Date. *Id.* ¶¶ 84, 97. But TXMD's initial transfer of the NDC Code in December 2022 was improper because Mayne had not agreed to receive it as: (1) the Transaction Agreement did not include the NDC Code as part of the Transferred Assets, and (2) it was not properly addressed in terms of government pricing and payments. As a result, Mayne transferred the NDC Code back to TXMD in January 2023. *Id.* ¶ 62. The parties then discussed, in March 2023, a correct transfer of the NDC

Code post-Closing, which resulted in Amendment No. 2 and a Side Letter agreement "detailing the government pricing process to ensure transition of the government pricing functions for the Products." Ex. C. TXMD ignores the express language of Amendment No. 2, wherein TXMD and Mayne agreed to transfer the NDC Code in March 2023, well after Mayne's alleged breach on January 3, 2023. Ex. C.

Sometime in 2023, TXMD claims, upon "information and belief," that Mayne began overselling TXMD Products beyond prescribing market demand. FAC ¶ 42. TXMD claims that as a result, the older and sooner-to-expire TXMD Inventory was preferentially returned at a volume that significantly exceeded expectations. *Id.* ¶ 43. TXMD further contends that these larger-than-expected returns generated changes to the constituent components of Net Working Capital, namely allowances for rebates and coupons. *Id.* ¶ 48. TXMD cites no provision of the Transaction Agreement that limits or restricts the quantity of TXMD Products that Mayne can sell. But this is not a gap in the Transaction Agreement requiring the Court to construe an implied term; rather, the Transaction Agreement already regulates greater-than-expected allowances for returns and the inherent uncertainty of interim estimates through the true-up mechanism and the dispute resolution process. Regretting the deal it struck, TXMD now asks this Court not to fill a gap but to draft entirely new obligations and provisions that are not apparent from the text of the Transaction Agreement.

In December 2023, TXMD and Mayne entered into a settlement for the Closing Net Working Capital ("December 2023 Settlement Agreement"). *Id.* ¶ 17; **Ex. E** (December 2023 Settlement Agreement). As part of the settlement, TXMD and Mayne agreed that TXMD would pay Mayne $5,500,000. FAC ¶ 108. The parties also entered into mutual releases arising out of the "Applicable Sections," which were defined as Sections 5.3(a) through (g), which described, among

other things, Closing Net Working Capital. Ex. E at 1. Despite the December 2023 Settlement Agreement and releases, TXMD has brought this action. TXMD claims that Mayne fraudulently induced TXMD into the December 2023 Settlement Agreement because "Mayne represented to TXMD that the Allowance for Coupons and Allowance for Payer Rebates line items through 2023 had already been and, in 2024, were expected to be higher than either Party expected." FAC ¶ 109. This was a mere good faith business prediction or estimate.

On January 16, 2024, Mayne sent TXMD the Closing Statement for Payer Rebates and Allowance for Wholesale Distributor Fees. *Id*. ¶ 57. TXMD alleges that Mayne's 2024 Closing Statement for allowance for rebates and wholesale distributor fees failed to provide "summary information in the format of the Pre-Closing Statement" and did not "'compar[e] actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)' (*id.*) such as in the format specified in Annex 5.3(a) 'Net Working Capital.'" *Id*. ¶¶ 49-50, 57.

On February 3, 2025, Mayne sent TXMD its "Closing Statement" for Allowance for Returns. TXMD again alleges that Mayne's 2025 Closing Statement did not "'compar[e] actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)' (*id.*) such as in the format specified in Annex 5.3(a) 'Net Working Capital.'" *Id.* ¶¶ 51, 58.

## LEGAL STANDARD

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must assume that well-pled factual allegations in the complaint are true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, the Court need not accept legal conclusions, naked assertions, conclusory statements, or implausible inferences. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (citing *Twombly*, 550 U.S. at 555). To be actionable, a claim must raise more than the "mere possibility of misconduct"; the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

678-79. "When an allegation in the complaint is contradicted by a document incorporated in it by reference, the document controls and the allegation is not accepted as true." *Lungu v. Antares Pharma Inc.*, 2022 WL 212309, at \*5 n.14 (3d Cir. Jan. 25, 2022); *Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 625 (D. Del. 2015) (a court "may grant a motion to dismiss when unambiguous language of a contract contradicts plaintiffs' allegations").

## ARGUMENT

Despite making a sale with a price tag of $140 Million, TXMD now believes, years later, that it entered into a bad deal. This seller's remorse has led TXMD to (1) brazenly flout a contractually required dispute resolution process and (2) assert a variety of meritless claims that in effect attempt to rewrite the Transaction Agreement to its economic advantage. Each of its breach of contact claims are so flawed that in both instances TXMD seeks to avail itself of the extraordinary remedy of implying terms through the implied covenant of good faith and fair dealing. Its fraudulent inducement claim is based on the very softest of turf—a nonactionable business estimate or prediction—and its tagalong unjust enrichment claim is governed by contract. At bottom, the parties, both highly sophisticated corporate entities represented by skilled legal counsel, bargained for and agreed to the Transaction Agreement as it was written, and this Court should enforce it as written.

I.    THE TRANSACTION AGREEMENT DOES NOT REQUIRE CLOSING STATEMENTS TO BE PROVIDED EVERY QUARTER IN THE FORMAT ALLEGED, NOR CAN TXMD ALLEGE CAUSAL DAMAGES

TXMD asserts a breach of contract claim quibbling over the formatting of the Closing Statements Mayne provided and inventing a frequency requirement that does not exist in the contract text. Notably, TXMD does not allege (a) that it ever *requested* quarterly Closing Statements at any point in the two plus years (more than eight fiscal quarters) between closing in

December 2022 and when Mayne submitted its Closing Statement for Allowance for Returns in February 2025; or (b) that it ever availed itself of its contractual right to "review relevant books and records (including accountant work papers) and access to accountants and employees of [Mayne]" to complete its review of Mayne's Closing Statements. Ex. A, § 5.3(b). This specious claim fails for the following reasons.

As for formatting, TXMD complains that Mayne's 2024 and 2025 Closing Statements "do[] not 'compar[e] actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)' (*id.*) such as in the format specified in Annex 5.3(a) 'Net Working Capital.'" FAC ¶¶ 57-58. But the Transaction Agreement does not require that Mayne provide a Closing Statement that mirrors Annex 5.3(a). It instead merely requires that Mayne's Closing Statement calculation be "prepared consistent with" the Net Working Capital Annex and "delivered with reasonable supporting detail." Ex. A, § 5.3(b). Even if the Transaction Agreement did require that Mayne's Closing Statement mirror the Net Working Capital Annex, Annex 5.3(a) does not organize the data in the manner TXMD is alleging. *See* **Ex. F** (Annex 5.3(a)). The Annex does not include invoice numbers at all but instead shows a summary calculation of Estimated Net Working Capital, historical aged trial balance per customer, accounts receivable aging per customer, accounts receivable aging summary, and a Historical Summary Inventory Trial Balance by Site. *Id.*

As for frequency, TXMD alleges that Mayne provided only a single Closing Statement of Payer Rebates and Allowance for Wholesale Distributor Fees in January 2024, and a single Closing Statement for Allowance for Returns in February 2025. FAC ¶¶ 57-60. TXMD alleges that the Transaction Agreement "required quarterly reports." *Id.* ¶ 56. TXMD is wrong. Section 5.3(h) states:

> For a period of two years following the Closing Date in the case of Allowance for Returns and one year following the Closing date in the case of Wholesale

- 8 -

> Distributor Fees and Payer Rebates, Purchaser shall continue to provide updated Closing Statements solely with respect to calculation of the Closing Net Working Capital conduct solely with respect to the matters included in the items entitled Allowance for Returns, Allowance for Wholesale Distributor Fees and Payer Rebates, in each case, comparing actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters).

Ex. B, § 5.3(h). By its plain language, the Transaction Agreement only requires that Mayne organize the data contained in the updated Closing Statement by Mayne's fiscal quarters. It does **not** require Mayne to provide Closing Statements every quarter, as TXMD alleges. *See Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (courts "give effect to the plain meaning of the contract's terms and provisions"); *Phunware, Inc.*, 117 F. Supp. 3d at 625 (a court may "grant a motion to dismiss when unambiguous language of a contract contradicts plaintiffs' allegations").

Even if the Transaction Agreement contained a discernable formatting and frequency requirement that Mayne violated, TXMD fails to adequately allege that any such breach was the proximate cause of damages, as required under Delaware law. *Johnson v. Gov't Emps. Ins. Co.*, 2014 WL 2708300, at *1 (D. Del. June 16, 2014), *aff'd sub nom. Johnson v. GEICO Cas. Co.*, 672 F. App'x 150 (3d Cir. 2016). TXMD claims that due to Mayne's failure to provide quarterly reports in the proper format: (1) TXMD "was forced to rely on incomplete information when settling the Closing Net Working Capital in December 2023 for the first true-up event, which caused settlement of funds in favor of Mayne and to the detriment of TXMD," FAC ¶ 61; (2) TXMD "accepted reductions or offsets to its quarterly license fees paid by Mayne based upon higher levels of returned products," *id.*; and (3) TXMD "was unable to identify, to prevent, or to mitigate any harms associated with the implementation of the Transaction Agreement or the Licensing Agreement," such as by "taking action to stop the flow of returns from distributors or by preventing Mayne from accepting such returns in the future," *id.* ¶ 62.

This speculative information theory of damages fails. Following delivery of each of Mayne's Closing Statements, TXMD had a contractual right "to review relevant books and records (including accountant work papers) and access to accountants and employees of [Mayne] to the extent necessary to complete TXMD's review of the Closing Statement" before Mayne's Closing Statement ever became finalized. Ex. A, § 5.3(b). As for the settlement in December 2023, TXMD was not "forced to rely on incomplete information" at the time of settlement: Mayne sent the Closing Statement in March 2023. FAC ¶ 17 ("Approximately 90-days after closing, Mayne provided its calculations of the 'Closing Net Working Capital' for the first true-up."). TXMD's failure to plead that it exercised its audit right in the intervening six months is telling and fatal. As for the alleged reductions or offsets, nowhere does TXMD allege the excess amount was supposedly captured by Mayne; instead, TXMD vaguely alleges that some unspecified amount was supposedly "in favor of Mayne." FAC ¶ 61. And as for the returns, nowhere does TXMD allege that TXMD had the contractual right or ability to disallow returns according to TXMD's return policies or to prevent future acceptance of such returns by Mayne. There is no language in the Transaction Agreement that provides for TXMD's ability to prevent any returns to Mayne. Accordingly, TXMD has failed to adequately allege that the purported breach proximately caused its damages. *See, e.g.*, *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 597 (D. Del. 2004) ("It is axiomatic that a plaintiff…must demonstrate with reasonable certainty that defendant's breach caused the loss.") (citation omitted). TXMD does not do that here, and the Court should not credit such speculative damages. *See id.* ("Speculative damages are not recoverable.").

II.    TXMD'S BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING CLAIM FAILS BECAUSE TXMD DOES NOT
PLEAD A SPECIFIC IMPLIED CONTRACTUAL OBLIGATION BUT
INSTEAD ASKS THE COURT TO REWRITE THE TRANSACTION
AGREEMENT

Under Delaware law, to state a claim for breach of the implied covenant of good faith and

fair dealing, the plaintiff must allege: (1) a specific implied contractual obligation, (2) a breach of

that obligation, and (3) resulting damages. *See, e.g.*, *Cantor Fitzgerald, L.P. v. Cantor, et al.*, 1998

WL 842316, at *1 (Del. Ch. Nov. 10, 1998). The covenant "is 'best understood as a way of

implying terms in the agreement,' whether employed to analyze unanticipated developments or to

fill gaps in the contract's provisions." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442

(Del. 2005) (citation omitted). The Delaware Supreme Court has made clear that "the covenant is

a limited and extraordinary legal remedy." *Oxbow Carbon & Minerals Holdings, Inc. v. Crestview-*

*Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (quoting *Nemec v. Shrader*, 991 A.2d

1120, 1128 (Del. 2010)). It is "not an equitable remedy for rebalancing economic interests after

events that could have been anticipated, but were not, that later adversely affected one party to a

contract"—"particularly where, as here, the parties are sophisticated business persons or entities."

*Id*. at 507-08. Accordingly, the implied covenant "does not apply when the contract addresses the

conduct at issue," *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d

878, 896 (Del. 2015), but only "when the contract is truly silent" concerning the matter at hand.

*Allied Capital Corp. v. GC—Sun Holdings, L.P.*, 910 A.2d 1020, 1032-33 (Del. Ch. 2006).

TXMD's implied covenant claim fails because it has not identified a specific contractual

gap in the Transaction Agreement. TXMD alleges that the parties would have proscribed: (1)

"Mayne's sales activities that oversold demand in the marketplace, had they thought to negotiate

the Transaction Agreement with the understanding that the TXMD Inventory would be replaced

by Mayne Inventory"; (2) "Mayne's acceptance of returns previously rejected by TXMD,

- 11 -

disallowed under TXMD policy, or disallowed for other reasons, had they thought to negotiate the Transaction Agreement with the understanding that rejected or disallowed returns should not be accepted"; and (3) "Mayne's refusal to process returns or to send distributors to TXMD for collection." FAC ¶ 74. TXMD does not allege where these obligations would be located within the Transaction Agreement, and that omission is fatal. *Cantor Fitzgerald, L.P.*, 1998 WL 842316, at *1 ("Since a court can only imply a contractual obligation when the express terms of the contract indicate that the parties would have agreed to the obligation had they negotiated the issue, the plaintiff must advance provisions of the agreement that support this finding in order to allege sufficiently a specific implied contractual obligation."); *Scott v. Vantage Corp.*, 2018 WL 5919743, at *6 (D. Del. Nov. 13, 2018) (same). Instead, TXMD invokes the "structure" of the Transaction Agreement. FAC ¶ 74. TXMD seeks to add the prototypical "free-floating duty" courts regularly refuse to retroactively insert into a contract through application of the covenant. *See, e.g.*, *Dunlap*, 878 A.2d at 441 ("Existing contract terms control…such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty…unattached to the underlying legal document.") (internal quotations and citation omitted). TXMD's inability to plead where this Court is supposed to pencil in the alleged implied obligations is telling and dispositive.

Even if this Court were to construe TXMD's allegations and the Transaction Agreement to identify a contractual gap prohibiting Mayne from "overselling" the TXMD Products or from "accepting" returns "previously rejected" or "disallowed" by TXMD—Delaware law instructs that "a court should be cautious when implying a contractual obligation and do so only where obligations which can be understood from the text of the written agreement have nevertheless been omitted from the agreement in the literal sense." *Cantor Fitzgerald, L.P.*, 1998 WL 842316, at *1. There is nothing in the text of the Transaction Agreement relating to market demand for the TXMD

Products, explaining how to handle product expiration dates, or regulating Mayne's sales process to avoid some uncertain volume of in-channel TXMD Inventory from being "replaced" based on product expiration dates. Nor is there anything in the Transaction Agreement regulating Mayne's processing of returns. As a result, TXMD asks this Court—two and a half years after contract execution—not to fill a gap but to draft entirely new obligations and provisions that are not apparent from the text of the Transaction Agreement and were not simply "omitted from the agreement in the literal sense." *Id.*

TXMD could have negotiated for the very obligations it now belatedly seeks to add, but it did not. Both this Court and the Delaware Supreme Court have routinely held that "[n]ot all gaps should be filled, however, because filling the gap with the implied covenant grants parties 'contractual protections that they failed to secure for themselves at the bargaining table.'" *Reklam v. Bellator Sport Worldwide LLC*, 2017 WL 5172397, at *5 (D. Del. Nov. 8, 2017), *report and recommendation adopted*, 2017 WL 5985562 (D. Del. Dec. 1, 2017) (citation omitted); *Nemec*, 991 A.2d at 1126 ("[Courts may] not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both."); *Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2017 WL 2729860, at *40 (Del. Ch. June 26, 2017) ("[T]he covenant does not save a party to an agreement from regret or negligent drafting, and Delaware courts will not rewrite contractual language 'just because one party failed to extract as complete a range of protections as it, after the fact, claims to have desired during the negotiation process.' It applies instead only 'to developments that could not be anticipated, not developments that the parties simply failed to consider.'" (citations omitted)); *Sheth v. Harland Fin. Sols., Inc.*, 2014 WL 4783017, at *4 (Del. Super. Ct. Aug. 28, 2014) ("Delaware courts have consistently held that the implied covenant is

- 13 -

not a license to rewrite contractual language just because the plaintiff failed to negotiate for protections that, in hindsight, would have made the contract a better deal." (internal quotation and citation omitted)). The parties to the Transaction Agreement are sophisticated corporate entities represented by skilled counsel. The implied covenant is "not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract"—"particularly where, as here, the parties are sophisticated business persons or entities." *Oxbow Carbon & Minerals Holdings, Inc.*, 202 A.3d at 507-08 (quoting *Nemec*, 991 A.2d at 1128).

In sum, TXMD received everything that it bargained for. TXMD may regret the deal it struck, but under Delaware law, regret does not suffice to state a claim for breach of the implied covenant of good faith and fair dealing. TXMD does not sufficiently plead a specific implied contractual obligation but instead asks this Court to do what the Delaware Supreme Court has expressly warned against—rewrite an agreement negotiated by sophisticated corporate entities represented by skilled counsel to add an obligation unmoored from the express terms of the contract. "Crafting, what is, in effect, a post contracting equitable amendment that shifts economic benefits from [Mayne to TXMD] would vitiate the limited reach of the concept of the implied duty of good faith and fair dealing." *See Nemec*, 991 A.2d at 1128. Accordingly, TXMD's implied covenant claim should be dismissed with prejudice.

III. **TXMD'S BREACH OF CONTRACT CLAIM RELATING TO THE NDC CODE FAILS BECAUSE IT PLEADS NO CONTRACTUAL OBLIGATION THAT MAYNE REFRAIN FROM TRANSFERING THE CODE**

TXMD's breach of contract claim relating to the NDC Code is contradicted by the express terms and chronology of the Transaction Agreement itself. The Transaction Agreement did not contemplate or reference the NDC Code in any way. *See* Ex. A. The Closing occurred on

December 30, 2022. FAC. ¶ 55. TXMD alleged that Mayne's breach occurred on January 3, 2023.

*Id*. ¶¶ 84, 97. The first agreement relating to or mentioning the NDC Code is Amendment No. 2

and the Side Letter, both of which were executed on March 16, 2023. *See* Ex. C; Ex. D. Thus, at

the time of the alleged breach by Mayne, there was no pre-existing obligation in the Transaction

Agreement (or in any other written agreement) that Mayne refrain from transferring the NDC

Code. TXMD also alleges that *verbal* discussions occurred in December 2022 but does not

specifically allege that the parties ever discussed or agreed that Mayne should not transfer the code

back to TXMD. *See* FAC ¶¶ 78-81. These pleading failures are dispositive because a party cannot

breach an obligation that does not exist. As a result, TXMD's claim must be dismissed.

Additionally, even if TXMD were to allege that such an obligation was orally agreed to in

the December 2022 discussions, any such breach of contract claim staked on the parties' verbal

discussions runs headlong into the merger clause of the Transaction Agreement. Ex. A., § 13.2

("No provision of this Agreement may be amended or modified except by an instrument in writing

signed by each of the Parties."); § 13.3 ("This Agreement, including the annexes, schedules, and

exhibits attached hereto which are deemed for all purposes to be part of this Agreement, the

Ancillary Agreements, and any other documents delivered pursuant to this Agreement and the

Ancillary Agreements, constitute the entire agreement among the Parties with respect to the subject

matter hereof and thereof…."). The Side Letter relating to the NDC Code transfer, which is an

exhibit to Amendment No. 2 and expressly incorporated therein, likewise contains a merger clause

which limits enforceable obligations to those stated within the Transaction Agreement.

> This Letter, the Agreement, and the Ancillary Agreements, and any other
> documents delivered pursuant to this Agreement and the Ancillary Agreements,
> contain the entire agreement and understanding between the Parties with respect to
> the subject matter hereof, and ***supersedes all previous agreements, negotiations,
> discussions, writings, understandings, commitments and conversations with
> respect to such subject matter***. In the event any terms or conditions in this Letter

conflict with the terms and conditions in the Agreement or Ancillary Agreements, the terms and conditions in this Letter shall govern and control.

Ex. D, § III(C) (emphasis added). TXMD's oral agreement claim is barred by the merger clause. *See, e.g.*, *Cavi v. Evolving Sys.*, Inc., 2017 WL 658470, at *8–9 (D. Del. Feb. 17, 2017), *report and recommendation adopted in part*, 245 F. Supp. 3d 604 (D. Del. 2017) ("The breach, asserted by Plaintiff, is predicated on oral representations made prior to the execution of a contract. Since the integration clause provides that each contract supersedes all oral or written promises made before entering into the contract, no breach occurred.").

IV.    **TXMD'S BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM RELATING TO THE NDC CODE FAILS BECAUSE THERE ARE NO CONTRACTUAL GAPS OR UNANTICIPATED DEVELOPMENTS**

Recognizing that the Transaction Agreement does not prohibit Mayne from transferring the NDC code, TXMD turns again to the implied covenant. TXMD alleges that "[h]ad the Parties sought to negotiate the transfer of the NDC Labeler Code explicitly in the Transaction Agreement, they would have proscribed Mayne from transferring the code back to TXMD in January 2023, *after the Closing Date.*" FAC ¶ 99. TXMD further alleges "they also would have proscribed TXMD from having to pay for the cost to collect and assemble the relevant information from Mayne, prepare the documentation on Mayne's behalf, and make the required regulatory filings also on Mayne's behalf." *Id.*

The implied covenant is unavailable here. It "does not apply when the contract addresses the conduct at issue," *Nationwide Emerging Managers, LLC*, 112 A.3d at 896 (Del. 2015), but only "when the contract is truly silent" concerning the matter at hand. *Allied Capital Corp.*, 910 A.2d at 1032-33 (Del. Ch. 2006). Here, although the Transaction Agreement executed on December 4, 2022 did not mention the NDC Code or include it in Transferred Assets, the parties later agreed to amend the Transaction Agreement to expressly handle all aspects of the NDC Code

transfer in Amendment No. 2 and the Side Letter, which were executed in March 2023. Critically, TXMD had every ability to negotiate and bargain for whatever terms it wanted included in Amendment No. 2 and the Side Letter. *Chordia v. Lee*, 2024 WL 49850 at *35 (Del. Ch. Jan. 4, 2024) (Cook, V.C.) ("The implied covenant will not serve as a means to provide contractual protections that parties failed to secure for themselves at the bargaining table. It only applies to developments that could not be anticipated, not developments that the parties simply failed to consider." (internal quotations and citations omitted)). There are no contractual gaps: Amendment No. 2 and the Side Letter comprehensively regulate the code transfer, add the NDC Code to the definition of Transferred Assets, and set out in detail the parties' relative responsibilities with respect to regulatory compliance. And there were no unanticipated developments when Amendment No. 2 and the Side Letter were agreed to; Mayne had already transferred the NDC Code two months earlier.

Given Amendment No. 2 and the Side Letter, TXMD is asking this Court to frustrate rather than effectuate the parties' intent. *Jeter v. Revolutionwear, Inc.*, 2016 WL 3947951, at *7 (Del. Ch. July 19, 2016) ("[T]his Court regards appeals to the implied covenant with a gimlet eye, lest its application frustrate, rather than perfect, the parties' intentions as explicitly stated in the contract."); *Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *11-12 (Del. Ch. Sept. 22, 2016) ("The court will not impose the implied duty of good faith and fair dealing on a party to require that the party actually improve the deal…. This Court will not engage in that kind of 'judicially compelled charity.'" (citation omitted)).

V.    TXMD'S FRAUDULENT INDUCEMENT CLAIM FAILS BECAUSE IT HAS NOT PLED WITH PARTICULARITY AN ACTIONABLE STATEMENT THAT WAS KNOWINGLY FALSE WHEN MADE

"Under Delaware law, the elements of fraudulent inducement and fraud are the same." *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *31

(Del. Ch. Dec. 3, 2018). A party claiming fraud must allege with particularity: (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction in justifiable reliance on the representation; and (5) damage to the plaintiff as a result of such reliance. *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000). "The factual circumstances that must be stated with particularity refer to the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation." *Liborio III, L.P. v. Artesian Water Co., Inc.*, 306 A.3d 529 (Table), at *10 (Del. 2023).

TXMD fails to allege a single actionable statement of fact made by Mayne. TXMD claims that Mayne misrepresented to TXMD that the Allowance for Coupons and Allowance for Payer Rebates line items were *projected* to be higher than either party previously expected. FAC ¶¶ 48, 109. This is a classic business prediction example, which courts have uniformly agreed is inactionable as fraud. *See, e.g.*, *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001) (future predictions "cannot give rise to actionable common law fraud."); *Garner v. Glob. Plasma Sols. Inc.*, 590 F. Supp. 3d 738, 744 (D. Del. 2022) (estimates not actionable).

Even if TXMD's alleged misrepresentations were actionable (they are not), TXMD has failed to plead its claim with sufficient particularity under Fed. R. Civ. P. 9. "Allegations based on information and belief will not satisfy the Rule." *Nutt v. A.C. & S., Inc.*, 466 A.2d 18, 23 (Del. Super. Ct. 1983), *aff'd sub nom. Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647 (Del. 1984); *Satellite Fin. Plan. Corp. v. First Nat. Bank of Wilmington*, 633 F. Supp. 386, 403 (D. Del. 1986), *on reconsideration*, 643 F. Supp. 449 (D. Del. 1986) ("Rule 9(b) allows a plaintiff to aver generally

the second and third of these elements, which involve a defendant's state of mind. Circumstances that constitute the remaining elements, if alleged on information and belief, generally will not satisfy Rule 9(b)'s particularity requirement."). Here, the falsity of the alleged representations—the very crux of TXMD's fraudulent inducement claim—is entirely premised upon a single conclusory allegation made upon information and belief.[3] That is insufficient as a matter of law. *Id*. In fact, TXMD never specifically alleges that Mayne's representation was false, *i.e.*, that Allowances for Coupons and Payer Rebates were not higher than the parties' prior expectations. TXMD has failed to allege with particularity *any* actionable statement that was knowingly false when made, and thus its fraudulent inducement claim must be dismissed.

## VI. TXMD'S UNJUST ENRICHMENT CLAIM FAILS BECAUSE THE ALLEGED CONDUCT ARISES FROM A RELATIONSHIP COMPREHENSIVELY GOVERNED BY CONTRACT

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999). "It was developed 'as a theory of recovery to remedy the absence of a formal contract.'" *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *27 (Del. Ch. Nov. 26, 2014) (citation omitted).

"In evaluating an unjust enrichment claim, the Court must first determine whether a

---

[3]    *See* FAC ¶ 42 ("On information and belief, over the course of 2023 (and possibly in 2024 or 2025) Mayne sold more Mayne Licensed Products than was justified by market demand and the inventory already in the channel that could meet the market demand, including the TXMD Inventory in the channel."); ¶ 110 ("These statements were false, at least because, throughout 2023, Mayne had oversold and was continuing to oversell Mayne Licensed Products into the supply chain and at same time, through 2023, had accepted and was continuing to accept abnormally high return volumes of TXMD Inventory in the supply chain.").

contract governs the parties' relationship." *iBio, Inc. v. Fraunhofer USA, Inc.*, 2020 WL 5745541, at *11 (Del. Ch. Sep. 25, 2020). If so, "then the contract must provide the measure of the plaintiff's rights, and any claim of unjust enrichment will fail." *Id.*; *see also Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312, 316 (D. Del. 2008) ("Because an express and valid contract exists that governs exclusively [the parties'] rights and duties with regard to the licenses and services, the [plaintiff's] unjust enrichment claim must fail, even though circumstances have made the contract less desirable for the [plaintiff] than anticipated."); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009) ("[W]hen the complaint alleges an express, enforceable contract that controls the parties' relationship…a claim for unjust enrichment will be dismissed."). Delaware courts thus "routinely dismiss[] unjust enrichment claims that are premised on an express, enforceable contract that controls the parties' relationship because damages is an available remedy at law for breach of contract." *iBio, Inc.*, 2020 WL 5745541, at *11 (citation modified); *REI Holdings, LLC v. LienClear - 0001, LLC*, 2019 WL 3546881, at *10 (D. Del. Aug. 5, 2019) (same).

Here, TXMD's alternative unjust enrichment claim is premised on the recycled allegation that Mayne oversold demand for the TXMD Products causing increased returns of TXMD Inventory which, pursuant to the Transaction Agreement, resulted in improper disbursements for coupons, rebates, and wholesale distributor fee allowances. FAC ¶¶ 119-123. TXMD alleges that the License Agreement, Transaction Agreement, and Settlement of Closing Net Working Capital agreement are valid, enforceable agreements which comprehensively govern the relationship between the parties. *Id.* ¶¶ 10-12, 54, 105-107. Since the wrongful conduct alleged arises from a relationship governed by these contracts, TXMD's unjust enrichment claim must be dismissed. *REI Holdings, LLC*, 2019 WL 3546881, at *10.

## **CONCLUSION**

For these reasons, Mayne respectfully moves to dismiss TXMD's FAC with prejudice.

OF COUNSEL:

**ARNOLD & PORTER KAYE
SCHOLER LLP**
Aaron F. Miner (admitted *pro hac vice*)
Matthew F. Medina (admitted *pro hac vice*)
250 West 55th Street
New York, NY 10019
Phone: 212.836.8000
aaron.miner@arnoldporter.com
matthew.medina@arnoldporter.com

July 21, 2025

**MORRIS, NICHOLS, ARSHT
& TUNNELL LLP**

*/s/ S. Mark Hurd*
S. Mark Hurd (#3297)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Phone: (302) 658-9200
shurd@morrisnichols.com

*Counsel for Defendant Mayne Pharma LLC*