IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THERAPEUTICSMD, INC.,                   )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )    C.A. No. 25-440-RGA
                                        )
MAYNE PHARMA LLC,                       )
                                        )
            Defendant.                  )

## REPORT AND RECOMMENDATION

Presently before the Court is the motion of Defendant Mayne Pharma LLC ("Defendant" or "Mayne") to dismiss the First Amended Complaint for failure to state a claim.  (D.I. 21).  For the reasons set forth below, the Court recommends that Defendant's motion be GRANTED-IN-PART and DENIED-IN-PART.

## I.    BACKGROUND

Prior to December 2022, Plaintiff TherapeuticsMD, Inc. ("Plaintiff" or "TherapeuticsMD") manufactured, marketed and distributed several women's health products, including ANNOVERA®, BIJUVA®, IMVEXXY®, and a portfolio of prescription prenatal vitamins. (D.I. 16 ¶ 8).  On December 4, 2022, TherapeuticsMD and Mayne entered into a Transaction Agreement and a License Agreement, under which Mayne received the exclusive rights to manufacture, market and distribute those women's health products.  (*Id*. ¶ 10; *see also* D.I. 16, Ex. A (Transaction Agreement)).  The transaction closed on December 30, 2022.  (D.I. 16 ¶ 55). At closing, TherapeuticsMD halted production and sale of its branded women's health products subject to the Agreements, and Mayne began selling the products under its Mayne brand using pharmaceutical labels and product names licensed from TherapeuticsMD.  (*Id*. ¶¶ 13 & 14).

**A.    The Transaction Agreement**

According to the terms of the Transaction Agreement, Mayne was required to pay the "Purchase Price" and "Estimated Net Working Capital" at closing. (D.I. ¶ 19; D.I. 16, Ex. A § 5.1). To arrive at the Estimated Net Working Capital, TherapeuticsMD was to provide Mayne with a Pre-Closing Statement that contained a good faith calculation of the "Net Working Capital," defined as the "Current Assets and Current Liabilities" as of immediately prior to closing. (D.I. 16, Ex. A §§ 1.1 & 5.3(a)). "Current Assets" included several positive line items, including Net Accounts Receivable, Finished Goods Inventory and Raw Materials – API. (D.I. 16 ¶ 21). And "Current Liabilities" included several negative line items, including Allowance for Returns, Allowance for Payer Rebates and Wholesale Distributor Fees. (*Id.*). In other words, Mayne paid TherapeuticsMD the Purchase Price plus its estimated assets (*e.g.*, inventory awaiting sale) minus its estimated liabilities (*e.g.*, amounts owed to contractors) on the closing date.

Because Estimated Net Working Capital is, by definition, estimated and therefore not necessarily reflective of final amounts due, the Transaction Agreement provided a mechanism by which either party could be reimbursed – or "trued-up" – if the Closing Net Working Capital was not equal to the Estimated Net Working Capital that Mayne paid TherapeuticsMD at closing. (D.I. 16 ¶ 22; *see also* D.I. 16, Ex. A § 5.3). In simplified terms, if TherapeuticsMD overestimated the Net Working Capital at closing, then TherapeuticsMD would pay Mayne the difference, and if TherapeuticsMD underestimated the Net Working Capital at closing, then Mayne would pay TherapeuticsMD the difference. (*See* D.I. 16, Ex. A §§ 5.3(f)-(g)).

In general, the Transaction Agreement provided for three true-up events to close specific Net Working Capital line items: (1) within ninety (90) days of closing for all Net Working Capital line items other than Allowance for Returns, Allowance for Payer Rebates and Wholesale Distributor Fees; (2) within one year of closing for Allowance for Payer Rebates and Wholesale

2

Distributor Fees and (3) within two years of closing for Allowance for Returns. (D.I. 16, Ex. A § 5.3(b) (detailing 90-day true-up event); D.I. 16, Ex. B ¶ 2 (amended § 5.3(h) detailing one- and two-year true-up events)). At each true-up event, the Transaction Agreement required Mayne to provide TherapeuticsMD with Closing Statements setting forth a calculation of the Net Working Capital. (D.I. 16, Ex. A § 5.3(b); D.I. 16, Ex. B ¶ 2). According to the Agreement, the Closing Statements would become "final and binding" if TherapeuticsMD did not deliver a "Notice of Disagreement" to Mayne within thirty days of receipt. (D.I. 16, Ex. A § 5.3(b); D.I. 16, Ex. B ¶ 2). In the event that TherapeuticsMD delivered a Notice of Disagreement, the Transaction Agreement required that the parties attempt to resolve their disagreement in good faith and in writing within thirty days of receipt. (D.I. 16, Ex. A § 5.3(c)).[1]

### B.    Current Dispute

This case arises from the parties' disputes over the three line items covered by the one- and two-year true-up events (*i.e.*, wholesaler distributor fees, payer rebates and returns), as well as Mayne's allegedly improper handling of a certain regulatory code for the relevant products.

### 1.    Mayne Transfers NDC Labeler Code Back to TherapeuticsMD

The FDA assigns a National Drug Code to pharmaceutical products marketed in the United States; the NDC Labeler Code is the first part of that National Drug Code. (D.I. 16 ¶ 79). Sometime in December 2022, TherapeuticsMD and Mayne met to discuss "various regulatory and related tasks" and agreed that TherapeuticsMD would transfer its "NDC Labeler Code to Mayne

---

[1]    Although not necessary to resolve the present motion, if no agreement was reached within thirty days, the Transaction Agreement required the parties to submit their dispute to the accounting firm BDO's advisory practice. (*See* D.I. 16, Ex. A at § 5.3(c)). By separate order today, the Court is granting Mayne's motion to compel submission of these disputes to BDO and to stay pending that expert determination.

as of the Closing Date." (*Id.* ¶¶ 78-80).[2]  At closing, TherapeuticsMD did.  (*Id.* ¶ 83).  A few days later, apparently without TherapeuticsMD's knowledge or consent, "Mayne transferred the NDC Labeler Code . . . back" to TherapeuticsMD.  (*Id.* ¶ 84).  This transfer back caused TherapeuticsMD to incur "significant costs" associated with "Post-Closing Date reporting responsibilities of the NDC holder related to government contracts."  (*Id.* ¶ 85; *see also id.* ¶¶ 98-100).

In mid-March 2023, about two months after the allegedly improper transfer back to TherapeuticsMD, the parties executed Amendment No. 2 to the Transaction Agreement and a corresponding Side Letter to address the NDC Labeler Code.  (*See* D.I. 22, Ex. C ("WHEREAS, the Parties mutually desire to amend, modify and restate certain terms and conditions of the Agreement to transfer the TXMD Labeler Code to Mayne as of Closing."); D.I. 22, Ex. D).[3] Amendment No. 2 and the Side Letter expressly required TherapeuticsMD to transfer the NDC Labeler Code back to Mayne as "soon as reasonably practicable."  (D.I. 22, Ex. D ¶ I.A; *see also* D.I. 22, Ex. C ¶ 2(b)).  The Side Letter included a merger clause superseding all previous agreements "with respect to such subject matter."  (D.I. 22, Ex. D ¶ III.C).

---

[2]  The original Transaction Agreement was silent as to transfer of the NDC Labeler Code. (*See generally* D.I. 16, Ex. A).

[3]  Unlike the Transaction Agreement and Amendment No. 1 (D.I. 16, Exs. A & B), Amendment No. 2 and its corresponding Side Letter were not attached to the First Amended Complaint but were instead attached to Mayne's opening brief (*see* D.I. 22, Exs. C & D).  Because they amend the document underlying TherapeuticsMD's contract claims (*i.e.*, the Transaction Agreement), Amendment No. 2 and its Side Letter can be considered at the motion to dismiss stage.  *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 n.11 (3d Cir. 2010) ("[T]he loan agreement may be reviewed because it is integral to the complaint." (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)); *see also Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

### 2.   Mayne Begins "Overselling" Demand

After the Transaction Agreement closed at the end of December 2022, Mayne began selling its own Mayne-branded women's health products pursuant to the parties' agreements. (D.I. 16 ¶ 39). Mayne apparently "sold more Mayne Licensed Products than was justified by market demand and the inventory already in the channel that could meet the market demand, including the [TherapeuticsMD inventory] in the channel." (*Id*. ¶ 42). Mayne's "overselling demand" caused older (sooner-to-expire) TherapeuticsMD-branded product already in the supply channel to be "preferentially returned" at a much higher rate than the parties accounted for at closing. (*Id*. ¶¶ 43 & 69). Mayne also apparently began accepting returns that TherapeuticsMD had previously rejected, disputed or disallowed, and Mayne began rejecting unprocessed returns and telling distributors to collect directly from TherapeuticsMD. (*Id*. ¶¶ 70 & 71).

### 3.   Mayne and TherapeuticsMD Settle 90-Day True-Up Event

After Mayne delivered its Closing Statement with respect to the 90-day true-up event, TherapeuticsMD sent Mayne a Notice of Disagreement on May 26, 2023, and the parties eventually settled their dispute with respect to the 90-day true-up line items on December 15, 2023. (D.I. 16 ¶ 103-05). During those settlement discussions, Mayne apparently represented that the coupons and rebates line items "through 2023 and, in 2024, were expected to be higher than either party expected," which indicated that TherapeuticsMD inventory "was selling through the supply chain as anticipated." (*Id*. ¶ 109). According to TherapeuticsMD, those statements were false because, throughout 2023, Mayne had been overselling its own products into the supply chain while at the same time accepting "abnormally high return volumes" of TherapeuticsMD inventory from the supply chain. (*Id*. ¶ 110; *see also id*. ¶ 111 ("Mayne knew or should have known these representations to be false, because Mayne had accepted abnormally large volume of returns of

5

TXMD Inventory in 2023, while knowing that rebates and coupons cannot be paid on inventory that is returned.")). TherapeuticsMD claims that Mayne's purportedly false statements induced TherapeuticsMD into settling the parties' dispute regarding the 90-day true-up event. (*Id.* ¶ 115).

### 4. Mayne Sends One- and Two-Year True-Up Closing Statements

On January 16, 2024 and February 3, 2025, Mayne sent Closing Statements for the one- and two-year true-up events, respectively. (*Id.* ¶¶ 57 & 58). TherapeuticsMD claims that Mayne breached the Transaction Agreement by not sending updated Closing Statements every quarter and by not providing the Closing Statements in the required format "comparing actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)." (*See id.* ¶¶ 59 & 60 (quoting D.I. 16, Ex. B ¶ 2)). According to TherapeuticsMD, this failure forced TherapeuticsMD to rely on "incomplete information" in settling the 90-day true-up event and, further, prevented TherapeuticsMD from mitigating damages with respect to the one- and two-year true-up events, "such as by taking action to stop the flow of returns from distributors or by preventing Mayne from accepting such returns in the future." (*Id.* ¶¶ 61 & 62).

\*      \*      \*

On April 8, 2025, TherapeuticsMD filed this action, asserting claims for breach of contract (the Transaction Agreement and NDC Labeler Code), breach of the implied covenant of good faith and fair dealing, fraudulent inducement and unjust enrichment. (D.I. 1). On June 20, 2025, in response to a motion to dismiss, Mayne filed the First Amended Complaint, adding factual allegations and maintaining its claims for breach of contract (Counts I & III), breach of the implied covenant of good faith and fair dealing (Counts II & IV), fraudulent inducement (Count V) and

unjust enrichment (Count VI).  (D.I. 16).[4]  On July 22, 2025, Mayne filed the present motion to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 9(b), seeking dismissal of all claims in their entirety.  (D.I. 21 & 22).  Briefing concluded on September 5, 2025.  (D.I. 24 & 25).

## II.    **LEGAL STANDARD**

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the plaintiff.  *See Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010); *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232-33 (3d Cir. 2008).  The Court is not, however, required to accept as true bald assertions, unsupported conclusions or unwarranted inferences.  *See Mason v. Delaware (J.P. Court)*, C.A. No. 15-1191-LPS, 2018 WL 4404067, at *3 (D. Del. Sept. 17, 2018); *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).  Dismissal under Rule 12(b)(6) is only appropriate if a complaint does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  This plausibility standard obligates a plaintiff to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  Instead, the pleadings must provide sufficient factual allegations to allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (cleaned up).

---

[4]    TherapeuticsMD also added a separate claim for breach of the implied covenant of good faith and fair dealing in the alternative to its breach of NDC Labeler Code (Count IV).  (D.I. 16 ¶¶ 88-101).

## III.    DISCUSSION

Defendant seeks to dismiss the claims for breach of contract (Counts I & III), breach of the implied covenant of good faith and fair dealing (Counts II & IV), fraudulent inducement (Count V) and unjust enrichment (Count VI).  (D.I. 22).  The Court addresses each claim in turn.

### A.    Count I – Breach of Section 5.3(h) of the Transaction Agreement

In Count I, TherapeuticsMD alleges that Mayne violated Section 5.3(h) of the Transaction Agreement by failing to provide updated Closing Statements on a quarterly basis in the required format.  (D.I. 16 ¶¶ 56-60).  "To state a claim for breach of contract under Delaware law, Plaintiffs must allege facts plausibly demonstrating: '(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff.'"  *Hydrogen Master Rts., Ltd. v. Weston*, 228 F. Supp. 3d 320, 333 (D. Del. 2017) (quoting *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003)).  Mayne argues that TherapeuticsMD has not adequately pled a contractual obligation or a resulting damage to plaintiff.  (D.I. 22 at 7-10; D.I. 25 at 1-3).[5]

Mayne's alleged breach concerns its updated Closing Statements provided to TherapeuticsMD pursuant to Section 5.3(h) of the Transaction Agreement during the two-year period following the Closing Date.  Section 5.3(h), as amended by Amendment No. 1, provides:

> For a period of two years following the Closing Date in the case of Allowance for Returns and one year following the Closing date in the case of Wholesale Distributor Fees and Payer Rebates, ***Purchaser shall continue to provide updated Closing Statements*** solely with respect to calculation of the Closing Net Working Capital conduct solely with respect to the matters included in the items entitled Allowance for Returns, Allowance for Wholesale Distributor Fees and Payer Rebates, in each case, ***comparing actual***

---

[5]    Mayne also argues that TherapeuticsMD had a contractual right to review certain books and records but did not – a failure that Mayne describes as "telling and fatal" as to Count I.  (D.I. 22 at 10; *see also* D.I. 16, Ex. A § 5.3(b) (right to "review relevant books and records . . . to the extent necessary" to complete review of closing statements)).  The Court disagrees. The Transaction Agreement imposed no contractual obligation on TherapeuticsMD to audit Mayne's records before bringing suit.

> ***invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)***.  The amounts set forth in the updated Closing Statements for such ***fiscal quarter*** shall become final and binding on the parties on the date that is thirty (30) Calendar Days following Purchaser's delivery thereof to TXMD, unless TXMD delivers written Notice of Disagreement to Purchaser on or prior to such date.

(D.I. 16, Ex. B ¶ 2 (emphases added)).

Mayne does not dispute that it failed to provide quarterly Closing Statements.  Mayne does, however, dispute that delivery of Closing Statements every quarter was required by Section 5.3(h).  (D.I. 22 at 7-10; D.I. 25 at 1-3).  Underlying the parties' disagreement here is the meaning of the term "Purchaser shall continue to provide updated Closing Statements . . . comparing actual invoices against accruals on a ***quarterly basis*** (using Purchaser's fiscal quarters)" in amended Section 5.3(h).  (*See* D.I. 16, Ex. B ¶ 2 (emphasis added)).  According to Mayne, "quarterly basis" in Section 5.3(h) only requires that the Closing Statements be organized by quarter – not that the Closing Statements must be provided every quarter. (D.I. 22 at 7-10; D.I. 25 at 1-3).  TherapeuticsMD disagrees, highlighting the singular "fiscal quarter" in the immediately following sentence.  (D.I. 24 at 3-4).

The Court need not determine at this stage whether Section 5.3(h) required Mayne to provide quarterly Closing Statements, however, because even under Mayne's interpretation of the provision, TherapeuticsMD adequately alleges that Mayne breached the agreement by failing to organize the Closing Statements in the required format "comparing actual invoices against accruals on a quarterly basis (using Purchaser's fiscal quarters)."  (*See* D.I. 16 ¶¶ 56-60).  As such, the First Amended Complaint adequately alleges breach of a contractual obligation.  *See Hydrogen Master*, 228 F. Supp. 3d at 333.

Mayne next argues that any alleged breach of Section 5.3(h) did not harm TherapeuticsMD, accusing TherapeuticsMD of "quibbling over the formatting of the Closing Statements Mayne

9

provided." (*See* D.I. 22 at 7, 9 & 10). According to TherapeuticsMD, the improper formatting of Mayne's Closing Statements prevented TherapeuticsMD from mitigating damages (*e.g.*, by reducing the high rate of returns) with respect to the one- and two-year true-up events. (*Id*. ¶¶ 61 & 62). That, in turn, apparently caused harm to TherapeuticsMD in the form of increased payments demanded from Mayne. (*Id.* ¶ 63). In Mayne's view, the alleged formatting of its Closing Statements could not have proximately caused any harm because TherapeuticsMD did not have a contractual right to stop the flow of returns from distributors or to prevent Mayne from accepting those returns. (D.I. 25 at 3).

Viewed most favorably to TherapeuticsMD, the First Amended Complaint contains sufficient facts for the Court to plausibly infer that Mayne's improper formatting of the Closing Statements proximately caused a non-speculative injury to TherapeuticsMD.[6] (*See* D.I. 16 ¶¶ 61-63). For example, had TherapeuticsMD been provided with the required information in the updated Closing Statements, it is not unreasonable to infer that TherapeuticsMD would have been alerted to the elevated level of returns and taken steps to slow their flow from distributors. (*See* D.I. 16 ¶ 62). Indeed, that is precisely what TherapeuticsMD alleges it would have done. (*Id.* ¶¶ 62-63). Whether TherapeuticsMD had a "contractual right or ability" to do so does not control the inquiry at this stage (D.I. 25 at 10); that argument is essentially asking the Court to make a finding that TherapeuticsMD had no ability at all to affect the rate of returns. That seems to be a

---

[6]     Mayne also overlooks the fact that, at the pleadings stage, the "principal issue" is "the existence of a contractual violation." *Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 454 (Del. Ch. 2023) (citing *Garfield v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022)). An "unexcused failure to perform a contract is a legal wrong," and an action will "therefore lie for the breach although it causes no injury." *Cygnus*, 302 A.3d at 451 (quoting 24 WILLISTON ON CONTRACTS § 64:9 (4th ed. 2007)); *see also Norman v. Elkin*, 860 F.3d 111, 128-29 (3d Cir. 2017); *Garfield*, 277 A.3d at 328; *In re P3 Health Grp. Holdings, LLC*, No. 2021-0518-JTL, 2022 WL 16548567, at *10 (Del. Ch. Oct. 31, 2022).

question of fact not appropriate for resolution at the pleading stage and, in any event, is not the only reasonable inference from the allegations here.  TherapeuticsMD plausibly alleges how it could have – but was unable to – mitigate the harm from the high rate of returns.  That is enough for now.

In sum, TherapeuticsMD adequately pleads that Mayne was contractually obligated to provide updated Closing Statements organized by quarter, that Mayne breached that obligation and that TherapeuticsMD was harmed as a result.  *See Hydrogen Master*, 228 F. Supp. 3d at 333.  The Court thus recommends that Mayne's motion to dismiss Count I be denied.

### B.  Count II – Implied Covenant of Good Faith and Fair Dealing

"The covenant of good faith and fair dealing is implied in every agreement in Delaware." *HSMY, Inc. v. Getty Petroleum Mktg., Inc.*, 417 F. Supp. 2d 617, 621 (D. Del. 2006).  Generally speaking, the implied covenant exists to imply terms in a contract to fill in gaps in the parties' agreement.  *See Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441-2 (Del. 2005).  But the implied covenant of good faith and fair dealing is a "limited and extraordinary legal remedy" that "only applies to developments that could not be anticipated, not developments that the parties simply failed to consider." *Nemec v. Shrader*, 991 A.2d 1120, 1126, 1128 (Del. 2010); *see also id*. at 1125 ("The implied covenant of good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." (citation omitted)).  To state a claim for the breach of the implied covenant, a plaintiff must allege "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Cantor Fitzgerald, L.P. v. Cantor*, No. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

Here, TherapeuticsMD alleges that Mayne breached the implied covenant of good faith and fair dealing by (1) overselling demand resulting in distributors returning all or nearly all TherapeuticsMD inventory, (2) accepting returns of TherapeuticsMD inventory that had been

11

previously rejected, disputed or disallowed and (3) refusing to process returns of TherapeuticsMD inventory and directing distributors to TherapeuticsMD for collection. (D.I. 16 ¶¶ 67-74). As to the elements of an implied-covenant claim, Mayne disputes only the first element – that TherapeuticsMD adequately pleads a specific implied contractual obligation.

"Since a court can only imply a contractual obligation when the express terms of the contract indicate that the parties would have agreed to the obligation had they negotiated the issue, the plaintiff must advance provisions of the agreement that support this finding in order to allege sufficiently a specific implied contractual obligation." *Cantor Fitzgerald*, 1998 WL 842316, at *1 (footnote omitted). Mayne argues that TherapeuticsMD fails to identify any provision of the Transaction Agreement that demonstrates the parties would have agreed to limit Mayne's sales and ability to reject and control return-related issues had they negotiated them. (D.I. 22 at 11-12; D.I. 25 at 4).[7] TherapeuticsMD responds that it does, in fact, identify such provisions and also argues that it has plausibly alleged that the parties could not have anticipated the overselling demand and return issues. (D.I. 24 at 6-7). The Court agrees with Mayne.

As set forth above, TherapeuticsMD's implied covenant claim is based on Mayne's allegedly overselling demand, accepting previously rejected returns and directing other returns to TherapeuticsMD for payment. Yet nowhere in the First Amended Complaint is there any reference to an express provision in the Transaction Agreement that suggests the parties would have agreed to terms prohibiting this conduct. The closest that TherapeuticsMD comes is by referencing the line items for coupons, rebates and wholesaler distributor fees and pointing to "the structure" of

---

[7] Mayne also argues that TherapeuticsMD is precluded from asserting the implied covenant because the First Amended Complaint "admits that variance of product returns based upon product expiration and overselling demand was anticipated by the parties." (D.I. 25 at 4-5 (citing D.I. 16 ¶ 35)). Because the Court agrees with Mayne's first ground, the Court will not reach this issue.

12

the agreement as a whole.  (D.I. 16 ¶¶ 73 & 74; *see also id.* ¶ 74 ("[B]ased upon the structure of the Transaction Agreement, the Parties would have proscribed Mayne's sales activities that oversold demand in the marketplace, had they thought to negotiate the Transaction Agreement with the understanding that [TherapeauticsMD] Inventory would be replaced by Mayne Inventory.")).  Generic reference to line items or the agreement as a whole does not suffice to identify any express contractual provision that plausibly suggests that the parties would have agreed to limit Mayne's sales and returns had they negotiated the issue.  *See Cantor Fitzgerald*, 1998 WL 842316, at *1.  This failure warrants dismissal.

Even if the Court were to assume that Section 5.3 of the Transaction Agreement is the provision TherapeuticsMD is relying on, the claim would still fail.  TherapeuticsMD does not plausibly allege that the obligations it seeks to now impose through implied terms are ones that the parties could not have anticipated.  *See Nemec*, 991 A.2d at 1126.  Indeed, it is wholly unclear why TherapeuticsMD could not have anticipated supply and demand issues so that the parties could have negotiated for provisions limiting Mayne's sales or returns activity for a certain period following the closing date.  This is especially true where both parties are sophisticated business entities.  *See Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 508 (Del. 2019).  At best, TherapeuticsMD plausibly alleges that the complained-of sales and returns issues were "developments that the parties simply failed to consider." *Nemec*, 991 A.2d at 1126.  The implied covenant of good faith and fair dealing cannot be used to remedy that failure.

TherapeuticsMD attempts to argue that demand and return issues were unanticipated as evidenced by Mayne "quintupl[ing] the dollar value of reported returns" in its two-year Closing Statement to a number that exceeded the amount of TherapeuticsMD inventory available as of

closing. (D.I. 24 at 8-9 (citing D.I. 16 ¶¶ 51 & 52)). But even if the volume of Mayne's sales was unanticipated, TherapeuticsMD still fails to plausibly allege that the parties would have agreed to contract terms limiting Mayne's sales or returns. Mayne paid $140 million for the right to sell the women's health products covered by the Transaction Agreement (D.I. 16, Ex. A § 5.1), and Mayne presumably sought to recoup its investment by selling its own products. (*See id*. at 2 (reciting express purpose of transferring assets "necessary or useful for the Product Exploitation")). TherapeuticsMD cannot now use the implied covenant to "circumvent the parties' bargain" and create a "free-floating duty" that Mayne should have limited its sales or returns. *Dunlap*, 878 A.2d at 441. The Court thus recommends that Count II be dismissed.

### C.    Count III – Breach of Contract (NDC Labeler Code)

In Count III, TherapeuticsMD alleges that Mayne breached an oral agreement made in December 2022 that TherapeuticsMD would transfer the NDC Labeler Code to Mayne at closing.[8] (D.I. 16 ¶¶ 78-80). According to the First Amended Complaint, TherapeuticsMD transferred the code to Mayne on the closing date, and Mayne thereafter transferred it back to TherapeuticsMD a few days later, causing TherapeuticsMD to incur "significant costs." (*Id*. ¶¶ 83-85). As to this breach claim, Mayne only disputes whether a contractual obligation has been adequately pled. Indeed, Mayne argues that there is no contract at all.

According to Mayne, Count III fails because the alleged oral agreement was superseded by the merger clauses in both the Transaction Agreement (executed December 4, 2022) and the Side

---

[8]    TherapeuticsMD attempts to restyle Count III as premised on an implied-in-fact contractual obligation. (D.I. 24 at 9). Because the First Amended Complaint does not allege (plausibly or otherwise) that the contractual obligation was implied-in-fact (D.I. 16 ¶¶ 77-87), TherapeuticsMD is improperly attempting to amend its pleading through its answering brief. *See Frederico v. Home Depot*, 507 F.3d 188, 201-02 (3d Cir. 2007).

14

Letter to Amendment No. 2 of the Transaction Agreement (executed March 15, 2023).[9]  (D.I. 22 at 14-16 (citing D.I. 16, Ex. A §§ 13.2 & 13.3 and D.I. 22, Ex. D § III.C); *see also* D.I. 25 at 6-7). In response, TherapeuticsMD argues that the oral agreement occurred after the Transaction Agreement was signed (and thus cannot be superseded by it) and, further, that the Side Letter's merger clause does not apply to the conduct at issue.  (D.I. 24 at 10).

The First Amended Complaint does not indicate whether the oral agreement at issue occurred before or after the parties executed the Transaction Agreement on December 4, 2022. (D.I. 16 ¶¶ 78 & 80 (pleading only that the oral agreement occurred in "December 2022")).  The timing matters because the merger clause only supersedes agreements made before the contract was signed.  (*See* D.I. 16, Ex. A § 13.3 (superseding "all prior . . . agreements . . . both oral and written")); *see also Cavi v. Evolving Sys., Inc.*, C.A. No. 15-1211-RGA-MPT, 2017 WL 658470, at *9 (D. Del. Feb. 17, 2017), *report and recommendation adopted in part*, 245 F. Supp. 3d 604 (D. Del. 2017).  That being said, even if the oral agreement occurred before the parties signed the Transaction Agreement, Mayne's interpretation of the merger clause in the Transaction Agreement (*i.e.*, that it supersedes NDC Labeler Code agreements) is far from the "only reasonable" interpretation.  *MicroStrategy Inc. v. Acacia Rsch. Corp.*, No. 5735-VCP, 2010 WL 5550455, at *5 (Del. Ch. Dec. 30, 2010) (dismissal on motion to dismiss only appropriate where defendants' interpretation is "only reasonable construction as a matter of law"); *Valeo Sistemas Electricos S.A. de C.V. v. CIF Licensing, LLC*, C.A. No. 06-627-GMS-LPS, 2008 WL 2736819, at *5 (D. Del.

---

[9]    In relevant part, Section 13.3 of the Transaction Agreement states that the agreement "supersede[s] all prior communications, representations, agreements, and understandings, both oral and written, among the Parties with respect to the subject matter hereof and thereof."  (D.I. 16, Ex. A § 13.3).  Similarly, Section III.C of the Side Letter states that the agreement "supersedes all previous agreements, negotiations, discussions, writings, understandings, commitments and conversations with respect to such subject matter." (D.I. 22, Ex. D § III.C).

15

July 11, 2008) (reciting same principle).  Indeed, as Mayne concedes in its reply brief, the original Transaction Agreement "does not contain any mention whatsoever of the NDC Code or its transfer."  (D.I. 25 at 6).  It is equally reasonable to infer that the Transaction Agreement merger clause does not supersede prior agreements relating to the NDC Labeler Code.  (*See* D.I. 16, Ex. A § 13.3 (superseding all prior agreements "with respect to the subject matter hereof and thereof")).

As to the Side Letter to Amendment No. 2, TherapeuticsMD does not dispute that the oral agreement occurred before execution of the Side Letter.  (D.I. 24 at 10).  The dispute here is whether the Side Letter's merger clause applies to the NDC Labeler Code oral agreement at all.  In Mayne's view, it does.  (D.I. 25 at 7 (citing D.I. 22, Ex. C at 1 and D.I. 22, Ex. D § I.A); *see also* D.I. 22 at 15-16).  In TherapeuticsMD's view, the Side Letter is limited to "Government Rebate Claims" and "Government Pricing Matters," and the NDC Labeler Code dispute falls outside of those categories.  (D.I. 24 at 10 (quoting D.I. 22, Ex. D §§ I-II)).  The Court agrees with Mayne that the NDC Labeler oral agreement falls within the Side Letter's merger clause.  (*See* D.I. 22, Ex. D § III.C (superseding "all previous agreements . . . with respect to such subject matter")).

Amendment No. 2 and the Side Letter cover the conduct at issue (transfer of the NDC Labeler Code) and were executed after the alleged December 2022 oral agreement (in March 2023).  Amendment No. 2, which incorporates the Side Letter, expresses the parties' mutual "desire to amend, modify and restate certain terms and conditions of the [Transaction] Agreement to transfer the [TherapeuticsMD] Labeler Code to Mayne as of the Closing."  (D.I. 22, Ex. C).  Similarly, the Side Letter provides that "[a]s soon as reasonably practicable after the Second Amendment Effective Date, [TherapeuticsMD] shall use commercially reasonable efforts to cooperate with Mayne to facilitate transition of the [TherapeuticsMD] Labeler Code . . . to Mayne's Medicare Coverage Gap Discount Program Agreement."  (D.I. 22, Ex. D § I.A).

16

TherapeuticsMD's attempt to distinguish the Side Letter by highlighting reference to "Government Rebate Claims" and "Government Pricing Matters" is unpersuasive, particularly because TherapeuticsMD alleges in Count III that it "incurred significant costs that were associated with the post-Closing Date reporting responsibilities of the NDC holder *related to government contracts*." (D.I. 16 ¶ 85 (emphasis added)). Any prior agreement regarding the NDC Labeler Code – like the one asserted by TherapeuticsMD in Count III – was superseded by the merger clause of the Side Letter. Because Count III alleges breach of a superseded oral agreement, the Court recommends that count be dismissed. *See Cavi*, 2017 WL 658470, at *9 ("Since the integration clause provides that each contract super[s]edes all oral or written promises made before entering into the contract, no breach occurred.").

### D.    Count IV – Implied Covenant of Good Faith and Fair Dealing (NDC Labeler Code)

In the alternative to its breach of contract claim, TherapeuticsMD alleges that Mayne breached the implied covenant of good faith and fair dealing by transferring the NDC Labeler Code back to TherapeuticsMD after closing. (D.I. 16 ¶¶ 88-101).[10] As before, Mayne only disputes whether a specific implied contract obligation existed. (D.I. 22 at 16-17; D.I. 25 at 7-8).

As an initial matter, Count IV should be dismissed as duplicative of the corresponding breach of contract claim (Count III). *Cision US, Inc. v. CapTech Ventures, Inc.*, C.A. No. 24-00063-MN-SRF, 2025 WL 1094318, at *5 (D. Del. Apr. 11, 2025) ("A plaintiff 'cannot assert a claim for breach of implied covenants of good faith and fair dealing that is based on exactly the

---

[10]    TherapeuticsMD alleges that "[h]ad the Parties sought to negotiate the transfer of the NDC Labeler Code explicitly in the Transaction Agreement, they would have proscribed Mayne from transferring the code back to [TherapeuticsMD] in January 2023, *after the Closing Date*." (D.I. 16 ¶ 99). TherapeuticsMD further alleges that the parties would have "proscribed [TherapeuticsMD] from having to pay for the cost to collect and assemble the relevant information from Mayne, prepare the documentation on Mayne's behalf, and make the required regulatory filings also on Mayne's behalf." (*Id*.).

same acts which are said to be in breach of express covenants.'" (quoting *Mosiman v. Madison Companies, LLC*, C.A. No. 17-1517-CFC, 2019 WL 203126, at *3 (D. Del. Jan. 15, 2019))). Count IV is based on the same acts as the breach of contract claim in Count III – Mayne's improper transfer of the NDC Labeler Code.  (*Compare* D.I. 16 ¶¶ 77-87, *with id*. ¶¶ 88-101).  As such, TherapeuticsMD's "claim for breach of the implied covenant of good faith and fair dealing must be dismissed as impermissibly duplicative of [its] breach claims."  *Rheault v. Halma Holdings Inc.*, C.A. No. 23-700-WCB, 2023 WL 8005318, at *13 (D. Del. Nov. 7, 2023) (collecting cases).

Moreover, as discussed above in Section III.C, Amendment No. 2 expressly addresses transfer of the NDC Labeler Code.  *See Oxbow*, 202 A.3d at 507 ("[T]he implied covenant 'does not apply when the contract addresses the conduct at issue,' but only 'when the contract is truly silent' concerning the matter at hand." (citation omitted)).  After agreeing to Amendment No. 2, TherapeuticsMD cannot now seek to improve the contractual rights that it obtained by implying more favorable terms into the original agreement.  *See Nemec*, 991 A.2d at 1126 ("[W]e must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both.").

TherapeuticsMD nevertheless argues that a specific contractual obligation can be implied[11] in the original Transaction Agreement because Mayne's conduct in transferring the NDC Labeler Code back to TherapeuticsMD "undermined [its] negotiation position and forced a deal in Amendment No. 2 that from [TherapeuticsMD]'s perspective did not handle ***all aspects*** of the transfer of the NDC labeler code."  (D.I. 24 at 11).  TherapeuticsMD cites no case law to support

---

[11]    Both parties agree that the original Transaction Agreement does not expressly account for transfer of the NDC Labeler Code.

the proposition that being placed in a difficult negotiating position would justify application of the implied covenant here. Ultimately, the parties negotiated an amendment to the Transaction Agreement to address transfer of the NDC Labeler Code. (*See* D.I. 22, Ex. C). TherapeuticsMD had the chance to bargain for more favorable terms when it negotiated that Amendment No. 2. Having not done so, TherapeuticsMD cannot now ask the Court to imply such terms. *See Oxbow*, 202 A.3d at 507; *Nemec*, 991 A.2d at 1126. The Court thus recommends that Count IV be dismissed.

### E.      Count V – Fraudulent Inducement

TherapeuticsMD alleges that Mayne fraudulently induced TherapeuticsMD into settling the 90-day true-up event. (D.I. 16 ¶¶ 102-16). In seeking dismissal of Count V, Mayne argues that (1) fraudulent inducement is not pled with sufficient particularity under Rule 9(b), (2) the alleged misrepresentation constitutes an inactionable business prediction and (3) TherapeuticsMD's reliance on "information and belief" is impermissible. (D.I. 22 at 17-19; D.I. 25 at 8-9). The Court agrees that TherapeuticsMD's claim of fraudulent inducement does not meet the particularly requirement of Rule 9(b).[12]

To state a claim for fraudulent inducement under Delaware law, a plaintiff must allege with particularity: "(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance." *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461-62 (Del. 1999). Under the particularity requirement imposed by

---

[12]      Because the claim of fraudulent inducement is inadequately pled under Rule 9(b), the Court does not reach Mayne's other arguments.

Rule 9(b), "the complaint must describe the time, place, and contents of the false representations or omissions, as well as the identity of the person making the statement and the basis for the statement's falsity." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 680 (3d Cir. 2023). In other words, a plaintiff must plead the "who, what, when, where and how." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).

Here, TherapeuticsMD alleges that during settlement discussions with respect to the 90-day true-up event, "Mayne" falsely represented that coupons and payer rebates through 2023 were higher than previously expected, indicating that TherapeuticsMD inventory "was selling through the supply chain as anticipated under Transaction Agreement." (D.I. 16 ¶ 109). By alleging only that "Mayne" made false representations without identifying a specific individual (*id*.), TherapeuticsMD fails to plead with sufficient particularity the "who." *See Frederico v. Home Depot*, 507 F.3d 188, 201-02 (3d Cir. 2007) (affirming dismissal of fraud claim under Rule 9(b) because plaintiff failed to identify specific individual employed by defendant that made false remark); *see also Migliore by Migliore v. Vision Solar LLC*, 160 F.4th 79, 91 (3d Cir. 2025) ("In a case with five defendants, the word 'Defendants' does not provide 'the identity of the person' who allegedly wronged her." (citing *Frederico*, 507 F.3d at 201)). This deficiency is fatal to TherapeuticsMD's fraudulent inducement claim.

Moreover, the First Amended Complaint is completely silent as to "where" and "how" the alleged misrepresentation took place – *e.g.*, during an in-person meeting somewhere, between the parties over email, etc. *See Frederico*, 507 F.3d at 200 ("To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."). And there is no real indication of the "when," suggesting only that the alleged false representation occurred sometime between May 26, 2023

20

(when TherapeuticsMD sent its first Notice of Disagreement) and December 15, 2023 (when the 90-day true-up event settled).  (D.I. 16 ¶¶ 104, 105 & 109).  Viewed in the light most favorable to TherapeuticsMD, the First Amended Complaint indicates that the alleged misrepresentation occurred sometime closer to December 15, 2023 because the statements were regarding coupons and rebates that occurred "throughout 2023."  (*Id*. ¶ 110; *see also* D.I. 24 at 13 (stating that alleged misrepresentations occurred in "December 2023")).  Without more, however, the "where," "when" and "how" of TherapeuticsMD's fraudulent inducement claim fail to meet the particularity requirements of Rule 9(b).  Count V should be dismissed.

### F.    Count VI – Unjust Enrichment

Finally, TherapeuticsMD alleges in the alternative that Mayne was unjustly enriched by overselling demand, causing the older (sooner-to-expire) TherapeuticsMD-branded product in the supply chain to be preferentially returned.  (D.I. 16 ¶¶ 117-27).  "Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"  *Nemec*, 991 A.2d at 1130 (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).  To state a claim of unjust enrichment, a plaintiff must allege (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law.  *Id*.  Mayne disputes only the absence of a remedy at law, arguing that TherapeuticsMD's unjust enrichment claim should be dismissed because the parties' relationship is governed by express contracts.  (D.I. 22 at 19-20; D.I. 25 at 9-10).[13]

---

[13]    In its reply, Mayne argues TherapeuticsMD's unjust enrichment claim should be dismissed as duplicative of its implied covenant of good faith claim (Count II).  (D.I. 25 at 10).  But arguments raised for the first time in a reply brief are improper and will not be considered. D. DEL. LR 7.1.3(c)(2); *see also Semcon Tech, LLC v. Micron Tech., Inc.*, C.A. No. 12-532-RGA, 2017 WL 2591945, at *3 (D. Del. June 15, 2017) ("I decline to consider this new argument raised for the first time in reply.").

TherapeuticsMD argues that dismissal is inappropriate because the unjust enrichment claim arises from different conduct than the contract claims and, further, because it is expressly pled in the alternative. (D.I. 24 at 15-16). The Court agrees with TherapeuticsMD.

In Delaware, "[i]f a contract comprehensively governs the relevant relationship between the parties, then the contract must provide the measure of the plaintiff's rights, and any claim of unjust enrichment will fail." *iBio, Inc. v. Fraunhofer USA, Inc.*, No. CV 10256-VCF, 2020 WL 5745541, at *11 (Del. Ch. Sept. 25, 2020). TherapeuticsMD is correct, however, that its unjust enrichment claim, premised on Mayne's alleged overselling demand, relies on different facts than its breach of contract claims. (*Compare* D.I. 16 ¶¶ 117-27, *with id*. ¶¶ 53-64 & 77-87). Unlike the unjust enrichment claim, the two breach of contract claims are premised on Mayne's alleged failure to provide Closing Statements every quarter and in the proper format (Count I) and Mayne's improper transfer of the NDC Labeler Code back to TherapeuticsMD after closing (Count III). Although a contract between the parties exists, that contract does not comprehensively govern the parties' relationship as to certain issues – *e.g.*, Mayne's ability to sell its inventory without regard to remaining TherapeuticsMD's inventory. TherapeuticsMD's unjust enrichment claim should be allowed to proceed in the alternative. *See Narrowstep, Inc. v. Onstream Media Corp.*, No. CIV.A. 5114-VCP, 2010 WL 5422405, at *16 (Del. Ch. Dec. 22, 2010) (declining to dismiss unjust enrichment claim because contract did not comprehensively govern the relationship between the parties as to some issues). The Court thus recommends that Mayne's motion to dismiss be denied as to Count VI.

*     *     *

The Court has recommended that most claims in the First Amended Complaint be dismissed. To the extent that TherapeuticsMD wishes to amend its pleading to cure the

22

deficiencies identified herein, it may seek leave to amend using the proper procedure for doing so. *See LabMD, Inc. v. Boback*, 47 F.4th 164, 192 (3d Cir. 2022) ("A plaintiff properly requests amendment by asking the district court for leave to amend and submitting a draft of the amended complaint, so that the court can judge whether amendment would be futile." (citation omitted)).

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that Defendant's motion to dismiss (D.I. 21) be GRANTED-IN-PART and DENIED-IN-PART. The Court recommends that the claims for breach of the implied covenant of good faith and fair dealing (Counts II & IV), breach of NDC Labeler Code agreement (Count III) and fraudulent inducement (Count V) be dismissed without prejudice.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b)(1) and District of Delaware Local Rule 72.1. Any objections to the Report and Recommendation shall be limited to ten (10) pages and filed within fourteen (14) days after being served with a copy of this Report and Recommendation. *See* FED. R. CIV. P. 72(b)(2). Any responses to the objections shall be limited to ten (10) pages and filed within fourteen (14) days after the objections. The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which is available on the court's website, https://www.ded.uscourts.gov.

Dated:  March 23, 2026

_____
UNITED STATES MAGISTRATE JUDGE