IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THERAPEUTICSMD, INC.,                )
                                     )
             Plaintiff,              )
                                     )
      v.                             )   C.A. No. 25-440-RGA
                                     )
                                     )
MAYNE PHARMA LLC,                    )
                                     )
             Defendant.              )

## MEMORANDUM ORDER

Presently before the Court is the motion of Defendant Mayne Pharma LLC ("Defendant" or "Mayne") to compel submission of certain disputes for an expert determination or, alternatively, to compel arbitration, and to stay proceedings pending a final determination.  (D.I. 8).  For the reasons set forth below, Defendant's motion to compel an expert determination is GRANTED and this action is STAYED until completion of said expert determination.[1]

## I.      BACKGROUND

Prior to December 2022, Plaintiff TherapeuticsMD, Inc. ("Plaintiff" or "TherapeuticsMD") manufactured, marketed and distributed several women's health products, including ANNOVERA®, BIJUVA®, IMVEXXY® and a portfolio of prescription prenatal vitamins. (D.I. 16 ¶ 8).  On December 4, 2022, TherapeuticsMD and Mayne entered into a Transaction Agreement and a License Agreement, under which Mayne received the exclusive rights to manufacture, market and distribute those women's health products.  (*Id.* ¶ 10; *see also* D.I. 16,

---

[1]     A motion to compel an expert determination is akin to a motion to compel arbitration, which is non-dispositive because it does "not dispose of the case, or any claim or defense found therein." *Virgin Islands Water & Power Auth. v. Gen. Elec. Int'l Inc.*, 561 F. App'x 131, 134 (3d Cir. 2014); *Barnard v. Marchex, Inc.*, C.A. No. 22-1382-RGA, 2024 WL 3439808, at *1 n.1 (D. Del. July 17, 2024).

Ex. A (Transaction Agreement)).  The transaction closed on December 30, 2022.  (D.I. 16 ¶ 55).

At closing, TherapeuticsMD halted production and sale of its branded women's health products

subject to the Agreements, and Mayne began selling the products under the Mayne brand using

pharmaceutical labels and product names licensed from TherapeuticsMD.  (*Id*. ¶¶ 13 & 14).

### A.    The Transaction Agreement

According to the terms of the Transaction Agreement, Mayne was required to pay the

"Purchase Price" and "Estimated Net Working Capital" at closing.  (D.I. 16 ¶ 19; D.I. 16, Ex. A

§ 5.1).  To arrive at the Estimated Net Working Capital, TherapeuticsMD was to provide Mayne

with a Pre-Closing Statement that contained a good faith calculation of the "Net Working Capital,"

defined as the "Current Assets and Current Liabilities" immediately prior to closing.  (D.I. 16,

Ex. A §§ 1.1 & 5.3(a)).  "Current Assets" included several positive line items, including Net

Accounts Receivable, Finished Goods Inventory and Raw Materials – API.  (D.I. 16 ¶ 21).  And

"Current Liabilities" included several negative line items, including Allowance for Returns,

Allowance for Payer Rebates and Wholesale Distributor Fees.  (*Id*.).  In other words, Mayne paid

TherapeuticsMD the Purchase Price plus its estimated assets (*e.g.*, inventory awaiting sale) minus

its estimated liabilities (*e.g.*, amounts owed to contractors) on the closing date.

Because Estimated Net Working Capital is, by definition, estimated and therefore not

necessarily reflective of final amounts due, the Transaction Agreement provided a mechanism by

which either party could be reimbursed – or "trued-up" – if the Closing Net Working Capital was

not equal to the Estimated Net Working Capital that Mayne paid TherapeuticsMD at closing.

(D.I. 16 ¶¶ 22 & 24; *see also* D.I. 16, Ex. A § 5.3).  In simplified terms, if TherapeuticsMD

overestimated the Net Working Capital at closing, then TherapeuticsMD would pay Mayne the

difference, and if TherapeuticsMD underestimated the Net Working Capital at closing, then Mayne

would pay TherapeuticsMD the difference.  (*See* D.I. 16, Ex. A §§ 5.3(f)-(g)).

In general, the Transaction Agreement provided for three true-up events to close specific Net Working Capital line items: (1) within ninety (90) days of closing for all Net Working Capital line items other than Allowance for Returns, Allowance for Payer Rebates and Wholesale Distributor Fees; (2) within one year of closing for Allowance for Payer Rebates and Wholesale Distributor Fees and (3) within two years of closing for Allowance for Returns. (D.I. 16, Ex. A § 5.3(b) (detailing 90-day true-up event); D.I. 16, Ex. B ¶ 2 (amended § 5.3(h) detailing one- and two-year true-up events)). At each true-up event, the Transaction Agreement required Mayne to provide TherapeuticsMD with Closing Statements setting forth a calculation of the Net Working Capital. (D.I. 16, Ex. A § 5.3(b); D.I. 16, Ex. B ¶ 2). According to the Agreement, the Closing Statements would become "final and binding" if TherapeuticsMD did not deliver a "Notice of Disagreement" to Mayne within thirty days of receipt. (D.I. 16, Ex. A § 5.3(b); D.I. 16, Ex. B ¶ 2).

In the event that TherapeuticsMD delivered a Notice of Disagreement, the Transaction Agreement required that the parties attempt to resolve their disagreement in good faith and in writing within thirty days of receipt. (D.I. 16, Ex. A § 5.3(c)). If no resolution was reached within the thirty-day period, the Transaction Agreement stated:

> **Purchaser and TXMD shall submit such dispute to BDO USA, LLP's National Dispute Advisory Service Practice (the "Firm")**; provided that, any representatives of the Firm associated in any way with resolving any such dispute shall not have previously provided services to the Purchaser or TXMD, for resolution of all matters which remain in dispute which were included in the Notice of Disagreement, and the Firm shall make a final determination of the Closing Net Working Capital in accordance with the terms of this Agreement (with it being understood that the parties will request that the Firm deliver to the parties its resolution in writing not more than forty five (45) Calendar Days after its engagement). The Firm shall make its determination only with respect to the matters still in dispute and, with respect to each such matter, its determination shall be within the range of the dispute between Purchaser and TXMD. The Firm's determination shall be based solely on written materials submitted by Purchaser and TXMD (*i.e.*, not on independent review)

3

and on the definitions included herein and the provisions of this Agreement. Any determinations by the Firm, and any work or analyses performed by the Firm in connection with its resolution of any dispute under this Section 5.3(c) shall not be admissible in evidence in any suit, action or other proceeding between the parties, other than to the extent necessary to enforce payment obligations under this Section 5.3.

(*Id.* (emphasis added); D.I. 16, Ex. B ¶ 2 (incorporating dispute resolution procedure of § 5.3(c) for one- and two-year true-up events)).

## B.    Current Dispute

The present dispute arises from the three Current Liabilities (line items) covered by the one- and two-year true-up events under the Transaction Agreement:  wholesale distributor fees, payer rebates and returns.  Wholesale distributor fees are fees charged by wholesalers to manufacturers for distributing their product. (*See* D.I. 16 ¶ 26).  Payer rebates are payments made by manufacturers to buyers after the drug is dispensed to a patient. (*See id.* ¶¶ 30-33).  And returns occur when drugs are sent back to the manufacturer for reasons including expiration, damage or recall.  (*See id.* ¶¶ 35-37).  As explained above, if the negative line items are greater than anticipated at closing, then the Transaction Agreement requires TherapeuticsMD to pay Mayne the difference.  (*See* D.I. 16, Ex. A § 5.3(g)).

After closing, Mayne apparently sold so much of its Mayne-branded product that the older (sooner-to-expire) TherapeuticsMD-branded product was preferentially returned at a much higher rate than the parties accounted for at closing.  (*See* D.I. 16 ¶ 43).  Mayne's alleged "over-selling market demand" caused the Allowance for Returns line item to "balloon" from the nearly $4 million estimated at closing to almost $21 million at the two-year true-up event.  (*Id.* ¶¶ 43 & 51).  The parties vehemently dispute who is responsible for the amounts due under these returns.  Neither party has submitted either the one- or two-year true-up events to BDO USA, LLP's National Dispute Advisory Service Practice ("BDO").  (*See* D.I. 16, Ex. A § 5.3(c)).

4

As to the present motion, TherapeuticsMD claims that Mayne's overselling demand for the relevant products constitutes a breach of the Transaction Agreement. In particular, TherapeuticsMD claims that Mayne breached Section 5.3(h) of the Transaction Agreement by failing to provide updated Closing Statements in the required format for payer rebates, wholesaler distributor fees and returns, thus preventing TherapeuticsMD from mitigating ballooning line items before the one- and two-year true-up events. (*See* D.I. 16 ¶¶ 59, 60, 62 & 63; *see also* D.I. 16, Ex. B ¶ 2). Next, and in the alternative, TherapeuticsMD asserts that Mayne breached the implied covenant of good faith and fair dealing by (1) "overselling demand" and thereby "caus[ing] returns of all, or nearly all, of the TXMD Inventory in the commercial channel as of the Closing Date," by (2) "accept[ing] returns of TXMD inventory that TXMD had previously rejected, disputed, or that were disallowed" and by (3) "rejecting unprocessed returns and telling distributors to collect from directly [sic] TXMD." (*Id.* ¶¶ 69-71). TherapeuticsMD also claims that Mayne fraudulently induced TherapeuticsMD into settling the Closing Net Working Capital line items covered by the first true-up event (*i.e.*, the 90-day true-up). (*See id.* ¶ 115).[2] And finally, TherapeuticsMD alleges in the alternative that Mayne was unjustly enriched by overselling demand. (*See id.* ¶¶ 119-22).

On April 8, 2025, TherapeuticsMD filed the original Complaint in this action, asserting these claims for breach of the Transaction Agreement, breach of the implied covenant of good faith and fair dealing, fraudulent inducement and unjust enrichment. (*See generally* D.I. 1).[3] On May 30, 2025, Mayne filed a motion to dismiss for failure to state a claim under Federal Rule of

---

[2]    On December 15, 2023, the parties settled their dispute concerning the line items covered by the 90-day true-up event. (D.I. 16 ¶ 17; *see also* D.I. 22, Ex. E (December 2023 Settlement Agreement)).

[3]    Unrelated to the present motion, TherapeuticsMD also asserted a claim of breach of contract relating to an NDC Labeler Code. (*See* D.I. 1 ¶¶ 58-64 (original Count II)).

Civil Procedure 12(b)(6), as well as the instant motion to compel submission of the parties' true-up disputes to an expert or to arbitration. (D.I. 8, 9, 10 & 11). On June 20, 2025, TherapeuticsMD filed the First Amended Complaint, adding factual allegations and maintaining its claims for breach of the Transaction Agreement (Count I), breach of the implied covenant of good faith and fair dealing (Count II), fraudulent inducement (Count V) and unjust enrichment (Count VI). (D.I. 16).[4] Briefing for Mayne's motion to compel concluded on July 21, 2025. (D.I. 18 & 19).

## II.    LEGAL STANDARDS

### A.    Expert Determination

Unlike arbitrations governed by the Federal Arbitration Act or state equivalent, expert determinations are governed by state contract law. *ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975, 990 (Del. Ch. 2023). Although both constitute alternative dispute resolution mechanisms, expert determinations differ from arbitrations in that they typically (1) have a narrow scope of authority, (2) are completed within a predefined and limited time period, (3) lack procedural rules and (4) are included in contracts alongside litigation or mediation provisions. *See Sapp v. Indus. Action Servs., LLC*, 75 F.4th 205, 213-14 (3d Cir. 2023). "In a typical expert determination, the authority granted to the expert is limited to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation." *Bus Air, LLC v. Woods*, C.A. No. 19-1435-RGA-CJB, 2022 WL 2666001, at *3 (D.

---

[4]    TherapeuticsMD also maintained its breach of NDC Labeler Code claim (now Count III) and added a separate claim for breach of the implied covenant of good faith and fair dealing in the alternative to its breach of NDC Labeler Code (Count IV). (D.I. 16 at ¶¶ 77-87 (breach regarding NDC labeler code); ¶¶ 88-101 (breach of implied covenant regarding NDC Labeler Code)). Counts III and IV are unrelated to the dispute regarding line items and, as such, not part of the present motion to compel.

6

Del. July 11, 2022) (cleaned up).  Unless otherwise specified, "an expert determination is not reviewable by a court."  *ArchKey*, 302 A.3d at 990.

### B.    Motion to Stay

The decision of whether to stay litigation is a matter left to the Court's discretion. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936); *see also Dentsply Int'l Inc. v. Kerr Mfg. Co.*, 734 F. Supp. 656, 658 (D. Del. 1990).  In exercising this discretion, courts typically consider and balance three factors:  (1) whether a stay will simplify the issues for trial, (2) whether discovery is complete and a trial date has been set and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party.  *See UCB, Inc. v. Hetero USA Inc.*, 277 F. Supp. 3d 687, 690 (D. Del. 2017); *see also St. Clair Intell. Prop. Consultants v. Sony Corp.*, C.A. No. 01-557-JJF, 2003 WL 25283239, at *1 (D. Del. Jan. 30, 2003).

## III.    <u>DISCUSSION</u>

Mayne seeks to compel submission of all claims relating to disputes regarding true-up events (Counts I, II, V and VI) for an expert determination or, alternatively, to compel arbitration. Mayne also seeks to stay proceedings pending a final determination by the expert or in arbitration.

### A.    Motion to Compel

#### 1.    <u>Submission to BDO for Expert Determination</u>

Mayne argues that the Transaction Agreement requires submission of the disputed matters underlying Counts I, II, V and VI to BDO.  (D.I. 9 at 7-14; D.I. 19 at 4-10).  In response, TherapeuticsMD argues that submission to BDO is merely optional and that the parties can choose to proceed directly to federal court.  (D.I. 18 at 5-17).  Although no claim asserted by TherapeuticsMD must be submitted in its entirety for expert determination, the Court agrees with

Mayne that the Transaction Agreement requires submission to BDO of the one- and two-year true-up disputes that underlie TherapeuticsMD's claims in this case.

Delaware law governs the Transaction Agreement.  (D.I. 16, Ex. A § 13.10).  "Delaware black-letter contract law advises that 'the role of a court is to effect[] the parties' intent.'" *Sapp*, 75 F.4th at 212 (alteration in original) (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)).  "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).  "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *Id*.  "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (footnotes omitted).  "Contract language is not ambiguous merely because the parties dispute what it means.  To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Id*.

According to the clear terms of the Transaction Agreement, when disputes concerning the Closing Net Working Capital arise and remain unresolved (as is true here), the parties "***shall submit*** such dispute[s] to BDO USA, LLP's National Dispute Advisory Service Practice." (D.I. 16, Ex. A § 5.3(c) (emphasis added)).  Notwithstanding this language, TherapeuticsMD maintains that the Transaction Agreement merely provides submission to BDO as an optional dispute resolution method and that Therapeutics MD can, instead, proceed directly to federal court. (*See id*. at 7 ("The parties may litigate '[a]ny claim or dispute arising out of or relating to' the Transaction Agreement. . . . Alternatively, the parties may engage in an expert for a determination of what the disputed Closing Net Working Capital line-item values are." (quoting D.I. 16, Ex. A

§ 13.10))). The Court disagrees. The disputed provision is not reasonably susceptible to the meaning TherapeuticsMD ascribes (that submission to BDO is optional) – or any meaning other than the one Mayne offers. The parties must submit to BDO their disputes concerning the Closing Net Working Capital line items. (D.I. 16, Ex. A § 5.3(c) ("[BDO] shall make a final determination of the Closing Net Working Capital in accordance with the terms of this Agreement . . . .")).

TherapeuticsMD's arguments to the contrary are unavailing. (*See* D.I. 18 at 15-17). That BDO's work, analyses and determination "shall not be admissible in evidence" does not make the dispute resolution procedure any less mandatory, particularly because the Transaction Agreement empowers the Court to enforce BDO's determination. (*See* D.I. 16, Ex. A § 5.3(c)). And as to the requirement that BDO make its determination solely on written materials submitted by the parties and "not on independent review" (*id.*), that does not mean that the process can be bypassed. (*See* D.I. 18 at 15-17). None of the cases cited by TherapeuticsMD impose an admissibility or "independent review" requirement for expert submission to be appropriate, and TherapeuticsMD overlooks that *ArchKey* enforced a similar provision that required the expert to resolve disputes "based solely on the written presentations of Purchaser and Seller and not by independent review." *ArchKey*, 302 A.3d at 996. Finally, contrary to TherapeuticsMD's suggestion (D.I. 18 at 5 n.2), BDO is not wholly disqualified from conducting the dispute resolution because the Transaction Agreement only disqualifies the particular "representatives" of BDO that performed accounting services for Mayne. (*See* D.I. 16, Ex. A § 5.3(c)).

Ultimately, the Court finds that the plain language of Section 5.3 of the Transaction Agreement requires submission of true-up disputes to BDO for resolution.

2.    Section 5.3 Mandates Expert Determination, Not Arbitration

Although both are forms of alternative dispute resolution, expert determinations and arbitrations are different undertakings. *See Sapp*, 75 F.4th at 211 (distinguishing between expert determinations and arbitrations). Here, both parties appear to agree that the dispute resolution method provided in Section 5.3(c) of the Transaction Agreement constitutes an expert determination, as opposed to an arbitration. (*See* D.I. 9 at 7 ("The Transaction Agreement contemplates that the parties' dispute would be submitted to BDO for an expert determination."); D.I. 18 at 11 ("These other available options suggest that § 5.3(c) refers to an expert determination by [BDO] and not arbitration.")). In its motion to compel, Mayne includes a request in the alternative for the Court to compel arbitration. (*See* D.I. 9 at 9-14; D.I. 19 at 4-7). Guided by the factors set forth in *Sapp*, the Court concludes that the Transaction Agreement only mandates an expert determination – not arbitration. *See Sapp*, 75 F.4th at 213-14.

Regarding the first factor, the scope of authority granted to BDO is narrow. The Transaction Agreement grants BDO authority to resolve "all matters which remain in dispute which were included in the Notice of Disagreement" for "final Determination of the Closing Net Working Capital in accordance with the terms of this Agreement." (D.I. 16, Ex. A § 5.3(c)). According to the Transaction Agreement, the Notice of Disagreement requires TherapeuticsMD to "specify[] in reasonable detail each disputed item or amount and the basis for its disagreement therewith." (D.I. 16, Ex. A at § 5.3(b)). As in *Sapp*, 75 F.4th at 213, the phrase "all matters which remain in dispute" here implies a broad grant of authority, but when read along with the phrase "included in the Notice of Disagreement," the "all matters" term is considerably narrower. Thus, the "narrow scope of authority granted to" BDO "points to an expert determination." *Id.*

10

As to the time allocated for BDO to resolve disputed matters, the Transaction Agreement requires the parties to request that BDO deliver to the parties its resolution in writing within forty-five (45) calendar days of its engagement. (D.I. 16, Ex. A at § 5.3(c)). "Such a short turnaround time suggests the independent decision maker is not an arbitrator." *Sapp*, 75 F.4th at 213 (finding 30-day deadline suggested expert determination); *Ray Beyond Corp. v. Trimaran Fund Mgmt., L.L.C.*, No. CV 2018-0497-KSJM, 2019 WL 366614, at *8 (Del. Ch. Jan. 29, 2019) (finding 20-day deadline suggested expert determination).

Next, the Transaction Agreement includes "no procedural rules that would govern the alleged arbitration." *Sapp*, 75 F.4th at 213-14 ("It contains no reference to a standard set of rules, like those of the American Arbitration Association ('AAA'), nor does it outline its own rules for selecting the decision maker, conducting discovery, submitting briefing and evidence, or holding a merits hearing."); *Cheffers v. Ideagen Software Inc.*, C.A. No. 24-866 (MN), 2025 WL 2549411, at *6 (D. Del. Sept. 4, 2025) (finding lack of procedural rules weighs in favor of expert determination); *Bus Air*, 2022 WL 2666001, at *4 ("Even though the absence of procedural rules is not dispositive, it nevertheless weighs against a finding of a clear intent to arbitrate."). This factor also weighs in favor of Section 5.3 mandating an expert determination over arbitration.

Finally, as to whether the agreement allows for other types of dispute resolution, the Transaction Agreement specifies that "[a]ny claim or dispute arising out of or relating to this Agreement shall be subject to the exclusive jurisdiction of the United States District Court for the District of Delaware, so long as it shall have subject matter jurisdiction over such claim or dispute and otherwise the state courts located in the State of Delaware." (D.I. 16, Ex. A § 13.10). "Because arbitration agreements generally govern all disputes stemming from a contract, the inclusion of a . . . litigation section . . . undermines the argument that" Section 5.3 of the Transaction Agreement

11

calls for arbitration. *Sapp*, 75 F.4th at 214; *see also Cheffers*, 2025 WL 2549411, at *6 ("This forum selection clause would have no meaning if the Court were to accept Ideagen's suggestion that the According Firm Provision mandates arbitration.").

In sum, considering all four *Sapp* factors, the Court finds that Section 5.3 of the Transaction Agreement compels an expert determination, not an arbitration.

### 3.    TherapeuticsMD's Claims Fall Within Scope of Section 5.3

Having found that Section 5.3 of the Transaction Agreement requires certain disputes to be submitted to an expert, the Court now turns to "whether Plaintiff's claims fall within 'the sort of fact-intensive and technical questions [within] . . . the expertise of an accounting expert, and the parties agreed to delegate.'" *I Am Athlete, LLC v. IM EnMotive, LLC*, No. N24C-03-280 EMD CCLD, 2024 WL 4904685, at *7 (Del. Super. Ct. Nov. 27, 2024) (alteration in original) (quoting *Dolce v. WTS Int'l, LLC*, No. 2023-0789-SKR, 2024 WL 714128, at *3 (Del. Ch. Feb. 20, 2024)); *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 617 (Del. 2023) ("[W]here an ADR provision contemplates a process other than arbitration, such as when the parties have entrusted a discrete decision to an expert, thus earning the label 'expert determination,' the court applies contract interpretation principles to determine the ADR provision's scope.").

TherapeuticsMD's alleged damages underlying Counts I, II and VI result from the three line items covered by the one- and two-year true-up events. (*See* D.I. 16 ¶¶ 61-63, 72-74 & 123; *see also* D.I. 18 at 3 ("At present, there remain three Closing Net Working Capital line items for the Parties to resolve:  Allowance for Returns, Allowance for Payer Rebates, and Wholesale Distributor Fees.")).  The parties specifically contemplated that disagreements could arise as to the line items and expressly contracted for BDO to make a "final determination of the Closing Net Working Capital in accordance with the terms of this Agreement."  (D.I. 16, Ex. A § 5.3(c)).

12

TherapeuticsMD cannot now back out of its express agreement because it no longer views this term favorably.  *See RedBird Cap. Partners Platform LP v. Concorde Parent, LP*, No. 2024-0274-SG, 2024 WL 3220350, at \*3 (Del. Ch. June 28, 2024) ("This Court enforces parties' contractual agreements, even if a party has come to believe it received a bad deal.").

Because Section 5.3 of the Transaction Agreement requires true-up disputes to be submitted to BDO, and because true-up disputes underlie TherapeuticsMD's claims here, the Court grants Mayne's motion to compel submission of those disputes to BDO.  To be clear, no claim must be submitted in its entirety for expert determination; instead, the parties' disputes regarding the line items covered by the one- and two-year true-up events must be submitted to BDO.

**B.      Motion to Stay Pending Expert Determination**

Mayne argues that submission to BDO warrants a complete stay of proceedings pending the outcome of BDO's determination.  (D.I. 9 at 14-17; D.I. 19 at 10).  TherapeuticsMD argues that if the Court grants Mayne's motion to compel submission to BDO, a stay is not warranted. (D.I. 18 at 17-19).  The Court agrees with Mayne that a stay of proceedings is appropriate here.

Regarding simplification of issues, TherapeuticsMD concedes that BDO's determination of the Closing Net Working Capital line items "may inform some aspects of trial" but argues that BDO "will not make any legal determinations and the rationales underlying its accounting calculations will be inadmissible."  (D.I. 18 at 18).  But regardless of admissibility, BDO's determination as to the Closing Net Working Capital line items will remain final.  (*See* D.I. 16, Ex. A § 5.3(c)); *see also ArchKey*, 302 A.3d at 1003 ("For purposes of that claim, the Independent Accountant's determination as to whether there were any qualifying Accounts Receivable will be binding on the parties.  The court will not revisit it.").  And resolution by BDO will answer a "key question" of this litigation – *i.e.*, the correct Closing Net Working Capital line items.  *See Cheffers*,

2025 WL 2549411, at *8 (finding expert determination by accounting firm will simply issues). Accordingly, this factor weighs in favor of a stay.

As to judicial economy achieved by a stay, TherapeuticsMD concedes that this factor weighs in favor of a stay. (*See* D.I. 18 at 18). Discovery has not begun, and no trial has been scheduled. Because neither the Court nor the parties have "already expended significant effort on the litigation," this factor therefore weighs in favor of a stay. *454 Life Scis. Corp. v. Ion Torrent Sys., Inc.*, C.A. No. 15-595-LPS, 2016 WL 6594083, at *4 (D. Del. Nov. 7, 2016); *see also Cheffers*, 2025 WL 2549411, at *8.

Finally, regarding the balance of harms, Mayne filed its motion to compel submission to BDO and to stay this litigation on the same day that it sued TherapeuticsMD in a separate action for breach of the same Transaction Agreement. *See Mayne Pharma LLC v. TherapeuticsMD, Inc.*, C.A. No. 25-670-RGA (D. Del.) ("the Second Action"). Although the Second Action relates to different provisions and different underlying facts (D.I. 19 at 10), Mayne may be seeking a tactical advantage here, as TherapeuticsMD suggests (D.I. 18 at 19). But, as discussed above, the parties specifically contracted for resolution of the line items by BDO. *See Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("Parties have a right to enter into good and bad contracts, the law enforces both."). And any prejudice to TherapeuticsMD from a stay pending that resolution is minimal, particularly because the stay will be short. (*See* D.I. 16, Ex. A § 5.3(c) (imposing forty-five (45) day deadline for BDO determination)).[5] Accordingly, the Court finds that this third factor weighs

---

[5]     TherapeuticsMD's remaining arguments are unpersuasive. (*See* D.I. 18 at 18-19). Whether the BDO resolution process is "opaque" and "will hide the facts evidencing Defendant's acts from the Court's view" does not change the fact that the parties agreed to that mandatory resolution process; a stay pending the outcome of it merely conserves resources while the process plays out. And as to Mayne's Second Action, the provisions of the Transaction Agreement at issue there do not require submission to BDO, and any short stay of these proceedings has real no impact on that litigation.

14

in favor of a stay. *See Cheffers*, 2025 WL 2549411, at *8 (no prejudice caused by stay where parties agreed to "expert determination mechanism when they executed the Merger Agreement").

Because all three factors weigh in favor of a stay, the Court will stay this action pending BDO's final determination of the disputed line items covered by the one- and two-year true-up events.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion to compel submission to BDO is GRANTED and this action is STAYED pending completion of that expert determination. IT IS FURTHER ORDERED that the parties shall submit a joint status report within one week of the expert determination concluding.

Dated:  March 23, 2026

_____
UNITED STATES MAGISTRATE JUDGE

15