IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THERAPEUTICSMD, INC.,

Plaintiff,

v.

MAYNE PHARMA LLC,

Defendant.

No. 1:25-cv-00440-CFC

**DEFENDANT MAYNE PHARMA LLC'S RESPONSE TO
PLAINTIFF'S OBJECTIONS TO THE MEMORANDUM ORDER (D.I. 33)**

Defendant Mayne Pharma LLC ("Defendant" or "Mayne") respectfully submits this response to Plaintiff TherapeuticsMD, Inc.'s ("Plaintiff" or "TXMD") objections to Magistrate Judge Tennyson's Memorandum Order (D.I. 33, referred to hereinafter as the "Order") granting Mayne's motion to compel an expert determination by accounting firm BDO and staying this case pending completion of that expert determination.

**INTRODUCTION**

This case arises out of a December 2022 Transaction Agreement under which Mayne purchased from TXMD the exclusive licenses to a portfolio of women's health products and prenatal vitamins along with associated commercialization assets, including TXMD's existing inventory of its products. Under that Transaction Agreement, Mayne paid TXMD a purchase price in addition to Estimated Net Working Capital. The Net Working Capital was "estimated" because, among other things, the ultimate disposition of the TXMD inventory would affect the calculation of Net Working Capital. The parties anticipated that Net Working Capital would be trued-up over the next two years as the TXMD Inventory was distributed, dispensed to patients, or returned. For

example, the disposition of the TXMD inventory would affect wholesale distribution fees, payer rebates, and returns, all of which would cause a decline in Net Working Capital. The Transaction Agreement contained a dispute resolution provision relating to Net Working Capital. If the parties are unable to resolve a dispute, Section 5.3(c) provides: "[Mayne] and TXMD **shall** submit such dispute to BDO USA, LLP's National Dispute Advisory Service Practice . . . for resolution of all matters which remain in dispute which were included in the Notice of Disagreement, and the Firm shall make a final determination of the Closing Net Working Capital in accordance with the terms of this Agreement . . . ." (emphasis added).

Despite this clear contractual text, TXMD has brazenly refused to move forward with the dispute resolution process it agreed to, instead choosing to assert meritless claims in this Court as part of a concerted effort to short-circuit and delay what is contractually required and inevitable: a final determination by BDO of the disputed line items for Closing Net Working Capital. The real reason that TXMD has refused to abide by the Transaction Agreement's dispute resolution process was laid bare in the motion briefing—TXMD's fear that it will be subject to a final determination by BDO that it does not like. As TXMD put it in its Answering Brief: "The solution, according to Defendant, is to take these questions to the accounting Firm, which will review written submissions and make an unappealable determination with a potentially eight figure price tag." (D.I. 18 at 6). Fear of BDO's final determination is not a valid reason for refusing to comply with a contractual obligation that TXMD bargained for, agreed to, and initiated.

At this point, Mayne's motion to compel an expert determination by BDO and to stay this case pending that determination has been pending for nine (9) months. The Magistrate Judge has issued a thorough and well-reasoned Order addressing the parties' respective arguments, granting that motion, and staying this case. TXMD's objections fail to demonstrate that the Magistrate's

Order is clearly erroneous, contrary to law, or an abuse of discretion. Instead, TXMD's objections amount to a request for this Court to adopt a different contractual interpretation—one that the Magistrate Judge has already carefully considered and correctly rejected. For the reasons set forth below, Mayne respectfully requests that the Court overrule TXMD's objections and affirm the Order.

### STANDARD OF REVIEW

The Order is a nondispositive pretrial ruling reviewed under Federal Rule of Civil Procedure 72(a) and 28 U.S.C. § 636(b)(1)(A). Under this standard, the Court may modify or set aside the Magistrate Judge's order only where it is "clearly erroneous or contrary to law." *Id.* A ruling is clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Evonik Degussa GmbH v. Materia Inc.*, 2011 WL 3707067, at *5 (D. Del. Aug. 24, 2011). A ruling is contrary to law "only when the magistrate judge has misinterpreted or misapplied the applicable law." *Evans v. John Crane, Inc.*, 2019 WL 5457101, at *6 (D. Del. Oct. 24, 2019) (internal quotation marks omitted). The Magistrate Judge's order on the motion to stay is reviewed for abuse of discretion. *Applied Biokinetics LLC v. KT Health, LLC*, 2023 WL 6387679, at *2 (D. Del. Sept. 29, 2023).

### ARGUMENT

**I.　　THE MAGISTRATE JUDGE CORRECTLY APPLIED THE PLAIN TERMS OF THE TRANSACTION AGREEMENT**

**A.　　*AN EXPERT DETERMINATION BY BDO IS MANDATORY, NOT OPTIONAL***

The Magistrate Judge's interpretation is grounded in the plain, mandatory language of Section 5.3(c), which provides that BDO "***shall*** make a final determination of the Closing Net Working Capital in accordance with the terms of this Agreement." (D.I. 16, FAC Ex. A § 5.3(c) (emphasis added)). The Magistrate Judge concluded that this provision "is not reasonably

susceptible to the meaning TherapeuticsMD ascribes (that submission to BDO is optional)—or any meaning other than the one Mayne offers." (Order at 9).

TXMD's objection argues that the Magistrate Judge selectively construed Section 5.3(c) without considering the permissive "may" language in Section 5.3(h) and the forum selection clause in Section 13.10 and "erred by reading Section 5.3(c) as taking priority over any competing or conflicting claims, such as those arising under Section 5.3(h)." (Obj. at 2, 5–9).

With respect to Section 5.3(h), the Magistrate Judge rejected TXMD's argument that an expert determination by BDO was "optional" but did not expressly cite to that specific section of the Transaction Agreement—*because TXMD did not raise this argument in its Answering Brief.* The only time Section 5.3(h) is cited or referred to in TXMD's Answering Brief is a single summary sentence explaining the factual basis for its breach of contract cause of action.  (D.I. 18 at 13) ("Count I alleges breach of § 5.3(h) of the TA based upon the format, frequency, and information associated with updated Closing Statements."). TXMD did not argue in its Answering Brief that Section 5.3(h) contradicts or somehow supplants the clear sequential dispute resolution process that is set forth in Section 5.3(c): Closing Statement, Notice of Disagreement, negotiation, and then mandatory submission to BDO. This new argument violates the Court's March 7, 2022 Standing Order for Objections Filed Under Fed. R. Civ. P. 72. "[TXMD's] failure to comply with this Court's Rule 72 Standing Order is an independent ground to overrule [TXMD's] objections." *ImmerVision, Inc. v. Apple Inc.*, 2026 WL 381744, at *3 (D. Del. Feb. 11, 2026).

Even if this Court were to entertain TXMD's new argument (which it should not), it would fail. Section 5.3, titled Net Working Capital, begins by stating: "The Estimated Net Working Capital Amount and the Final Net Working Capital Amount shall be determined as set forth below in this Section 5.3…" (D.I. 16, FAC Ex. A § 5.3). Section 5.3(h) in turn states: Final Net Working

Capital "means the Closing Net Working Capital as finally determined pursuant to this Section 5.3, as adjusted pursuant to this Section 5.3(h)." (*Id.*). Reading those provisions together makes clear that the same sequential dispute resolution mechanism outlined in Section 5.3(c) applies to true-up disputes regarding the three line-items in Section 5.3(h) (i.e., Allowance for Returns, Allowance for Wholesale Distributor Fees, and Payer Rebates). Section 5.3(h) does not create an alternative path to federal court that circumvents a final determination by BDO.

With respect to the forum selection clause in Section 13.10, TXMD argues that because the Transaction Agreement permits either party to file a lawsuit raising "[a]ny claim or dispute arising out of or relating to this Agreement" (D.I. 16, FAC Ex. A § 13.10), TXMD had an independent right to bypass the Section 5.3(c) expert determination process and proceed directly to federal court. (Obj. at 2, 5–9). The Magistrate Judge correctly rejected this argument, explaining: "TherapeuticsMD maintains that the Transaction Agreement merely provides submission to BDO as an optional dispute resolution method and that Therapeutics MD can, instead, proceed directly to federal court. The Court disagrees." (Order at 8-9) (internal citation omitted). Section 13.10 is a general forum selection clause that identifies the courts with jurisdiction over claims arising under the Transaction Agreement; it does not address, much less override, the specific dispute resolution mechanism in Section 5.3(c) for Closing Net Working Capital line items. Under longstanding Delaware principles of contract interpretation, specific provisions control over general ones. *See, e.g.*, *Advantage Sales & Mktg. LLC v. USG Companies, Inc.*, 2016 WL 2588163, at *2 (D. Del. May 4, 2016) (rejecting argument "that the parties' agreement to submit to the jurisdiction of the courts of Delaware to resolve disputes regarding the merger agreement trumps the arbitration clause," because "specific language controls over general language"). Critically, the Magistrate Judge relied on Section 13.10 for precisely the purpose it serves—as

evidence that the parties contemplated judicial resolution for some disputes, which weighed in favor of characterizing Section 5.3 as an expert determination rather than an arbitration. (Order at 11–12 (citing *Sapp v. Indus. Action Servs., LLC*, 75 F.4th 205, 214 (3d Cir. 2023); *Cheffers v. Ideagen Software Inc.*, 2025 WL 2549411, at *6 (D. Del. Sept. 4, 2025)). That is, the Magistrate Judge gave Section 13.10 its proper role in the contract's architecture: It establishes the forum for litigation, while Section 5.3 establishes the mandatory process for resolving true-up disputes before that litigation may proceed. Reading Section 13.10 as TXMD proposes—to render the Section 5.3(c) expert determination entirely optional—would effectively nullify Section 5.3(c), a result Delaware courts will not allow. *See, e.g.*, *Intercept Pharms., Inc. v. Fiorucci*, 277 F. Supp. 3d 678, 686 (D. Del. 2017) ("Delaware law states that contractual language should be interpreted in a way that gives effect to all terms, 'so as not to render any part of the contract mere surplusage.'") (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 397 (Del. 2010)).

Finally, TXMD's "priority of claims" argument—that the Transaction Agreement is "silent as to the priority of claims raised under Section 13.10 in relation to those raised under Section 5.3(c) or (h)" (Obj. at 8)—is both procedurally improper and substantively meritless. As a threshold matter, TXMD did not present this argument in its Answering Brief. TXMD instead argued broadly that the Transaction Agreement provided "at least three possible routes for dispute resolution" (D.I. 18 at 3–4), but it never framed the issue as one of "priority" between competing contractual provisions or asked the Court to determine the hierarchy among Sections 5.3(c), 5.3(h), and 13.10. This theory, raised for the first time in objections, should be rejected under the Court's March 7, 2022 Standing Order. *See Immervision*, 2026 WL 381744, at *3. On the merits, the "priority" argument fails because it rests on a false premise: The Transaction Agreement is not

"silent" on priority. As explained above, Section 5.3 establishes a specific, sequential process for resolving Closing Net Working Capital disputes—Closing Statement, Notice of Disagreement, negotiation, and then mandatory submission to BDO—and Section 5.3(c)'s use of "shall" makes that final step mandatory, not optional. Section 13.10 is a general forum selection clause; it does not create a competing pathway that overrides the specific dispute resolution mechanism in Section 5.3. There is no "silence," and the Magistrate Judge did not err by "reading new terms into the Transaction Agreement and effectively rewriting it" as TXMD claims. (Obj. at 8).

### B.    TXMD'S CLAIMS FALL WITHIN THE SCOPE OF SECTION 5.3

TXMD's contention that the Magistrate Judge concluded "without engaging in any contractual interpretation under Delaware law, that TXMD's claims in the FAC fall solely within the scope of Section 5.3(c)" (Obj. at 3) mischaracterizes the Order. The Magistrate Judge devoted several pages to careful contractual analysis, applying the framework established by the Delaware Supreme Court in *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 617 (Del. 2023), which directs courts to use "contract interpretation principles to determine the ADR provision's scope" when an ADR provision contemplates expert determination rather than arbitration. (Order at 12–13). The Magistrate Judge then examined whether TXMD's claims involve "the sort of fact-intensive and technical questions" delegated to BDO, citing *I Am Athlete, LLC v. IM EnMotive, LLC*, 2024 WL 4904685, at *7 (Del. Super. Ct. Nov. 27, 2024), and *Dolce v. WTS Int'l, LLC*, 2024 WL 714128, at *3 (Del. Ch. Feb. 20, 2024). (Order at 12). The conclusion was straightforward: TXMD's own FAC and Answering Brief concede that the alleged damages underlying Counts I, II, and VI "result from the three line items covered by the one- and two-year true-up events"—the Allowance for Returns, Allowance for Payer Rebates, and Wholesale Distributor Fees—which are precisely the Closing Net Working Capital line items the parties contracted for BDO to determine. (Order at 12–13; *see also* D.I. 18 at 3 ("At present, there remain three Closing Net Working Capital

- 7 -

line items for the Parties to resolve: Allowance for Returns, Allowance for Payer Rebates, and Wholesale Distributor Fees.")). Importantly, the Magistrate Judge did not hold that TXMD's claims must be submitted in their entirety for expert determination; rather, the Order carefully distinguished between the legal claims (which remain before this Court) and the underlying line-item disputes (which must go to BDO). (Order at 13 ("To be clear, no claim must be submitted in its entirety for expert determination; instead, the parties' disputes regarding the line items covered by the one- and two-year true-up events must be submitted to BDO.")). This is precisely the kind of nuanced contractual analysis Delaware law requires. TXMD's real objection is not that the Magistrate Judge failed to engage in contractual interpretation but that the Magistrate Judge reached a conclusion TXMD does not like—that the plain language of the contract it negotiated and signed requires submission of these discrete accounting disputes to the expert the parties themselves selected. That disagreement does not demonstrate that the Magistrate Judge's well-reasoned analysis was clearly erroneous or contrary to law.

## II. THE MAGISTRATE JUDGE DID NOT ABUSE HER DISCRETION IN ORDERING A STAY

TXMD's objection to the Magistrate's order staying this case does not demonstrate any abuse of discretion.[1] Rather, TXMD merely protests that an asymmetric stay—where TXMD's case is stayed while Mayne's case proceeds—is unfair. But the Magistrate Judge expressly addressed the relationship between the two actions, noting in footnote 5 of the Order that "the

---

[1] In addition to complaining of the asymmetric stay, TXMD recycles the exact same arguments that it made in its Answering Brief, namely that (1) the Closing Statement information Mayne sent to TXMD is allegedly "deficient and incomplete," and (2) BDO's final determination will be "inadmissible at trial." (Obj. at 10). Each of these arguments was considered and rejected by the Magistrate Judge, who soundly reasoned that "regardless of admissibility, BDO's determination as to the Closing Net Working Capital line items will remain final" and "will answer a 'key question' of this litigation – *i.e.*, the correct Closing Net Working Capital line items." (Order at 13-14).

- 9 -

provisions of the Transaction Agreement at issue [in the Mayne case] do not require submission to BDO, and any short stay of these proceedings has real no [sic] impact on that litigation." (Order at 14 n.5). The decision to stay only TXMD's case was deliberate and well-reasoned—the two cases involve different facts, giving rise to different claims arising under different contract provisions, and governed by different dispute resolution mechanisms.

TXMD's position is also internally inconsistent: TXMD simultaneously argues here (in the TXMD case) that the stay is prejudicial and should be overturned (Obj. at 10), while arguing in the Mayne case that the Court should impose an additional stay on Mayne's claims (Case No. 1:25-cv-00670, D.I. 23 at 5). TXMD cannot have it both ways. What TXMD seeks is not the elimination of stays but the strategic reallocation of them—its own case proceeding while Mayne's case is delayed. That is not a principled argument but instead gamesmanship that should be rejected.

## CONCLUSION

For the foregoing reasons, Mayne respectfully requests that the Court overrule TXMD's objections and affirm the Magistrate Judge's Memorandum Order in its entirety.

**Dated**: April 20, 2026

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

/s/ S. Mark Hurd
S. Mark Hurd (#3297)

ARNOLD & PORTER KAYE
  SCHOLER LLP
Aaron F. Miner (*pro hac vice*)
Matthew F. Medina (*pro hac vice*)
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
aaron.miner@arnoldporter.com
matthew.medina@arnoldporter.com

Jacob M. Perrone (#7250)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
shurd@morrisnichols.com
jperrone@morrisnichols.com

*Attorneys for Defendant Mayne Pharma LLC*

- 10 -